UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X

PAUL SPINELLI, SCOTT BOEHM, PAUL
JASIENSKI, GEORGE NEWMAN LOWRANCE, DAVID
STLUKA, DAVID DRAPKIN, and THOMAS E.
WITTE,

                      Plaintiffs,

    - against -

NATIONAL FOOTBALL LEAGUE, NFL PROPERTIES,
LLC, NFL VENTURES, L.P., NFL PRODUCTIONS,
LLC, NFL ENTERPRISES, LLC, REPLAY PHOTOS,
LLC, GETTY IMAGES (US), INC., ASSOCIATED
PRESS, ARIZONA CARDINALS HOLDINGS, INC.,
ATLANTA FALCONS FOOTBALL CLUB LLC,
BALTIMORE RAVENS LIMITED PARTNERSHIP,
BUFFALO BILLS, INC., PANTHERS FOOTBALL
LLC, CHICAGO BEARS FOOTBALL CLUB, INC.,
CINCINNATI BENGALS, INC., CLEVELAND
BROWNS LLC, DALLAS COWBOYS FOOTBALL CLUB,
DENVER BRONCOS FOOTBALL CLUB, DETROIT
LIONS, INC., GREEN BAY PACKERS, INC.,
HOUSTON NFL HOLDINGS LP, INDIANAPOLIS
COLTS, INC., JACKSONVILLE JAGUARS LTD.,
KANSAS CITY CHIEFS FOOTBALL CLUB, INC.,
MIAMI DOLPHINS, LTD., MINNESOTA VIKINGS
FOOTBALL CLUB LLC, NEW ENGLAND PATRIOTS,
LP, NEW ORLEANS LOUISIANA SAINTS, LLC,
NEW YORK FOOTBALL GIANTS, INC., NEW YORK
JETS FOOTBALL CLUB, INC., OAKLAND RAIDERS
LP, PHILADELPHIA EAGLES FOOTBALL CLUB,
INC., PITTSBURGH STEELERS SPORTS, INC.,
SAN DIEGO CHARGERS FOOTBALL CO., SAN
FRANCISCO FORTY NINERS LTD., FOOTBALL
NORTHWEST LLC, THE RAMS FOOTBALL CO. LLC,
BUCCANEERS LIMITED PARTNERSHIP, TENNESSEE
FOOTBALL, INC., and WASHINGTON FOOTBALL
INC.,

                    Defendants.
----------------------------------------X

13 Civ. 7398 (RWS)

<u>REDACTED OPINION</u>*

---

\* The initial Opinion was filed under seal to protect any confidential
information asserted by the parties.

A P P E A R A N C E S :


    <u>Attorneys for the Plaintiffs</u>

    NELSON & MCCULLOCH LLP
    155 East 56th Street
    New York, NY 10022
    By:  Danial A. Nelson, Esq.
        Kevin Patrick McCulloch, Esq.


    <u>Attorneys for the Defendants</u>

    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
    Four Times Square
    42nd Floor
    New York, NY 10036
    By:  Jeffrey A. Mishkin, Esq.
        Anthony Joseph Dreyer, Esq.
        Jordan Adam Feirman, Esq.
        Karen Hoffman Lent, Esq.

    WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
    1133 Westchester Avenue
    White Plains, NY 10604
    By:  Jura Christine Zibas, Esq.
        Jana A. Slavina, Esq.

    WEIL, GOTSHAL & MANGES LLP
    767 Fifth Avenue
    25th Floor
    New York, NY 10153
    By:  Bruce S. Meyer, Esq.

    DLA PIPER US LLP
    1251 Avenue of the Americas
    New York, NY 10020
    By:  Andrew Lawrence Deutsch, Esq.
        Marc Evan Miller, Esq.
        Paolo Morante, Esq.
        Tamar Y. Duvdevani, Esq.

**Sweet, D.J.**

There are several motions currently pending in this action between plaintiffs Paul Spinelli, Scott Boehm, Paul Jasienski, George Newman Lowrance, David Stluka, David Drapkin, and Thomas E. Witte ("Plaintiffs") and defendants National Football League ("NFL"), NFL Properties, LLC, ("NFLP"), NFL Ventures, L.P., NFL Productions, LLC, NFL Enterprises, LLC (together with NFL, NFLP, NFL Ventures, L.P, and NFL Productions, "NFL Entities"), Arizona Cardinals Holdings, Inc., Atlanta Falcons Football Club LLC, Baltimore Ravens Limited Partnership, Buffalo Bills, Inc., Panthers Football LLC, Chicago Bears Football Club, Inc., Cincinnati Bengals, Inc., Cleveland Browns LLC, Dallas Cowboys Football Club, Denver Broncos Football Club, Detroit Lions, Inc., Green Bay Packers, Inc., Houston NFL Holdings LP, Indianapolis Colts, Inc., Jacksonville Jaguars Ltd., Kansas City Chiefs Football Club, Inc., Miami Dolphins, Ltd., Minnesota Vikings Football Club LLC, New England Patriots, LP, New Orleans Louisiana Saints, LLC, New York Football Giants, Inc., New York Jets Football Club, Inc., Oakland Raiders LP, Philadelphia Eagles Football Club, Inc., Pittsburgh Steelers Sports, Inc., San Diego Chargers Football Co., San Francisco Forty Niners Ltd., Football Northwest LLC, The Rams Football Co. LLC, Buccaneers Limited Partnership,

Tennessee Football, Inc., and Washington Football Inc. (Arizona Cardinal Holdings, Inc. through Washington Football Inc., "NFL Clubs," and together with NFL Entities, "NFL Defendants"), Replay Photos, LLC ("Replay"), Getty Images (US), Inc. ("Getty"), and Associated Press ("AP," together with NFL Defendants, Replay, and Getty, "Defendants").

NFL Defendants, Replay and AP have moved to dismiss the amended complaint (the "AC").  Getty has moved to dismiss the AC and compel arbitration, or stay the action as to Getty.

For the reasons set forth below, NFL Defendants', Replays', and AP's motions to dismiss, and Getty's motion to compel arbitration, are granted.

**Prior Proceedings**

Plaintiffs filed their initial complaint ("Complaint") against the NFL Entities, Replay, Getty, and AP on October 21, 2013.  On December 16, 2013, Getty moved to dismiss or, in the alternative, to stay the action as against it based on arbitration clauses contained within contracts at issue in this dispute.  (See Dkt. Nos. 21, 22, 24.)  At the same time, Getty filed a demand for arbitration with the American Arbitration

Association ("AAA").  (See Bloom Decl. Ex. A.)  On December 18, 2013, AP and the NFL Entities, and on December 26, 2013, Replay filed motions to dismiss the complaint.

On February 12, 2014, in lieu of opposing Defendants' motions to dismiss, Plaintiffs filed the AC against all currently named Defendants.  (See Dkt. No. 42.)  On March 31, 2014, Defendants renewed their motions to dismiss.  (Dkt. No. 51.)  Getty and Plaintiffs have agreed to hold the arbitration proceeding in abeyance pending resolution of Getty's motion to compel arbitration.  (See Bloom Decl. Ex. B.)

The instant motions were heard and marked fully submitted on October 1, 2014.  Subsequently, and while the motions to dismiss have been pending, motions to stay discovery were filed by Defendants and granted by the Court.  (See Dkt. Nos. 99, 100.)

**Facts**

The following facts are taken from the Plaintiffs AC, which are taken to be true for the purposes of disposing of the instant motions, and the terms of certain agreements either

directly referenced by Plaintiffs or integral to the AC.[1]

Plaintiffs are seven "professional photographers who make their living taking and licensing sports-related photographs, including but not limited to content related to [NFL] practices, games, functions, and other events."  (AC ¶ 1.)

Plaintiffs, collectively, have photographed "hundreds, if not thousands" of NFL and NFL Club games, practices and events, and have taken "literally hundreds of thousands of NFL-

---

[1] Plaintiffs argue specifically that the Second AP Agreement and the Replay Agreement (defined below) should not be considered because Plaintiffs are not parties to the agreements, had no possession of the agreements, and had no "direct knowledge of the terms of these agreements." (Pls.' Opp'n to AP Mot. 15.)  However, courts may consider documents on a motion to dismiss, even if not incorporated by reference in a complaint, "where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint.  DiFolco v. MSNBC Cable LLC, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted); see also Chamberlain v. City of White Plains, 986 F. Supp. 2d 363 (S.D.N.Y. 2013) (On a motion to dismiss, the Court may consider documents that are "integral" to Plaintiffs' AC, that is, documents "upon the terms and effect of which the complaint relies heavily . . . ."). The AC refers to and relies on these agreements (see AC ¶¶ 20, 25-26, 27, 28, 38, 54, 79, 92, 116, 136, 138, 139, 140, 141, 157, 166, 175, 181), the agreements were discussed and quoted in NFL's initial unredacted motion to dismiss (see Dkt. No. 30) and copies of these two agreements were attached as exhibits to the declaration of Andrew L. Deutsch (see Deutsch Decl. Exs. A-D) in support of AP's first motion to dismiss Plaintiffs' Complaint.  See Chambers v. Time Warner, Inc., 282 F.3d 147, 153-54 & n. 4 (2d Cir. 2002) (contracts properly considered on Rule 12(b)(6) motion where "the Amended Complaint [was] replete with references to the contracts" and requested adjudication related to their terms); see also Feinman v. Schulman Berlin & David, 677 F. Supp. 168, 170 n. 3 (S.D.N.Y. 1988) (finding document referred to in complaint, but not identified by name, incorporated by reference).  The Court "need not credit . . . characterizations presented as factual allegations," In re Livent, Inc. Noteholders Securities Litig., 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001), or "accept as true an allegation that is contradicted by documents on which the complaint relies," In re Elan Corp. Securities Litig., 543 F. Supp. 2d 187, 206 (S.D.N.Y. 2008) (quoting In re Bristol-Myers Squibb Sec. Litig., 312 F. Supp. 2d 549, 555 (S.D.N.Y. 2004)).

related photographs." (AC ¶ 31.)  Among these photographs,

Plaintiffs allege there are "tens of thousands of photos . . .

that do[] not include any marks, logos, or other intellectual

property owned by the NFL Entities."[2]  (AC ¶¶ 34-35.)


The NFL has collectively licensed and protected NFL

and NFL Club trademarks, including names, nicknames, logos,

colors, designs, slogans, symbols, and other identifying indicia

for decades.  (See AC ¶¶ 44-45; NFL Def.'s Mot. 7)  ███████  NFL

and NFL Clubs, ██████████████████████████████████

provided NFL with exclusive licensing rights for certain

business operations ██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████

██████████████████████████


Prior to 2004, NFL maintained an in-house department

that directly licensed the rights to NFL-related photographs.

(AC ¶¶ 44-46.)  For many years, Plaintiffs obtained media

credentials – either through their agents, Getty and AP, or

---

[2] "NFL Entities," as defined in the AC, refers to the same entities defined
herein by the same abbreviation.

directly from the NFL Clubs via the NFL's in-house department,
NFL Photos, to photograph events for the NFL and individual NFL
Clubs.  (AC ¶ 30.)[3]

In July 2004, NFL — through NFLP — entered into a
five-year licensing agreement with Getty ("Getty Agreement"),
whereby Getty acquired rights to license photographs of NFL
content to: (i) NFL business partners (including sponsors and
licensees of the NFL, and other NFL-approved companies) for
commercial uses; and (ii) media organizations for editorial
uses.  (Getty Agreement ███████████; see also AC ¶ 46.)  The
rights granted under the Getty Agreement covered a "worldwide"
territory (Getty Agreement ███), and became exclusive in 2007
when Getty acquired WireImage, another stock photography agency.
(AC ¶ 46.)

Among the images covered by the Getty Agreement were
photographs in which Getty owned the copyrights (Getty Agreement
██████), and photographs from independent contributors such
as Plaintiffs ("Contributor Photographs"), ████████████
████████████████████████████████████████████████████

---

[3] Plaintiffs allege that they primarily photographed NFL events and games
under "speculation agreements," or "on spec," meaning that instead of being
paid flat fees for their work they retained ownership of the copyrights in
the photos that they took during an event and then earned income by licensing
their photos. (AC ¶ 32.)  Plaintiffs note that this action only involve those
photos that Plaintiffs created on spec.  (AC ¶ 33.)

██████████ (Getty Agreement ██████████████████)
██████████████████████, Getty had entered into
agreements with each of the Plaintiffs ("Getty Contributor
Agreements"), pursuant to which Plaintiffs became contributing
photographers for Getty, and Getty received the right to license
Plaintiffs' works, including NFL photographs.  (AC ¶ 47.)

        The Getty Agreement authorized "NFL Entities" —
defined to include the NFL (and its affiliates, subsidiaries,
and successors in interest), and NFL Clubs (Getty Agreement ██)
— to make royalty-free use of photographs owned by Getty for a
wide variety of uses, including:



(<u>Id.</u>)  The right of NFL Entities to make such uses extended to
Contributor Photographs, ██████████████████████
█████████████████████████████████████████████
██████████ (Getty Agreement ████)  Plaintiffs each

submitted images to Getty of NFL games and other NFL-related matters pursuant to the Getty Contributor Agreements.  (AC ¶ 47.)

Plaintiffs allege that "[d]espite the fundamental obligations to license Plaintiffs' works . . . Getty . . . granted the NFL nearly unfettered access to Plaintiffs' photo collections and, either expressly or by inaction, allowed the NFL to make free or 'complimentary' use of Plaintiffs' copyrights photos."  (AC ¶ 72.)  Plaintiffs further allege that Getty "lacked authority to grant such unfettered usage rights or complimentary and indefinite use licenses to the NFL without obtaining separate and express permission from Plaintiffs for each such 'complimentary' license or use," (AC ¶ 77) and that the Getty Contributor Agreements "precluded Getty . . . from granting usage rights at no cost and Getty['s] . . . own standard terms and conditions for usage licenses pertaining to its Rights Managed collections photos prohibited such use."  (AC ¶ 78.)]

The Getty Agreement expired on March 31, 2009.  (Getty Agreement ███ )

In 2009, "[NFLP] entertained bids for exclusive

commercial licensing rights for NFL and NFL Club photos and eventually selected AP to be the sole commercial licensor [of] such photographs." (AC ¶¶ 26, 54.) Under the resulting agreement (the "First AP Agreement"), AP became the NFLP's exclusive agent and distributor for licensing commercial uses of images of NFL content to NFL business partners, and a non-exclusive agent for licensing editorial uses of those images. (First AP Agreement █.) As a direct consequence of the switch to AP, Plaintiffs allege they lost their ability to sell higher-value commercial licenses (as opposed to editorial licenses) through Getty and thus were forced to transition their entire NFL collections to AP if they wished to continue offering commercial licenses for their NFL content. (AC ¶ 55.)

Plaintiffs also allege that because they owned the copyrights and licenses for other non-NFL sports-related content, and Getty had exclusive licensing deals and/or significant licensing partnerships with other sports entities, such as Major League Baseball and National Collegiate Athletic Association, they were presented with an "impossible choice." (AC ¶¶ 56, 58.) Getty, Plaintiffs allege, threatened to remove Plaintiffs' other sports content from its distribution networks and/or terminate its relationship with Plaintiffs entirely if they did not agree to continue licensing their NFL content

through Getty even after its commercial licensing deal with the
NFL expired, and made it clear that it would not "welcome back"
any contributors who moved their NFL content to AP should Getty
ever regain the rights to license NFL content in the future.
(AC ¶ 57.)  Because certain Plaintiffs had significant non-NFL
content at Getty, Getty's position forced Plaintiffs to choose
between losing commercial licensing opportunities for their NFL
content by not going to AP or giving up commercial licensing
opportunities for their non-NFL content by leaving Getty.  (AC ¶
58.)

Five of the Plaintiffs, Jasienski, Stluka, Spinelli,
Witte, and Drapkin, ended their relationships with Getty (AC ¶
62), entered into license agreements with AP ("AP Contributor
Agreements"), and transferred their existing images of NFL
content from Getty to the AP photo library.  (AC ¶ 59.)
Subsequently, Plaintiffs Lowrance and Boehm entered into license
agreements with AP and moved their NFL images from Getty to AP.
(AC ¶ 62.)  As a result of terminating their relationships with
Getty, Plaintiffs allege that they have lost significant revenue
due to the loss of licensing opportunities for their non-NFL
content.  (AC ¶ 63.)

The First AP Agreement encompassed the use and

10

licensing of images in which AP owned copyrights (First AP

Agreement ████ ), as well as Contributor Photographs ██████

███████████████████████████████████████████ (First AP Agreement █

████████ ).   The First AP Agreement covered a "worldwide"

territory (First AP Agreement ████ ), and authorized the NFL (and

its affiliates, subsidiaries, and successors) and NFL Clubs to

make a wide range of editorial, charitable, and marketing uses

of photographs owned by AP on a royalty-free basis.   (First AP

Agreement ████ )


When the First AP Agreement expired, "[NFLP] again

entertained bids for the exclusive commercial licensing rights

for NFL and NFL Club photos and eventually renewed its agreement

with AP."   (AC ¶ 27.)   AP and the NFL thus entered into a new

license agreement, with a term from April 1, 2012 through March

31, 2015 (the "Second AP Agreement").   (Second AP Agreement █

██ )   The Second AP Agreement, while not identical to the First

AP Agreement, states that AP is: (i) the "exclusive" and

"worldwide agent and distributor" for licensing commercial uses

of NFL photographs to NFL business partners (Second AP Agreement

████ ); and (ii) a non-exclusive worldwide agent and

distributor for licensing editorial uses.   (Second AP Agreement

████ .)

The Second AP Agreement permits "NFL Entities," i.e.,
NFL (and its affiliates, subsidiaries, and successors) and the
NFL Clubs, to make royalty-free use of AP-owned and Contributor
Photographs for a wide range of editorial, charitable, and
marketing uses, including:



(Second AP Agreement ████ .)  The Second AP Agreement expressly
authorizes the foregoing uses of photographs by the NFL and NFL
Clubs from April 1, 2009 through the end of the agreement's
term.  (Id.)


Plaintiffs allege that at one time they contacted the
NFL to "demand that it cease and desist using their copyrighted
works without permission and without paying the requisite
licensing fees."  (AC ¶ 83.)  The NFL responded that the First
AP Agreement included an express license that allowed
complimentary use of any NFL-related photos licensed by AP.

(Id.)  Plaintiffs then contacted AP regarding the NFL's response and contend that AP denied the NFL's claim and "assured Plaintiffs that not only did the [First AP Agreement] . . . not include such a license, but the AP was currently renegotiating its agreement with the NFL to address the widespread misuse of photos by the NFL."  (AC ¶ 84.)  Subsequently, AP granted NFL a license that was "Royalty Free" and "retroactive" to 2009, which Plaintiffs contend was granted due to "threats and coercive pressure by the NFL, including the threat of moving its exclusive license back to Getty . . ., which also had submitted a bid to reacquire the NFL's business."  (AC ¶ 86.)

Plaintiffs allege that despite repeated cease and desist demands, the NFL Defendants continue to use thousands of Plaintiffs' photographic works to promote the NFL's brand, sell-NFL related products, and "enhance the NFL's image" in order to generate revenue both as an independent entity and on behalf of the NFL Clubs.  (AC ¶ 98.)  To that end, Plaintiffs allege that NFL permits visitors to NFL.com to access large resolution copies of Plaintiffs' photos "without appropriate copyright management information or protection against illegal copying," as well as "encourage[] visitor to 'tweet' on Twitter.com or 'share' on Facebook.com copies of Plaintiffs' works."  (AC ¶ 111.)

Plaintiffs allege that if it were not for "the NFL's illegal efforts to control the commercial licensing market for NFL-related stock photos, Plaintiffs' licensing agents would not have been forced to purportedly grant the NFL 'complimentary' usage of Plaintiffs' photos . . . [and], [i]nstead . . ., Plaintiffs' agents could have negotiated licensing agreements with individual NFL [Clubs] on better terms and/or Plaintiffs could have negotiated agreements with other licensing agents that precluded such unfair and inequitable terms." (AC ¶ 148.)

Effective as of April 1, 2012, AP entered into an "NFL Photo Store Services and License Agreement" with Replay ("Replay Agreement"), under which Replay agreed to operate the "NFL Photo Store" for AP and fulfill customer orders. (Replay Agreement; AC ¶ 114 ("AP and Replay . . . also sell copies of photographs directly to consumers through the NFL Photo Store.").) Plaintiffs allege that Replay is an online retailer that specializes in selling sports-related photographs, and that owns and operates the website located at www.replayphotos.com. (AC ¶ 19.) Plaintiffs contend that Replay "infringed Plaintiffs' copyrights by copying, publishing, displaying, exporting, and otherwise using and exploiting photographic works to which Plaintiffs own all copyrights without a valid license." (AC ¶ 166.) Plaintiffs further allege that AP requested that

14

Plaintiffs agree to amendments in their contributor agreements to allow such sales and Plaintiffs expressly rejected AP's request. (AC ¶ 116.)

The AC sets forth seven counts: Count I alleges violations of the Sherman Act against NFL Defendants, Getty, and AP for conspiring to "restrain trade" through exclusive licensing agreements (AC ¶¶ 122-59); Count II alleges copyright infringement against all Defendants (AC ¶¶ 160-200); Counts III through VI allege vicarious copyright infringement, contributory copyright infringement, breach of contract, and breach of fiduciary duties against Getty and AP (AC ¶¶ 201-46); and Count VII alleges unjust enrichment against all Defendants (AC ¶¶ 247-55).

**The Contributor Agreements**

Central to the success of Plaintiffs' claims are the Getty Contributor Agreements and the AP Contributor Agreements. As such, the relevant terms of each will be briefly outlined below.

15

**1. The Getty Contributor Agreements**[4]

Each of the Getty Contributor Agreements requires arbitration of any disputes arising in connection with the agreements.  Specifically, Section 9.5 of the Lowrance Agreement provides that "[a]ny dispute arising out of or in connection with the Agreement shall be finally settled under the Commercial Rules of the [AAA] or International Chamber of Commerce ('ICC') . . . ."  (Lowrance Getty Contributor Agreement § 9.5.)  In virtually identical language, Section 11.8 of the Getty Images Standard Terms and Conditions, which is incorporated into the remaining six Getty Contributor Agreements, provides that "[a]ny dispute arising out of or in connection with the Brand Agreement shall be finally settled under the Commercial Rules of the [AAA] or [ICC] . . . ."  (See Lindquist Decl. Exs. B-G.)

**2. The AP Contributor Agreements**

a. The Relationship Between the Parties

The AP Contributor Agreements are all governed by New

---

[4] Discussion of the Getty Contributor Agreements is limited to the terms relevant to Getty's motion to compel arbitration.

York law.[5]  (AP Contributor Agreements § 10.)  Each of the

Plaintiffs agrees to "provide contributing photography services

to AP."  (Id. § 1 or § 1.1.)  AP agrees to use commercially

reasonable efforts to assign each Plaintiff to cover NFL events

and to obtain NFL credentials for that photographer to permit

him to take photographs at the NFL events. (Id., §§ 2 or 2.2-

2.3).  Each Plaintiff agrees to make a selection of photos from

the event available to AP, and AP agrees to review these photos

and reasonably limit the rejection of tendered photos.  (Id., §§

3 or 3.1-3.4).


        While each Plaintiff retains copyright in his photos,

he provides a broad copyright license to AP in all of his photos

that are not rejected by AP.  (AP Contributor Agreements, § 4 or

§4.2).  In exchange for the license, AP agrees to pay royalties

to each Plaintiff for certain sublicenses that AP grants to

third parties.  (Id., §§ 5.1-5.2).  Either AP or the Plaintiff

is entitled to terminate an AP Contributor Agreement, with or

without cause, upon thirty days written notice.  (Id., §§ 7 or

7.1).  Obligations under the license section of the AP

---

[5] "AP Contributor Agreements" as used herein collectively refers to all the AP
Contributor Agreements between AP and Plaintiffs.  Terms are substantially
the same across AP Contributor Agreements, although in some AP Contributor
Agreements, the terms are divided only by section numbers, while in others,
section and subsection numbers are used.  Citations reference both section
and subsection numbers.  References to a specific AP Contributor Agreement
are prefaced by the particular Plaintiff's name.

Contributor Agreements survive termination.  (Id.)

In the AP Contributor Agreements, each Plaintiff agrees that he is an independent contractor to AP and that he has no agency relationship with AP:

> Photographer shall be acting as an independent contractor and shall not represent himself or herself as an employee of AP, but only as an independent contractor. . . . Neither the making of this Agreement nor the performance of its provisions shall be construed to constitute either Party an agent, partner, joint venture, employee or legal representative of the other Party.

(AP Contributor Agreements, §1 or §1.3.)

### b. The License Provisions

Section 4 of each AP Contributor Agreement, with slight variation, contains a broad license to AP of the photographer's rights in his photos, which grants AP the right to copy, disseminate and otherwise use those photos, and permits AP to transfer and sublicense all these rights to "other entities":

> Photographer hereby provides to AP a perpetual, irrevocable, transferable, worldwide, right and license to reproduce, edit, translate the caption of, prepare derivative works of, publicly perform, publicly display, load into computer

18

> memory, cache, store and otherwise use the Event
> Photos and to transfer or sublicense these rights
> to other entities.  With respect to NFL Event
> Photos taken at NFL Events for which AP directly
> or indirectly arranges for Photographer to obtain
> a credential, the foregoing rights shall be
> exclusive for so long as the NFL (or one of its
> affiliates) confers to AP (or one of its
> affiliates) the exclusive rights to operate as an
> NFL commercial use licensing agent, and non-
> exclusive thereafter.  With respect to all other
> Event Photos, the foregoing rights shall be non-
> exclusive.  AP shall present the Event Photos
> through AP's image database currently known as
> "AP Images" and other image databases at AP's
> discretion.[6]

(Boehm and Drapkin AP Contributor Agreements § 4.2.)

> Subject to Section 7.1, Photographer hereby
> provides to AP a perpetual, irrevocable,
> transferable, worldwide, right and license to
> reproduce, edit, translate the caption of,
> prepare derivative works of, publicly perform,
> publicly display, load into computer memory,
> cache, store and otherwise use the Final Photos
> and to transfer or sublicense these rights to
> other entities.  With respect to NFL Event Photos
> taken at NFL Events for which AP directly or
> indirectly arranges for Photographer to obtain a
> credential, the foregoing rights shall be
> exclusive for so long as the NFL (or one of its
> affiliates) confers to AP (or one of its
> affiliates) the exclusive rights to operate as an
> NFL commercial use licensing agent, and non-

---

[6] "Event Photos" are defined as the photographs taken by the contributor at an "Event," which have been selected by the contributor as his best photographs taken at the Event ("Best Cut Photos") (AP Contributor Agreements § 3.1) and which AP has not rejected. (Id. §3.4).  "NFL Event Photos" are Event Photos taken at "NFL Events," which are Events credentialed, promoted, sponsored or requested by the NFL, its affiliates, and its member clubs. (Id.)  Some AP Contributor Agreements also use the term "Final Photos," which refer to the contributor's Event Photos together with his "Archival Event Photos" (photos taken by the contributor at NFL games prior to the effective date of the AP Contributor Agreement). (Id. § 3.2.1.)

> exclusive thereafter.  With respect to all other
> Event Photos and the Archival Event Photos, the
> foregoing rights shall be non-exclusive.  AP
> shall present the Final Photos through AP's image
> database currently known as "AP Images" (the "AP
> Images Platform") and other image databases at
> AP's discretion.

(Spinelli, Stluka, Witte and Jasienski AP Contributor Agreements

§ 4.2.)

> Photographer hereby provides to AP a non-
> exclusive, transferable, perpetual, irrevocable,
> worldwide right and license to reproduce, edit,
> translate the caption of, prepare derivative
> works of, publicly perform, publicly display,
> load into computer memory, cache, store and
> otherwise use the Event Photos and to transfer or
> sublicense these rights to other entities.  AP
> shall present the Final Photos through AP's image
> database currently known as "AP Images" and other
> image databases at AP's discretion.

(Lowrance AP Contributor Agreement § 4.2)


     In all but Lowrance's AP Contributor Agreement, the

photographer has granted AP an exclusive license for NFL Event

Photos taken by him at an NFL event where AP directly or

indirectly arranges for the photographer to be credentialed for

the event.  The license is to be exclusive for the period of

time that AP remains the NFL's exclusive licensing agent, and is

non-exclusive thereafter.  The Lowrance AP Contributor Agreement

grants AP the same broad rights as the other AP Contributor

20

Agreements, but on a non-exclusive basis.  As with the other AP
Contributor Agreements, the Lowrance Contributor Agreement
expressly authorizes AP to transfer and sublicense to other
entities to the full extent of AP's own license rights.


   c. The Royalty Provisions


        Each of the AP Contributor Agreements sets forth AP's
agreement to pay royalties to the contributor, "[i]n exchange
for the license granted in Section 4."  The Boehm, Drapkin, and
Lowrance Agreements require AP to pay the photographer a royalty
equal to a defined percentage of "Net Revenue" on "qualifying
Event Photo Sales."  "Event Photo Sales" are defined as
"mean[ing] only the a la carte sale of licenses for Event Photos
through AP's online database service, currently known as 'AP
Images.'"  "A la carte sales" are further defined as "the sale
of licenses for individual photos for which a per-image price is
established."  "Net Revenue" is defined as "all cash actually
collected by AP from the sale of copies of a particular Event
Photo, less sales commission."  The AP Contributor Agreements
also recognize that AP may offer the Event Photos for a la carte
sale at a "bulk rate" which may include the photographs of
photographers other than the contributor.  In such a case, to
determine royalties, AP is to apportion the cash received on an

equal pro-rata basis across all photos included in the a la carte bulk rate.  (AP Contributor Agreements § 5.1).

Section 5.1 of the Jasienski, Spinelli, Stluka and Witte AP Contributor Agreements provide that upon a "qualifying Event Photo Sale," AP will provide the contributor with the greater of royalties calculated on the revenue-share basis described in the above paragraph, and "a royalty equal [to] twenty-five dollars ($25.00) per Final Photo."  However, these AP Contributor Agreements also provide that these minimum royalties are only due on "qualifying Event Photo Sales," which means "the a la carte sale of licenses for Event Photos."  (Id.)

The AP Contributor Agreements do not require AP to license the contributors' photographs to third parties only through a "sale" that would generate revenue and therefore royalties.[7]  Nothing in the AP Contributor Agreements requires AP to issue only royalty-bearing sublicenses.  Additionally there is nothing in the AP Contributor Agreements that compels AP to limit the uses that NFL (or any other sublicensed third party) makes of a sublicensed photo, or to "track and manage" such sublicensee uses.  (Cf. AC ¶¶ 69-72).

---

[7] Some of the AC Contributor Agreements contain a "minimum royalty" provision. However, minimum royalties are due only where AP has made an "a la carte sale of licenses for Event Photos."  (AP Contributor Agreements § 5.1.)

**Applicable Standard**

On a motion to dismiss pursuant to Rule 12(b)(6), all factual allegations in the complaint are accepted as true, and all inferences are drawn in favor of the pleader.  Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993). However, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

A claim is facially plausible when "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Iqbal, 556 U.S. at 663 (quoting Twombly, 550 U.S. at 556).  In other words, the factual allegations must "possess enough heft to show that the pleader is entitled to relief."  Twombly, 550 U.S. at 557 (internal quotation marks omitted).

When determining whether parties have agreed to arbitrate a dispute, courts consider two questions: (1) whether a valid agreement to arbitrate under the contract in question exists and (2) whether the particular dispute in question falls

23

within the scope of that arbitration agreement.  See <u>Hartford</u> <u>Accident & Indem. Co. v. Swiss Reins. Am. Corp.</u>, 246 F.3d 219, 226 (2d Cir. 2001) (quoting <u>Nat'l Union Fire Ins. Co. v. Belco</u> <u>Petrol. Corp.</u>, 88 F.3d 129, 135 (2d Cir. 1996)).

**I.    The Motion To Compel Arbitration Of Plaintiffs' Claims**
**<u>Against Getty Is Granted</u>**

        Arbitration is "strictly a matter of contract."  <u>Ross</u> <u>v. Am. Express Co.</u>, 478 F.3d 96, 99 (2d Cir. 2007) (citing <u>Thomson–CSF, S.A. v. Am. Arbitration Ass'n</u>, 64 F.3d 773, 779 (2d Cir. 1995)).  The Federal Arbitration Act (FAA) provides that "an agreement in writing to submit to arbitration an existing controversy . . . shall be valid, irrevocable and enforceable . . . ."  9 U.S.C. § 2.  The FAA "requires the federal courts to enforce arbitration agreements, reflecting Congress' recognition that arbitration is to be encouraged as a means of reducing the costs and delays associated with litigation."  <u>Vera v. Saks &</u> <u>Co.</u>, 335 F.3d 109, 116 (2d Cir. 2003) (citation omitted); <u>see</u> <u>also</u> <u>Am. Express Co. v. Italian Colors Rest.</u>, 133 S. Ct. 2304, 2309 (2013) (noting that courts "must 'rigorously enforce' arbitration agreements according to their terms") (citation omitted)).  The Second Circuit has "often and emphatically applied" the strong federal policy in favor of arbitration.

Arciniaga v. Gen. Motors Corp., 460 F.3d 231, 234 (2d Cir. 2006).

Because of this policy favoring arbitration, "the burden of persuasion falls on the party attempting to escape an arbitration agreement, not the one attempting to enforce it." Marubeni Am. Corp. v. M/V "OHFU" her Engines, No. 94 CIV. 6251 (SAS), 1996 WL 84485, at *2 (S.D.N.Y. Feb. 27, 1996). When the existence of an arbitration agreement is undisputed, "doubts as to whether a claim falls within the scope of that agreement should be resolved in favor of arbitrability." ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co., 307 F.3d 24, 29 (2d Cir. 2002) (citing Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)). Courts in this Circuit have held that, where a valid arbitration clause has been found to exist, they must abstain from adjudicating plaintiffs' claims. See, e.g., Robinson Brog Leinwand Greene Genovese & Gluck P.C. v. Quinn & Assoc. LLP, 523 F. App'x 761, 764 (2d Cir. 2013).

The Second Circuit has directed courts to classify arbitration clauses as either broad or narrow. JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 172 (2d Cir. 2004) (quoting Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 224 (2d Cir. 2001)). Clauses requiring

arbitration of disputes "arising out of or in connection with" underlying contracts are considered "broad" arbitration clauses. See, e.g., Googla Home Decor LLC v. Uzkiy, No. 09-CV-1049 (CPS)(RML), 2009 WL 2922845, at *5 (E.D.N.Y. Sept. 8, 2009) (finding clause requiring arbitration of "[a]ny dispute, controversy, or claim arising out of or in connection with this Agreement" to be broad).  Indeed, an arbitration clause covering "any claim or controversy arising out of or relating to" an agreement is "the paradigm of a broad clause," Collins & Aikman Prods. Co. v. Bldg. Sys., Inc., 58 F.3d 16, 20 (2d Cir. 1995) (citation omitted) – broader than one covering all claims and disputes "arising under th[e] contract." Genesco, Inc. v. T. Kakiuchi & Co., Ltd., 815 F.2d 840, 845, 848 (2d Cir. 1987).

A "presumption of arbitrability" arises from contracts containing broad arbitration clauses.  ACE Capital, 307 F.3d at 34.  In particular, a broad arbitration clause is "presumptively applicable to disputes involving matters going beyond the 'interpret[ation] or enforce[ment of] particular provisions' of the contract which contains the arbitration clause." JLM, 387 F.3d at 172 (citation omitted).

a. The Arbitration Clauses Are Enforceable

Plaintiffs contend that they should not be subject to arbitration because the Getty Contributor Agreements as a whole were procedurally and substantively unconscionable. (See Pls.' Opp'n to Getty Mot. 11-18.) The United States Supreme Court has, however, held that "a challenge to the validity of the contract as a whole, and not specifically to the arbitration clause, must go to the arbitrator." Buckeye Check Cashing, Inc. v. Cardegna, 546 U.S. 440, 448-49 (2006); see also Preston v. Ferrer, 552 U.S. 346 (2008) (holding that a dispute concerning the legality of a contract must be resolved by an arbitrator since respondent sought invalidation of the contract as a whole, and made no discrete challenge to the validity of the arbitration clause); Cole v. Pearson Educ., Inc., No. 10 Civ. 7523(JFK)(RLE), 2011 WL 4483760, at *5 (S.D.N.Y. Sept. 28, 2011) ("[a]n arbitration clause is not rendered invalid by a challenge to the contract as a whole") (citing Rent-A-Center, West, Inc. v. Jackson, 561 U.S. 63, 71 (2010) (holding that "basis of challenge [need] to be directed specifically to the agreement to arbitrate before the court will intervene")). Because Plaintiffs do not challenge the validity of the arbitration provision specifically, their arguments regarding the unenforceability of the arbitration provisions fail.

b. Breach Of Contract Claims Must Be Arbitrated

27

Plaintiffs' breach of contract claims are arbitrable. The allegation that Getty failed to honor its obligations under the Getty Contributor Agreements (see AC ¶¶ 219-20, 223-26) obviously "aris[es] out of or in connection with" the Getty Contributor Agreements.  (See Lindquist Decl. Exs. A § 9.5, B-G § 11.8); World GTL Inc. v. Petroleum Co. of Trinidad & Tobago Ltd., No. 10 Civ. 1542 (LMM), 2010 WL 3291673, at *3-4 (S.D.N.Y. Aug. 11, 2010) (holding that breach of contract claims were covered by broad arbitration clause).  As stated above, Plaintiffs have not argued that the arbitration clauses themselves are unenforceable.  Accordingly, the breach of contract claims must be arbitrated.

### c. Breach Of Fiduciary Duties Claims Must Be Arbitrated

The breach of fiduciary duties claims also clearly arise out of and in connection with the Getty Contributor Agreements.  Claimed breaches of fiduciary duty arising out of agreements with broad arbitration clauses are subject to arbitration.  See, e.g., Syncora Guar. Inc. v. HSBC Mexico, S.A., 861 F. Supp. 2d 252, 259 (S.D.N.Y. 2012) ("This claim alleges that HSBC, as [t]rustee, owes Syncora a fiduciary duty under the Trust Agreement, and that HSBC breached its fiduciary duty owed to Syncora, and falls within the plain meaning of

[a]ny controvers[y] arising pursuant to [the] Trust Agreement"
(quotation marks and internal citations omitted) (alterations in
original)).   Plaintiffs base their allegation of fiduciary
duties owed to them by Getty on the Getty Contributor
Agreements.  (See AC ¶¶ 229-30 ("Plaintiffs' contributor
agreements with Getty Images expressly provided that Plaintiffs
were permitted to select the licensing model of their photos at
the time of submission . . . . Plaintiffs' contributor
agreements with Getty Images expressly provided that Plaintiffs
were permitted to specify any other restrictions on the
licensing of any photos . . . and that Getty Images would honor
such restrictions.").)   Moreover, the allegation that Getty held
itself out as Plaintiffs' agent (see AC ¶ 232) squarely
implicates the provision in the Getty Contributor Agreements
that the contributor "agrees that he/she is an independent
contractor" and that the parties' relationship "is one of
contract only and is not one of partnership, employment, joint
venture, principal-agent or any other legal identity."  (Getty
Contributor Agreements §§ 9.3 (Lowrance), 11.7.)


        In short, the breach of fiduciary duties claims are
encompassed by the arbitration clauses and must be arbitrated.


        d. Unjust Enrichment Claims Must Be Arbitrated

It is well established that unjust enrichment claims
fall within the scope of broad arbitration clauses.  See, e.g.,
Grenawalt v. AT&T Mobility, LLC, 937 F. Supp. 2d 438, 459
(S.D.N.Y. 2013) (compelling arbitration of unjust enrichment
claim that cited agreement containing broad arbitration
provision as "substantial support").  Plaintiffs' unjust
enrichment claim is predicated on Getty allegedly having "used
Plaintiffs' photos without paying any license fees, royalties,
or other compensation to Plaintiffs" pursuant to the Getty
Contributor Agreements.  (AC ¶ 250.)  This claim thus expressly
"aris[es] out of or in connection with" the Getty Contributor
Agreements and therefore, as in Grenawalt, must be arbitrated.


   e. Federal Copyright Infringement Claims Must Be Arbitrated


As noted, the FAA establishes a strong federal policy
in favor of arbitration, and courts have long considered
arbitration to be "presumptively an appropriate and competent
forum for federal statutory claims."  MBNA Am. Bank, N.A. v.
Hill, 436 F.3d 104, 110 (2d Cir. 2006).  Statutory claims may be
arbitrated "so long as the prospective litigant effectively may
vindicate his or her statutory cause of action in the arbitral
forum."  Green Tree Fin. Corp.-Ala. v. Randolph, 531 U.S. 79, 90
(2000) (citation omitted).  "The burden is on the party opposing

arbitration . . . to show that Congress intended to preclude a waiver of judicial remedies for the statutory rights at issue." Shearson/Am. Express, Inc. v. McMahon, 482 U.S. 220, 227 (1987); see also Green Tree, 531 U.S. at 91-92 ("We have held that the party seeking to avoid arbitration bears the burden of establishing that Congress intended to preclude arbitration of the statutory claims at issue.").

The Supreme Court has set forth a two-step inquiry for determining whether statutory claims arising out of a contract are arbitrable.  First, courts must determine "whether the parties' agreement to arbitrate reached the statutory issues." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985).  Second, courts must consider whether legal constraints external to the parties' agreement foreclosed the arbitration of those claims – namely, if a party has "made the bargain to arbitrate," it "should be held to it unless Congress . . . has evinced an intention to preclude a waiver of judicial remedies for the statutory rights at issue."  Id.; see also Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991) (holding that claims under federal statutes generally are arbitrable so long as the arbitration agreement is broad enough to encompass the statutory claim and Congress has not indicated its intent to prohibit arbitration of the claim).  Finally,

where Congress has not clearly precluded arbitration, arbitration of a statutory claim will be compelled unless, as noted, the prospective litigant shows that it "cannot effectively vindicate [its] statutory rights in the arbitral forum." In re Cotton Yarn Antitrust Litig., 505 F.3d 274, 282 (4th Cir. 2007); see also Italian Colors, 133 S. Ct. at 2314. Under this test, Plaintiffs cannot avoid arbitration of their copyright infringement or Sherman Act claims.

It is well settled that copyright claims asserted in connection with licensing disputes are encompassed by broad arbitration clauses like those contained in the Getty Contributor Agreements. In Kamazaki Music Corp. v. Robbins Music Corp., 684 F.2d 228 (2d Cir. 1982), the Second Circuit affirmed that an arbitration clause requiring the parties to arbitrate claims "arising out of, or relating to" their contract covered copyright claims. See id. at 229-31. Similarly, in Cole the arbitration clause at issue required that "[a]ny dispute in connection with this stock picture invoice including its validity, interpretation, performance, or breach shall be arbitrated . . . ." 2011 WL 4483760 at *4 (emphasis added). The court held that the arbitration clause "include[d] disputes arising under the copyright law. Defendant licensed all of the works claimed by the Plaintiff to have been infringed, and any

dispute about the publication of the licensed photographs [wa]s a 'dispute in connection' with the license agreements . . ." and dismissal of the claims was warranted.  Id. at *6.


The arbitration provisions in the Getty Contributor Agreements are substantially similar to those held in Kamakazi and Cole to encompass both contract and related copyright claims.  Moreover, Plaintiffs' copyright claims clearly arise "out of or in connection with" their agreements with Getty, as they are predicated on Getty's alleged authorization of or failure to prevent the NFL from engaging in uses of Plaintiffs' images that purportedly fell outside the scope of the Getty Contributor Agreements.  (See AC ¶¶ 71-78, 167-71, 203-06, 212-15.)  In other words, the claimed infringements are defined by the scope of the Getty Contributor Agreements.  The copyright claims therefore must be arbitrated.[8]

---

[8] To the extent that Plaintiffs rely on agreements not pleaded in the AC (see Pls.' Opp'n to Getty Mot. 28 (arguing that Plaintiffs' claims arise under separate subsequent agreements with no arbitration clauses that are not mentioned in the AC)), their arguments are disregarded.  See Klauber Bros., Inc. v. Russell-Newman, Inc., 11 CIV. 4985 PGG, 2013 WL 1245456, at *11 (S.D.N.Y. Mar. 26, 2013), aff'd sub nom Klauber Bros., Inc. v. Bon-Ton Stores, Inc., 557 F. App'x 77 (2d Cir. 2014) ("Allegations made outside of the complaint are not properly before the court on a motion to dismiss.") (citations omitted).  Claims that are raised for the first time in an opposition brief are not properly before the court. U.S. Bank Nat'l Ass'n v. PHL Variable Ins. Co., 12 CIV. 6811 CM JCF, 2013 WL 791462, at *2 (S.D.N.Y. Mar. 5, 2013).  Furthermore, Plaintiffs' assertions that the fact that NFL Defendants "are indispensable parties to Plaintiffs' claims against Getty involving secondary forms of liability" makes the secondary infringement claims against Getty are non-arbitrable must also fail.  Secondary infringement claims are often litigated without joinder of any alleged direct infringer.  See generally, Viacom Int'l, Inc. v. YouTube, Inc., 676 F.3d 19

f. Sherman Act Claims Must Be Arbitrated


The Supreme Court has made clear that Sherman Act antitrust conspiracy claims are arbitrable.  See Mitsubishi, 473 U.S. at 633-34; Gilmer, 500 U.S. at 28 (claims under the Sherman Act "are appropriate for arbitration"); see also In re Cotton Yarn, 505 F.3d at 282 ("We . . . have no difficulty concluding that domestic antitrust claims, as a class, are suitable for arbitration.").  Indeed, the Court in Mitsubishi found no "explicit support" in either the Sherman Act or in the FAA for holding Sherman Act claims to be nonarbitrable.  473 U.S. at 628-29.


The Second Circuit has held that if the allegations underlying claims "touch matters covered by the parties' contracts," those claims must be arbitrated "whatever the legal labels attached to them."  JLM, 387 F.3d at 172 (emphasis added).  Conspiracy allegations may "touch matters" covered by a contract even if the alleged conspiracy includes non-parties to the contract or involves alleged wrongdoing that occurred before or after the formation of the contract.  Alghanim v. Alghanim,

---

(2d Cir. 2012); Capitol Records, Inc. v. MP3tunes, LLC, 821 F. Supp. 2d 627 (S.D.N.Y. 2011); Capitol Records, LLC v. Vimeo, LLC, 972 F. Supp. 2d 537 (S.D.N.Y. 2013); Arista Records LLC v. Lime Grp. LLC, 784 F. Supp. 2d 398 (S.D.N.Y. 2010).

828 F. Supp. 2d 636, 655-56 (S.D.N.Y. 2011) ("independent conspiracies may lie within the scope of arbitration clauses").

In JLM, the plaintiffs alleged an antitrust conspiracy among owners of tankers in the business of shipping liquid chemicals.  The plaintiffs – corporations in the business of shipping, buying, selling, and trading chemicals in bulk – had entered into contracts with the defendants that directed "[a]ny and all differences and disputes of whatsoever nature arising out of this Charter . . . be put to arbitration."  See 387 F.3d at 167.  The plaintiffs argued that because the alleged conspiracy was formed independently of the contractual relationship between the parties, the Sherman Act claims were not covered by the broad arbitration clause.  See id. at 175.

The Second Circuit disagreed:

> [T]he damages which JLM asserts it suffered as a
> result of the conspiracy among the Owners result
> from the fact that it entered into the charters,
> each of which specifies price terms which are
> variously characterized in the amended complaint
> as "artificially high" and as "overpayments."  We
> therefore conclude that this is a dispute
> "arising out of" the charters, and is therefore
> within the scope of the [] arbitration clause.

Id.  The court added that in dealing with broad arbitration clauses, it "ha[s] not limited arbitration claims to those that

constitute a breach of the terms of the contract at issue," id.
at 176 (quoting Mehler v. Terminix Int'l Co., 205 F.3d 44, 50
(2d Cir. 2000)), and it cited earlier cases in which it had held
claims based on alleged conspiratorial conduct by a party with
whom the plaintiffs were in privity to be arbitrable.  See JLM,
387 F.3d at 176.

        Plaintiffs' Sherman Act conspiracy allegations against
Getty are analogous to those at issue in JLM.  Plaintiffs
allege, for example, that

> [t]he NFL's illegal monopoly and NFL Properties'
> agreement to grant an exclusive license to Getty
> Images and then AP also artificially undermined
> Plaintiffs' ability to bargain fairly with Getty
> Images and AP to obtain more favorable terms in
> their contributor contracts. . . . Because other
> licensors could not offer commercial licenses for
> NFL photos, Plaintiffs were forced into an
> impossible dilemma of either accepting the
> contract terms being offered by the NFL's
> licensing partner or losing the ability to earn
> revenue from the sale of more lucrative
> commercial licenses.

(AC ¶ 144.)  As in JLM, Plaintiffs contend that the damages they
purportedly suffered as a result of the alleged conspiracy among
the NFL Defendants and Getty flowed from the Getty Contributor
Agreements.  See JLM, 387 F.3d at 175.  Given these allegations,
any assertion that the antitrust claims are not sufficiently

connected to Getty Contributor Agreements to be arbitrable must
fail.

Nor are there any "legal constraints external to the
parties' agreement," Mitsubishi, 473 U.S. at 628, that should
prevent arbitration of the antitrust claims despite the
agreement to arbitrate.  In their response and objection to
Getty's arbitration demand, Plaintiffs argued that the Sherman
Act claims should not be arbitrated because Getty is "a
necessary and indispensable party to several of [Plaintiffs']
claims against the Getty Images co-defendants," which are not
subject to arbitration.  (See Bloom Decl. Ex. C at 2.)  However,
alleged co-conspirators "are not necessary parties; a plaintiff
can prove the existence of a conspiracy in an action against
just one of the members of the conspiracy."  In re Cotton Yarn,
505 F.3d at 284 (citing Georgia v. Pa. R.R. Co., 324 U.S. 439,
463 (1945) ("In a suit to enjoin a[n anti-trust] conspiracy not
all the conspirators are necessary parties defendant."); Cf.
Doctor's Assocs., Inc. v. Distajo, 66 F.3d 438, 445-46 (2d Cir.
1995) (noting that individuals not party to an arbitration
agreement cannot be "indispensable" for Rule 19 purposes); see
also Wilson P. Abraham Constr. Corp. v. Tex. Indus., Inc., 604
F.2d 897, 904 n. 15 (5th Cir. 1979) ("A private plaintiff need

not sue all co-conspirators but may choose to proceed against any one or more of them.")).

In In re Cotton Yarn, the plaintiffs sought to evade a broad arbitration clause by arguing that "the inability to join all defendants in a single proceeding [by virtue of a no-joinder clause in the arbitration agreements] prevent[ed] them from vindicating their statutory rights."  505 F.3d at 283.  They argued that "severing the conspiracy into separate parts would deprive [them] of the full benefit of their proof, and make the proving of the conspiracy, if not impossible, extremely difficult."  Id.  In rejecting this argument, the Fourth Circuit found that potential inconvenience to the plaintiffs was trumped by congressional intent:

> [C]o-conspirators are not necessary parties in an action against a single conspirator.  There is nothing in the arbitration agreements that would prevent the plaintiffs from presenting evidence about the actions of non-party defendants in order to establish the existence of the price-fixing conspiracy alleged by the plaintiffs. Accordingly, the mere fact that the plaintiffs may not join the defendants in a single arbitration proceeding does not prevent the plaintiffs from effectively vindicating their statutory rights.  While individual proceedings may be less efficient than a single proceeding, that inefficiency is a function of Congress's preference for resolution of disputes by arbitration and cannot be a basis for defeating the arbitration that Congress was seeking to encourage.

<u>Id.</u> at 285.

The same reasoning applies here.  Plaintiffs'
assertion of nonarbitrable claims against alleged co-
conspirators should not prevent arbitration of the claims
against Getty.  Indeed, the principle that co-conspirators are
not necessary parties applies in this case because the alleged
conspiracy is based on separate, successive exclusive licenses
between the NFL and Getty and AP, respectively.  (<u>See</u> AC ¶ 134
(alleging the NFL granted exclusive licenses to "Getty Images
and then AP").)  Plaintiffs allege that Getty held exclusive NFL
licensing rights until 2009, (AC ¶ 46) after which AP entered
into its own exclusive license agreement with the NFL (AC ¶ 46).
The lack of any alleged temporal overlap between these licensing
deals undermines Plaintiffs' assertion that Getty is a necessary
party to this litigation.

Plaintiffs argue that their antitrust claims are
collateral to any contracts between Plaintiffs and Getty and
that the claims do not depend on the interpretation of the Getty
Contributor Agreements.  (Pls.' Opp'n to Getty Mot. 24-26.)
However, the AC expressly links the claimed conspiracy to the
Getty Contributor Agreements by alleging that the purported
adverse impact of the alleged conspiracy between NFL and Getty

39

is manifested in the Getty Contributor Agreements.  (See AC ¶ 144.)  As such, the Sherman Act claims appear to "touch matters covered by the parties' contracts[.]"  See JLM, 387 F.3d at 172 ("[T]he damages which JLM asserts it suffered as a result of the conspiracy among the Owners result from the fact that it entered into the charters, each of which specifies price terms which are variously characterized in the amended complaint as 'artificially high' and as 'overpayments.'  We therefore conclude that this is a dispute 'arising out of' the charters, and is therefore within the scope of the [] arbitration clause.").

Plaintiffs also argue that the Court is "required to determine whether the claims would actually require construction of contract terms or determining rights under contract provisions."  (Pls.' Opp'n to Getty Mot. 24.)  However, a broad arbitration clause is "presumptively applicable to disputes involving matters going beyond the 'interpret[ation] or enforce[ment of] particular provisions' of the contract which contains the arbitration clause."  JLM, 387 F.3d at 172 (citation omitted).  Plaintiffs' reliance on Collins & Aikman

<u>Prods. Co. v. Bldg. Sys., Inc.</u>, 58 F.3d 16 (2d Cir. 1995) to

assert otherwise is misplaced.[9]


    In sum, because Plaintiffs' antitrust claims touch and

concern the Getty Contributor Agreements, the antitrust claims

are properly referred to arbitration.


   g. <u>Objections Based On Cost Do Not Bar Arbitration</u>


    Finally, Plaintiffs' objection that they will incur

additional expense or inconvenience from having to arbitrate

their claims against Getty (<u>see</u> Bloom Decl. Ex. C at 2) cannot

defeat the strong federal policy in favor of enforcing

arbitration agreements.  The "possibility that a party to an

arbitration clause will be inconvenienced and will incur some

extra expense . . . does not necessarily mean that the party

cannot effectively vindicate its statutory rights through

arbitration."  <u>In re Cotton Yarn</u>, 505 F.3d at 285.  As the

Supreme Court stated in <u>Italian Colors</u>, the antitrust laws "do

not guarantee an affordable procedural path to the vindication

of every claim."  133 S. Ct. at 2309.  "It would be unwieldy . .

---

[9] <u>Collins & Aikman</u> did not involve an antitrust claim.  At issue there was
which of two contracts between the parties was implicated by the plaintiffs'
state-law claims.  <u>See</u> 58 F.3d at 23 ("the task of determining whether a clam
or a set of claims 'arises out of or relates to' <u>the particular contract in
which the arbitration clause is found</u> was properly determined by the district
court") (emphasis added).

. to require courts to proceed case by case to tally costs and burdens to particular plaintiffs in light of their means . . . ." <u>Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer</u>, 515 U.S. 528, 536 (1995).

Additionally, "uninformed speculation about cost" is insufficient to carry the burden of proving that proceeding against antitrust defendants individually would prevent the plaintiffs from effectively vindicating their statutory rights. <u>In re Cotton Yarn</u>, 505 F.3d at 285; <u>see also</u> <u>Green Tree</u>, 531 U.S. at 90 (rejecting argument that statutory claims could not be arbitrated due to prohibitive costs as "too speculative to justify the invalidation of an arbitration agreement.")  While Plaintiffs note the high costs of federal court litigation, they do not provide support for the proposition that arbitration would be more expensive (<u>see</u> Pls.' Opp'n to Getty Mot. 20), or that the expense would be so great as to impede prosecution of their claims.  <u>See</u> <u>AT&T Mobility LLC v. Concepcion</u>, 131 S. Ct. 1740, 1749 (2011) ("the informality of arbitral proceedings is itself desirable, reducing the cost and increasing the speed of dispute resolution"); <u>see also</u> <u>Vera</u>, 335 F.3d at 116 (noting Congress' determination that arbitration "is to be encouraged as a means of reducing the costs and delays associated with litigation" (citation omitted).

Finally, Plaintiffs note in passing that "there is a tremendous risk that Plaintiffs will not be able to effectively vindicate their claims against Getty Images because the NFL Defendants certainly will not agree to participate in arbitration and thus Plaintiffs cannot be assured of necessary discovery from those parties." (Pls.' Opp'n to Getty Mot. 30 n. 16.)  However, any limitations on discovery in arbitration do not establish grounds to defeat the agreement to arbitrate.

Because Plaintiffs have failed to adequately plead or establish their objections based on cost, these objections are disregarded.

## II.   The Motion To Dismiss Plaintiffs' Sherman Act Antitrust Claims (Count I) Against NFL Defendants and AP Is Granted

### a. Antitrust Claims Against NFL Defendants

In order to state a claim against the NFL Defendants, Getty, and AP under Sections 1 and 3 of the Sherman Act, 15 U.S.C. §§ 1 and 3, that will withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), Plaintiffs must allege sufficient facts to support a plausible inference that NFL Defendants, Getty, and AP took part in an agreement that

unreasonably restrained trade.[10]  See Twombly, 550 U.S. at 570;
Port Dock & Stone Corp. v. Oldcastle Northeast, Inc., 507 F.3d
117, 121 (2d Cir. 2007); In re Elevator Antitrust Litig., 502
F.3d 47, 50 (2d Cir. 2007).


     The AC asserts that the NFL Defendants, in concert
with Getty[11] and AP, "conspire[d] to create a monopoly in favor
of NFL in order to illegally restrain trade and otherwise fix
and control the market for commercial licensing of NFL-related
'stock' photos."  (AC ¶¶ 28, 37.)  According to Plaintiffs, the
NFL Defendants conspired to restrain trade in two ways.


     First, Plaintiffs allege that each NFL Club
"authorized the NFL and/or [NFLP] to make decisions regarding
[its] separately owned intellectual property [and] to grant an
exclusive license to a single licensing company to market and
sell commercial licenses for all stock photography of NFL-
related photos."  (Id. ¶ 24.)  As such, according to Plaintiffs,

---

[10] Section 3 of the Sherman Act merely extends the reach of Section 1 to trade or commerce involving U.S. Territories and the District of Columbia. Substantively, however, Section 3 claims are analyzed in the same manner as Section 1 claims.  See Dart Drug Corp. v. Parke, Davis & Co., 344 F.2d 173, 174 n. 1 (D.C. Cir. 1965) ("Section 3 is, in terms of the substantive offense defined therein, an exact counterpart of Section 1, made expressly applicable to the Territories and the District of Columbia.").

[11] Consistent with the rest of this opinion, this section's mention of Getty does not serve as a determination with respect to Getty's antitrust liability but rather mentions Getty as an alleged participant in Plaintiffs' asserted antitrust conspiracy.

in the absence of the alleged conspiracy, their "agents [i.e., Getty, AP or their competitors] could have negotiated licensing agreements with individual NFL Teams on better terms."  (Id. ¶ 148.)  Second, Plaintiffs allege that the NFLP and NFL granted "illegal" exclusive licenses to Getty in 2007 and then AP in 2009 and 2012 (id. ¶¶ 25-27, 136), which prevented Plaintiffs "from seeking or obtaining fair market value for commercial uses of their NFL photographs" and "undermined [their] ability to bargain fairly with Getty Images and AP to obtain more favorable terms in their contributor contracts."  (Id. ¶¶ 143-44.) Plaintiffs also claim that they were harmed by the NFL's decision in 2009 to switch exclusive licensors from Getty to AP because Getty, with whom Plaintiffs had a continuing relationship, distributed their other photo collections (e.g., MLB and NCAA photos).  (Id. ¶¶ 55-58, 147.)

     As a threshold matter, "Congress did not intend the antitrust laws to provide a remedy in damages for all injuries that might conceivably be traced to an antitrust violation." Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 534 (1983) (quoting Hawaii v. Standard Oil Co., 405 U.S. 251, 263 n. 14 (1972)).  To have standing, a plaintiff must, among other things, be "an 'efficient enforcer' of the antitrust laws."  Gatt Commc'ns,

45

Inc. v. PMC Assocs., L.L.C., 711 F.3d 68, 78 (2d Cir. 2013).
The Second Circuit has identified four factors to determine
whether a plaintiff is an "efficient enforcer:"

> (1) the directness or indirectness of the
> asserted injury; (2) the existence of an
> identifiable class of persons whose self-interest
> would normally motivate them to vindicate the
> public interest in antitrust enforcement; (3) the
> speculativeness of the alleged injury; and (4)
> the difficulty of identifying damages and
> apportioning them among direct and indirect
> victims so as to avoid duplicative recoveries.

Id. (quoting Paycom Billing Servs., Inc. v. MasterCard Int'l,
Inc., 467 F.3d 283, 290-91 (2d Cir. 2006)).  Here, all four
factors weigh against Plaintiffs' ability to establish antitrust
standing, requiring dismissal of Plaintiffs' antitrust claims.
Gatt Commc'ns, Inc., 711 F.3d at 75 ("[A]ntitrust standing is a
threshold, pleading-stage inquiry and when a complaint by its
terms fails to establish this requirement we must dismiss as a
matter of law." (citation omitted)).


Generally speaking, "[i]n order to limit the class of
plaintiffs with antitrust standing to the most efficient
enforcers of the antitrust laws, courts have typically limited
the types of individuals that may bring an antitrust action to
direct competitors or consumers."  Port Dock & Stone Corp. v.
OldCastle Ne., Inc., No. 05 Civ. 4294, 2006 WL 2786882, at *3

46

(E.D.N.Y. Sept. 26, 2006), aff'd, 507 F.3d 117 (2d Cir. 2007);

see also Solent Freight Servs., Ltd. v. Alberty, 914 F. Supp. 2d

312, 319 (E.D.N.Y. 2012) ("Generally, a plaintiff that is

'neither a consumer nor a competitor in the market in which

trade was restrained' does not have standing to allege an

antitrust injury to that market." (citation omitted)).


        Plaintiffs are neither consumers nor competitors in

the alleged market for commercial licensing of NFL-related

photographs.  Plaintiffs do not purchase the rights to use NFL-

related photographs for commercial purposes.  Nor do they enter

into license agreements with commercial enterprises that wish to

use NFL photographs.  Instead, they supply photographs to stock

photography agencies, like Getty and AP, which compete in the

alleged market.  See Reading Int'l, Inc. v. Oaktree Capital

Mgmt. LLC, 317 F. Supp. 2d 301, 335 (S.D.N.Y. 2003) ("Under

Associated General Contractors, courts have held that suppliers

to direct market participants 'typically cannot seek recovery

under the antitrust laws because their injuries are too

secondary and indirect.'" (citation omitted)).


        Plaintiffs contend in their opposition that they

"directly competed with agencies such as Getty Images and AP,"

(Pls.' Opp'n to NFL Def.'s Mot. 28) and that "prior to the NFL's

decision to restrict licensing rights to a single agency,
Plaintiffs were permitted to and did license their works
directly to the NFL Teams and the NFL's fans, as well as other
typical customers and end users" (id., at 27-28).  However, no
such allegation is contained within the AC.  The AC states that
Plaintiffs are professional photographers who initially
submitted their photos to NFL Photos, which then licensed those
photos "to media outlets and commercial entities," and after the
NFL outsourced licensing to Getty and AP, Plaintiffs supplied
their NFL-related photos to those agencies for licensing to
commercial end-users.  (AC ¶¶ 1, 17-18, 36, 44, 145.)  Indeed,
the AC clearly states that Plaintiffs have always "licensed the
photos that they shot 'on spec' through third-party licensing
agents (formerly NFL Photos and then Getty Images and currently
AP)."  (AC ¶ 36.)  As such, Plaintiffs argument on this point
must fail.


     Specifically, with respect to the first "efficient
enforcer" factor, to satisfy the antitrust injury requirement,
see Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344
(1990), a plaintiff must plead facts showing that it has
suffered "injury of the type the antitrust laws were intended to
prevent and that flows from that which makes defendants' acts
unlawful."  Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S.

48

477, 489 (1977).  "The antitrust injury requirement obligates a
plaintiff to demonstrate, as a threshold matter, 'that the
challenged action has had an <u>actual</u> adverse effect on
competition as a whole in the relevant market.'" <u>George Haug</u>
<u>Co. v. Rolls Royce Motor Cars Inc.</u>, 148 F.3d 136, 139 (2d Cir.
1998) (emphasis in original) (citation omitted).  In other
words, a plaintiff must allege "that its loss comes from acts
that reduce output or raise prices to consumers." <u>Chi. Prof'l</u>
<u>Sports Ltd. P'ship v. NBA</u>, 961 F.2d 667, 670 (7th Cir. 1992).
Here, Plaintiffs' purported injury is at most an indirect result
of the challenged agreements.

     The AC contains no facts to suggest that the
challenged conduct reduced output of commercial licenses for NFL
photographs or raised prices for consumers.  Plaintiffs do not
allege that fewer commercial entities are licensed to use NFL
photographs, nor do they allege that the prices those entities
or consumers pay are higher because of the NFL Clubs' collective
licensing or the exclusive licenses with Getty and AP.  The
injury alleged by Plaintiffs is damage to their personal
economic interests, namely that they received from Getty and AP
insufficient royalties for the commercial use of their NFL-
related photographs.  (<u>See, e.g.</u>, AC ¶¶ 146-49.)

But "underpayment of royalties . . . is not an antitrust injury because it has no adverse effect on competition or consumers." Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co., 407 F.3d 1091, 1125 (10th Cir. 2005) (affirming dismissal of complaint because it "makes no allegation of any harm other than the economic loss which [Appellant] itself allegedly suffered"). Because Plaintiffs' alleged injury amounts to personal economic loss, Plaintiffs have failed to allege antitrust injury. See Carell v. Shubert Org., Inc., 104 F. Supp. 2d 236, 266-67 (S.D.N.Y. 2000) (no antitrust injury because plaintiffs inability to license intellectual property "has had negligible effect on output and has chiefly prevented plaintiff from generating revenue"); Nat'l Ass'n of Freelance Photographers v. Associated Press, No. 97 Civ. 2267, 1997 WL 759456, at *10 (S.D.N.Y. Dec. 10, 1997) (no antitrust injury when alleged "interfer[ence] with the ability of Freelance Photographers to compete in the commercial exploitation of their images" caused photographers "to lose substantial revenue" because the allegations "show at most that [photographers] personally were harmed by AP's actions toward them, and not that others in the market were thereby harmed" (citation omitted)).

Plaintiffs also have failed adequately to plead antitrust injury because their asserted injury was not the

result of the challenged conduct.  Antitrust injury is limited
to injuries that are "attributable to an anti-competitive aspect
of the practice under scrutiny."  Atl. Richfield Co., 495 U.S.
at 334.  Plaintiffs challenge the NFL Clubs' collective
licensing arrangement and the exclusive licensing agreements
with Getty and AP, but acknowledge that any royalty payments for
the commercial use of their NFL-related photographs stem from
their contributor agreements with Getty and AP, and not any
agreement to which the NFL or NFL Clubs are a party.  (See,
e.g., AC ¶¶ 51, 53, 68, 91, 144.)  Put simply, Plaintiffs'
claimed injury arises not from the allegedly anticompetitive
agreements, but rather from the contributor agreements.  See
Atl. Richfield Co., 495 U.S. at 344 (requiring injury to result
from "competition-reducing aspect or effect of the defendant's
behavior") (emphasis in original); Granite Partners, L.P. v.
Bear, Stearns & Co., 58 F. Supp. 2d 228, 245 (S.D.N.Y. 1999)
(holding plaintiff failed to allege antitrust injury when "there
is a critical disjunction between the injuries suffered by the
[plaintiffs] and the injuries to the relevant market").

     Plaintiffs' claim that, absent the NFL Clubs'
collective licensing arrangement, Getty and AP could have
negotiated and secured better terms in agreements with
individual NFL Clubs, and that, absent the exclusive licensing

agreements, Plaintiffs could have negotiated and secured better terms with other stock photography agencies.  (AC ¶ 148.) However, the AC alleges no facts to support these assertions, which themselves demonstrate and confirm the "critical disjunction" between Plaintiffs' asserted injuries and any alleged anticompetitive agreement.  Indeed, the AC does not contain any facts to suggest that Getty or AP would have incorporated the benefit of any better terms they may have received from an individual NFL Club into Plaintiffs' contributor agreements, or that other stock photography agencies would have provided Plaintiffs with more advantageous terms in their contributor agreements.

Plaintiffs separately contend that they have adequately pled antitrust injury by alleging a per se "horizontal price fixing scheme."  (Pls.' Opp'n to NFL Def.'s Mot. 25.)  They also assert that "an adequate injury is alleged if the plaintiff is 'a participant in some capacity in the market in which the merger occurs,'" or "merely allege[s] an intent to enter the relevant market."  (Pls.' Opp'n to NFL Def.'s Mot. 24.)  However, antitrust injury is not as broadly defined as Plaintiffs contend, see Brunswick, 497 U.S. at 489, and, in any case, no merger is at issue here, and the AC does

not allege that Plaintiffs ever intended to enter the market for commercial licensing of NFL photos.

In sum, because Plaintiffs fail to plead sufficient facts to demonstrate antitrust injury, they do not satisfy the first "efficient enforcer" factor and dismissal is warranted. See Paycom, 467 F.3d at 293 (holding merchant lacked antitrust standing to challenge MasterCard's policy prohibiting banks from participating in competitor payment-card networks because it was those competitor networks, not the merchant, that were directly harmed); Boyd v. A WB Ltd., 544 F. Supp. 2d 236, 250 (S.D.N.Y. 2008) (holding wheat farmers did not have standing to challenge alleged conspiracy by certain wheat exporters because the farmers' injuries were derivative of the injury suffered by competitor wheat exporters).

With respect to the second factor, directly affected market participants could seek to enforce the antitrust laws on the basis of Plaintiffs' alleged violations. Specifically, Getty's and AP's competitors are potential plaintiffs with respect to the exclusive dealing claims, and Getty and AP themselves are potential plaintiffs with respect to the collective licensing claims. Because each constitutes "an identifiable class . . . whose self-interest would normally

motivate them to vindicate the public interest in antitrust enforcement," Plaintiffs lack standing here.  Associated Gen. Contractors, 459 U.S. at 542.[12]

With respect to the third factor, Plaintiffs' claimed injuries are too speculative to support antitrust standing. Plaintiffs have alleged that absent the NFL Clubs' agreement to collectively license their intellectual property, Getty and AP would have negotiated better terms in agreements with individual NFL Clubs, and that absent the exclusive licensing agreements with Getty and AP, Plaintiffs would have negotiated better terms in their contributor agreements.  (AC ¶ 148.)  Plaintiffs' theory is too speculative.  See, e.g., Paycom, 467 F.3d at 293 (affirming dismissal under Rule 12(b)(6) and rejecting as speculative claim that, absent MasterCard's policy prohibiting member banks from participating in competitor paymentcard networks, competition from Discover and American Express would have caused MasterCard to adopt policies more favorable to plaintiff).

---

[12] That these more direct entities have not filed suit is telling.  As the Supreme Court has observed, "if there is substance to [plaintiffs] claim, it is difficult to understand why the[] direct victims of the conspiracy have not asserted any claim in their own right."  Associated Gen. Contractors, 459 U.S. at 542 n. 47; see also Phillip Areeda & Herbert Hovenkamp, Fundamentals of Antitrust Law, § 3.01c (4th ed. 2011) ("If the 'superior' plaintiff has not sued, one may doubt the existence of any antitrust violation at all.").

Finally, Plaintiffs' claims raise complex and difficult issues of identifying and apportioning damages. "[Q]uantifying [plaintiffs'] damages would require wholesale speculation," and "[i]t would be virtually impossible to apportion damages" between Getty, AP and their competitors, "which [allegedly] suffered direct injuries," and Plaintiffs, who "might have been indirectly harmed." Paycom, 467 F.3d at 294.

All four "efficient enforcer" factors weigh against a finding of antitrust standing.  As such, Plaintiffs' antitrust claims are subject to dismissal.

However, even if Plaintiffs had adequately established standing, the AC would still fail to adequately set forth an antitrust claim.  An antitrust complaint must allege a relevant product market in which the anticompetitive effects of the challenged activity can be assessed.  City of New York v. Grp. Health, 649 F.3d 151, 155 (2d Cir. 2011); see also In re Aluminum Warehousing Antitrust Litig., No. 13-md-2481 (KBF), 2014 WL 4277510, at *21 (S.D.N.Y. Aug. 29, 2014); Global Disc. Travel Servs., LLC v. Trans World Airlines, Inc., 960 F. Supp. 701, 704 (S.D.N.Y. 1997) ("In order to survive a motion to dismiss, a claim under . . . the Sherman Act must allege a

relevant geographic and product market in which trade was
unreasonably restrained or monopolized." (citation omitted)).
When the proposed relevant market is defined without "reference
to the rule of reasonable interchangeability and cross-
elasticity of demand," or "clearly does not encompass all
interchangeable substitute products . . . the relevant market is
legally insufficient and a motion to dismiss may be granted."
Linzer Prods. Corp. v. Sekar, 499 F. Supp. 2d 540, 554 (S.D.N.Y.
2007) (citation omitted); see also Global Disc. Travel Servs.,
LLC, 960 F. Supp. at 705 ("Plaintiffs' failure to define its
market by reference to the rule of reasonable interchangeability
is, standing alone, valid grounds for dismissal." (citations
omitted)).


        Plaintiffs have defined the relevant market as the
"market for commercial licensing of NFL-related stock
photographs." (AC ¶¶ 23, 126.) Generally, however, "the
distribution of a single brand, like the manufacture of a single
brand, does not constitute a legally cognizable market," Global
Disc. Travel Servs., LLC, 960 F. Supp. at 705 (citation
omitted), because to define the market as that group of products
over which a defendant exercises control would "as an analytic
matter read[] the market definition step out of the Sherman
Act." Carell, 104 F. Supp. 2d at 265 (citation omitted); cf.

Adidas Am., Inc. v. NCAA, 64 F. Supp. 2d 1097, 1102 (D. Kan. 1999) ("[A]n antitrust plaintiff may not 'define a market so as to cover only the practice complained of, this would be circular or at least result-oriented reasoning.'" (citation omitted)). Thus, the Second Circuit and courts in the Southern District have often declined to recognize a relevant market defined by a single brand.  See Skyline Travel, Inc. (NJ) v. Emirates, 476 F. App'x 480, 481 (2d Cir. 2012) ("Where, as here, the complaint 'limit[s] a product market to a single brand, franchise, institution, or comparable entity that competes with potential substitutes' or fails to provide a 'plausible explanation as to why a market should be limited in a particular way,' the complaint is properly dismissed." (citations omitted)); Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 328-31 (2d Cir. 2008) (rejecting a proposed relevant market limited to licenses for MLB intellectual property while excluding licenses such as those obtained by plaintiff for "football, boxing, basketball, ice skating, hockey, and NASCAR").[13]

---

[13] See also Hack v. President & Fellows of Yale Coll., 237 F.3d 81, 86-87 (2d Cir. 2000), abrogated on other grounds (concluding that plaintiff had failed to allege a plausible relevant product market confined to Yale education because other colleges and universities provided interchangeable substitutes); Carell, 104 F. Supp. 2d at 264-66 (rejecting alleged "market for licensing Makeup Designs [for the Broadway musical Cats] and other Cats-related intellectual property"); Global Disc. Travel Servs., LLC, 960 F. Supp. at 705 ("The rule of reasonable interchangeability dictates that the relevant product market in this case be at least the market for all airline tickets between the relevant city pairs, not just tickets on [Trans World

In light of relevant Circuit case law, see, e.g., Belfiore v. N.Y. Times Co., 826 F.2d 177, 180 (2d Cir. 1987) (rejecting as "implausible" product market limited to the New York Times newspaper because substitutes reasonably included all "general circulation daily newspapers," at least some of which plaintiffs themselves distributed), the AC does not make sufficient factual allegations that would justify a product market limited to NFL-related photographs to the exclusion of, at a minimum, other sports-related photographs.  Indeed, Plaintiffs contend that they "own the copyrights to and license other sports-related content, including photographs of Major League Baseball ('MLB') and National Collegiate Athletic Association ('NCAA') games and events, and Getty Images had exclusive licensing deals and/or significant licensing partnerships with these entities, including MLB."  (AC ¶ 56.) However, Plaintiffs do not address why the commercial licensing of MLB- or NCAA-related photographs (or any other sports-related photographs) is not reasonably interchangeable with the commercial licensing of NFL-related photographs.

---

Airlines]."); Re-Alco Indus., Inc. v. Nat'l Ctr. for Health Educ., Inc., 812 F. Supp. 387, 391-92 (S.D.N.Y. 1993) (holding that one particular brand of health education materials was not a plausible relevant product market); Deep S. PepsiCola Bottling Co. v. Pepsico, Inc., No. 88 Civ. 6243, 1989 WL 48400, at *7-8 (S.D.N.Y. May 2, 1989) ("Plaintiffs' proposed market – Pepsi-Cola bottling franchises in the United States – does not comprise a viable antitrust market" and the "relevant product market might more reasonably be drawn as national brand soft drinks"); Shaw v. Rolex Watch, US.A., Inc., 673 F. Supp. 674, 679 (S .D.N.Y. 1987) ("This Court does not need protracted discovery to state with confidence that Rolex watches are reasonably interchangeable with other high quality timepieces.").

The court in Weber v. National Football League, 112 F. Supp. 2d 667 (N.D. Ohio 2000), dismissed a Sherman Act claim for failure to allege a relevant market under similar circumstances. There, the plaintiff, who bought and sold many different kinds of domain names, alleged that NFLP, the Miami Dolphins and New York Jets had monopolized the market for the domain names "dolphins.com" and "jets.com."  The court held that the plaintiff had failed to demonstrate why the relevant market should not be more broadly defined as domain names in general. Id. at 674.  Similarly here, in the face of Plaintiffs' allegations identifying a potential broader market for licensing of sports-related photographs, Plaintiffs have failed to allege a plausible product market limited to NFL-related photographs at this juncture.  See Adidas Am., Inc., 64 F. Supp. 2d at 1103 (rejecting "market for the sale of NCAA Promotional Rights" because "Adidas has failed to explain [why] ... sponsorship agreements with teams or individuals competing in the National Football League, the National Basketball Association, the Women's National Basketball Association, Major League Baseball, Major League Soccer, or the Olympics, are not reasonably interchangeable with NCAA promotion rights or sponsorship agreements"); Theatre Party Assocs., Inc. v. Shubert Org., Inc., 695 F. Supp. 150, 154-55 (S.D.N.Y. 1988) ("Plaintiff has failed to explain why other forms of entertainment, namely other

Broadway shows, the opera, ballet or even sporting events are not adequate substitute products.").

Plaintiffs contend that American Needle v. New Orleans Louisiana Saints, 385 F. Supp. 2d 687 (N.D. Ill. 2005) and Dang v. San Francisco Forty Niners, 964 F. Supp. 2d 1097 (N.D. Cal. 2013) support the market limited to commercial licenses for NFL-related photos that they have defined. However, Second Circuit precedent instructs that there exist available substitutes for the intellectual property of a professional sports organization. See Salvino, 542 F.3d at 330. Moreover, the relevant markets alleged in American Needle and Dang are distinguishable from the market Plaintiffs assert here. The product markets in those cases were potentially limited to NFL-related headwear and apparel because there was evidence suggesting that "for many people purchasing headwear and apparel with an NFL team's logo, they are purchasing the ability to be identified with a particular team – the right to be recognized as a fan." New Orleans Louisiana Saints, 385 F. Supp. 2d at 694. As a result, the courts concluded that "[i]f a store sold out of hats carrying the Chicago Bears logo, these individuals would not necessarily find caps carrying logos for Spongebob, the University of Michigan, or even the Chicago Bulls to be reasonable substitutes." Id.; Dang, 964 F. Supp. 2d at 1108.

In short, the courts relied on fan loyalty to find a genuine
dispute about reasonably interchangeable products in those
markets.

The same cannot be said of the "market for commercial
licensing of NFL-related stock photographs." The "consumers" in
the market alleged here are commercial enterprises licensing
NFL-related photos to promote their products. (AC ¶¶ 150-52.)
Plaintiffs have not plausibly alleged, and the AC is devoid of
any facts to suggest, that if the price of NFL-related photos
were to increase, "national photo licensors, media outlets,
online vendors, clothing retailers, and any other companies that
sell advertisements or products" (AC ¶ 151) would not simply
substitute different, less costly sports photographs to promote
their products.

Adidas America is analogous to the instant case. In
Adidas America, the court rejected plaintiff's proposed "market
for the sales of NCAA promotional rights" because plaintiff had
"failed to explain . . . why . . . sponsorship agreements with
teams or individuals competing in the National Football League,
the National Basketball Association, the Women's National
Basketball Association, Major League Baseball, Major League
Soccer, or the Olympics, are not reasonably interchangeable with

NCAA promotion rights or sponsorship agreements." <u>Adidas Am.</u>,
64 F. Supp. 2d at 1103.  The court dismissed plaintiff's
antitrust claims on the pleadings because it had "not explained
why sponsorship agreements with teams or individuals in any of
the above organizations would fail to satisfy Adidas' goal of
enhancing the 'visibility of adidas' trademarks on the playing
field' and authenticating Adidas as a 'high quality athletic
brand, with products that serve the high performance needs of
athletes.'"  <u>Id</u>.


Additionally, Plaintiffs allege that the NFL Clubs
conspired to restrain trade in the market for commercial
licensing of NFL-related photographs by allowing the NFL to
"control and make decisions relating to each NFL Team's
independently owned intellectual property."  (AC ¶ 127.)
However, the court in <u>Washington v. National Football League</u>,
880 F. Supp. 2d 1004 (D. Minn. 2012) dismissed nearly identical
claims.


In <u>Washington</u>, a putative class of former professional
football players alleged that the NFL and NFL Clubs had
monopolized the market for former players' likenesses in
violation of Section 1 by not giving the players rights to
historical game films and images from the games in which they

62

played.  Id. at 1005.  In dismissing Plaintiffs' claims, the
court carefully analyzed the implications of the Supreme Court's
decision in American Needle, Inc. v. National Football League,
560 U.S. 183 (2010), noting a clear distinction between
intellectual property that each NFL Club separately owns and
property that is collectively owned:

> Here, unlike in American Needle, the intellectual
> property involved is historical football game
> footage, something that the individual teams do
> not separately own, and never have separately
> owned.  Rather, the NFL owns the game footage,
> either alone or in conjunction with the teams
> involved in the game being filmed.  These
> entities must cooperate to produce and sell these
> images; no one entity can do it alone . . . .  The
> NFL and its teams can conspire to market each
> teams' individually owned property, but not
> property the teams and the NFL can only
> collectively own.

Washington, 880 F. Supp. 2d at 1006.


        Similarly here, many if not most of the photographs at
issue contain intellectual property owned by the NFL and at
least one NFL Club - e.g., photographs displaying both the NFL
shield and NFL Club marks on a player's jersey and/or helmet,
typically in NFL game-action settings or at NFL events.
Plaintiffs claim that their photo libraries include "tens of
thousands of photos . . . that do[] not include any marks,
logos, or other intellectual property owned by the NFL

Entities." (AC ¶¶ 34-35.) Yet the majority of photographs Plaintiffs have attached to the AC are game-action photographs displaying the marks of the NFL and at least one NFL Club, and in many cases two NFL Clubs, and Plaintiffs have not pleaded sufficient facts to suggest that this case is principally about anything other than these types of NFL game and event photographs. Such photographs necessarily contain the intellectual property of more than one entity, and constitute "collectively owne[d]" property under Washington; the NFL and NFL Clubs "must cooperate to produce and sell these images; no one entity can do it alone." Washington, 880 F. Supp. 2d at 1006. As such, Plaintiffs have not plausibly alleged collective action by the NFL Defendants, and their Section 1 claim fails as a matter of law.[14]

---

[14] At a minimum, under American Needle the collective licensing of intellectual property for NFL-related photographs is reasonable as a matter of law because collective licensing is "essential if the product is to be available at all." 560 U.S. at 203. In such cases, "the Rule of Reason may not require a detailed analysis; it 'can sometimes be applied in the twinkling of an eye.'" Id.; see also Agnew v. NCAA, 683 F.3d 328, 341 (7th Cir. 2012) (concluding that under American Needle, certain restraints, particularly necessary venture activities, may be held procompetitive, and thus lawful, in the "twinkling of an eye" - i.e., "at the motion-to-dismiss stage"). Here, without NFL and NFL Club cooperation, licensees would be unable to obtain from any one entity the rights to use photographs of NFL games and events, which exist only by virtue of that cooperation. See American Needle, 560 U.S. at 202 ("The fact that NFL teams share an interest in making the entire league successful and profitable, and that they must cooperate in the production and scheduling of games, provides a perfectly sensible justification for making a host of collective decisions."). Moreover, the pro-competitive benefits of collectively licensing intellectual property rights in NFL-related photographs are abundantly clear. See Broad. Music, Inc. v. Columbia Broad. Sys., Inc., 441 U.S. 1, 18-23 (1979). If a collective license were not available, a photo-by-photo assessment would be required to determine who may hold intellectual property rights in any given

Plaintiffs argue that the decision in <u>Washington</u> is inapposite and that "Plaintiffs' claims relate to still photography which neither the NFL nor the NFL Teams have <u>ever</u> owned any copyright." (Pls.' Opp'n to NFL Def.'s Mot. 37.) Nowhere in <u>Washington</u>, however, did the court limit "collectively own[ed]" property to copyright holders. Rather, the court deemed historical game footage "collectively own[ed]" because "the intellectual property involved is . . . something that the individual teams do not separately own, and never have separately owned." <u>Washington</u>, 880 F. Supp. 2d at 1006. NFL and the NFL Clubs "must cooperate to produce and sell these images; no one entity can do it alone." <u>Id</u>. Likewise, the majority of photos at issue here are "collectively owned" because they contain the trademarks of the NFL and at least one NFL Club, or the trademarks of more than one NFL Club, and thus neither the NFL nor any individual NFL Club alone could license these photos.

With respect to those photographs that reflect the intellectual property of only a single NFL Club, Plaintiffs also fail to allege a viable antitrust claim challenging the NFL Clubs' collective licensing arrangement. As the Second Circuit held in <u>Buffalo Broadcasting Co. v. American Society of</u>

photograph, and individual licensing negotiations would be required for every single photograph.

Composers, Authors & Publishers, a collective licensing

agreement does not constitute a "restraint" within the meaning

of Section 1 when "an alternative opportunity to acquire

individual rights is realistically available."  744 F.2d 917,

925 (2d Cir. 1984).[15]  Plaintiffs assert that the NFL maintains

exclusive control over each NFL Club's independently owned

intellectual property in the commercial market for photographs.

(AC ¶¶ 127, 130.)  However, ████████████████████████████

████████████████████████████████  the NFL Clubs have not

granted the NFL exclusive control or licensing rights over all

NFL-related photographs████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

───────────────

[15] The Second Circuit made clear that although it might be "difficult" to
obtain licenses outside the joint venture, "realistic alternative[s]" to a
collective license exist so long as individual licensing remains possible.
Buffalo Broad., 744 F.2d at 929.  The court reached this conclusion without
any showing that alternatives to the blanket license were popular, or even
that any such alternatives had ever been actively pursued.  Id. at 928
(finding no evidence that "any local [television] station ever offered any
composer a sum of money in exchange for the performing rights to his music").
Thus, so long as an individual venture member is not precluded from granting
an individual license, a collective licensing agreement may not, as a matter
of law, violate Section 1.

███████████████████████████   Plaintiffs argue that the Court

should not consider the █████████████████████████ limiting

the exclusivity of the collective license to "game action

photographs" in ruling on the NFL Defendants' motion to dismiss.

However, the collective licensing agreement memorialized in ███

████████████████████████ may be considered without

converting the NFL Defendants' motion to one for summary

judgment because Plaintiffs have made clear, definite, and

substantial reference to the collective licensing agreement in

the AC (see, e.g., AC ¶¶ 24, 38, 127, 130, 133, 137, 149), and

thus have incorporated that agreement into their pleadings.  The

collective licensing agreement may be interpreted as a matter of

law, Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C., 223 F.

Supp. 2d 435, 444 (S.D.N.Y. 2001), and the agreement plainly

grants NFL exclusive licensing rights only to "game action

photographs" and not to "photos taken at NFL Team practices,

functions, and events" (AC ¶ 35).


Additionally, Plaintiffs' assertion that this case

involves "tens of thousands of photos [in their photo libraries]

that do[] not include any marks, logos, or other intellectual

property owned by the NFL Entities" (AC ¶¶ 34-35) is

contradicted by the exhibits that Plaintiffs attached to the AC,

which depict a multitude of images, many of which, if not most,

display the intellectual property of the NFL, for example, the NFL shield on players' jerseys and/or helmets, as well as the intellectual property of at least one NFL Club.

Thus, Plaintiffs have not adequately alleged that the NFL Clubs' collective licensing is a "restraint" within the meaning of Section 1.  As such, on this basis, their claims relating to such collective licensing must be dismissed.

Plaintiffs further allege that the NFL Defendants' granting of exclusive licenses to Getty and then AP violates Section 1 of the Sherman Act.  (AC ¶ 135.)  They claim that this anticompetitive activity began in 2003, when the NFL decided to use third parties to license the commercial rights to NFL photographs rather than continuing to conduct such licensing in-house through NFL Photos.  (Id. ¶¶ 44-46.)  However, these agreements cannot harm competition; an exclusive license is something that the NFL can legally achieve without the aid of a licensee.  See E&L Consulting, Ltd. v. Domain Indus. Ltd., 472 F.3d 23, 30 (2d Cir. 2006) (finding no harm to competition as a result of exclusive distributorship "because the alleged single source and price increase, even if monopolistic, is something [defendant] can achieve without the aid of a distributor"); cf. Washington, 880 F. Supp. 2d at 1007 ("Plaintiffs also contend

that, because the game footage involved here is owned collectively, the antitrust laws somehow prescribe how the collective can market and sell the intellectual property it owns.  But this is precisely what the antitrust laws do not prohibit.").[16]

Moreover, because the benefits of exclusive licensing agreements are well-recognized, the Second Circuit has stated that these "arrangements are presumptively legal."  E&L Consulting, Ltd., 472 F.3d at 30.  An exclusive licensing arrangement violates Section 1 only when it "will foreclose competition in a substantial share of the line of commerce affected."  Tampa Elec. Co. v. Nashville Coal Co., 365 U.S. 320, 327 (1961); see also U.S. Dep't of Justice and Federal Trade Comm'n, Antitrust Guidelines for the Licensing of Intellectual Property § 4.3 (1995) ("Absent extraordinary circumstances, the Agencies will not challenge a restraint in an intellectual property licensing arrangement if (1) the restraint is not facially anticompetitive and (2) the licensor and its licensees

---

[16] Plaintiffs also take issue with NFLP's decision in 2009 to grant exclusive licensing rights to AP, rather than Getty.  (AC ¶ 55.)  But "freedom to switch suppliers lies close to the heart of the competitive process that the antitrust laws seek to encourage."  Nynex Corp. v. Discon, Inc., 525 U.S. 128, 137 (1997).  Therefore, "[i]t is not 'a violation of the antitrust laws, without a showing of actual adverse effect on competition market-wide, for a manufacturer to terminate a distributor . . . and to appoint an exclusive distributor.'"  E&L Consulting, Ltd., 472 F.3d at 29 (alteration in original, citation omitted).

collectively account for not more than twenty percent of each relevant market significantly affected by the restraint.").

In order to adequately plead foreclosure in a relevant market, a plaintiff first must properly define the relevant market. See, e.g., Linzer Prods. Corp., 499 F. Supp. 2d at 554-55 (dismissing exclusive dealing claim because single patented product was not a relevant product market). As discussed above, Plaintiffs have failed to allege a properly defined product market. In fact, Plaintiffs allege that despite losing the NFL exclusive license to AP, Getty continued to hold commercial licensing rights to MLB- and NCAA-related photographs (AC ¶ 58), thus acknowledging that competition for commercial licensing of sports-related photographs is not foreclosed by the NFL's exclusive licensing agreements.

In addition, the challenged agreements are not "exclusive;" rather, as noted above, the agreements provide Getty and AP only with exclusive rights limited to licensing NFL photographs to ███████████████████ not to individual NFL Club business partners. (Getty Agreement ██████, First AP Agreement ████, Second AP Agreement ██████.) Once the relevant market is properly defined to include, at a minimum, the commercial licensing of all sports-related photographs (a market

in which NFL-related photographs constitute only a small fraction) and takes into account the limited "exclusivity" granted to Getty and AP, Plaintiffs cannot allege foreclosure. See Sterling Merch., Inc. v. Nestlé, S.A., 656 F.3d 112, 123-24 (1st Cir. 2011) ("'[F]oreclosure levels are unlikely to be of concern where they are less than 30 or 40 percent,' and while high numbers do not guarantee success for an antitrust claim, 'low numbers make dismissal easy.'" (citation omitted)); CDC Techs., Inc. v. Idexx Labs., Inc., 186 F.3d 74, 77 n. 1, 80 (2d Cir. 1999) (noting that for exclusivity agreement limited to a single product line, "[i]f competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution, it is unclear whether exclusive dealing arrangements with distributors foreclose from competition any part of the relevant market" (citations omitted) (emphasis in original)).

It also is well established that exclusive agreements do not harm competition when there is competition to obtain the exclusive contract.  The Second Circuit has recognized that "[s]uch a situation may actually encourage, rather than discourage, competition, because the incumbent and other [competitors] . . . have a strong incentive continually to improve the [services] and prices they offer in order to secure

71

the exclusive positions." Balaklaw v. Lovell, 14 F.3d 793, 799 (2d Cir. 1994); see also Indeck Energy Servs., Inc. v. Consumers Energy Co., 250 F.3d 972, 977-78 (6th Cir. 2000) (affirming dismissal of antitrust claims "in light of the fact that the exclusive contracts were of limited duration, and in light of the fact that the customers were free to seek other [suppliers] at the conclusion of the contracts"); Paddock Publ'ns, Inc. v. Chi. Tribune Co., 103 F.3d 42, 45 (7th Cir. 1996) ("Competition-for-the-contract is a form of competition that antitrust laws protect rather than proscribe.").

Here, the NFL's licensing agreements with Getty and AP had exclusivity periods of no more than three years, and the NFL "entertained bids for the exclusive commercial licensing rights for NFL and NFL Team photos" at the conclusion of each agreement's term. (AC ¶¶ 25-27.) These types of contracts do not foreclose competition and are not anticompetitive as a matter of law. See Indeck Energy Servs., Inc., 250 F.3d at 975, 977-78 (dismissing Section 1 complaint and describing as a "limited exclusivity deal" five to ten-year exclusives with nineteen facilities); Balaklaw, 14 F.3d at 799 (noting that "opportunities for competition remain[ed]" for three-year exclusive dealing contract with early termination provision); Ferguson v. Greater Pocatello Chamber of Commerce, Inc., 848

F.2d 976, 982 (9th Cir. 1988) (upholding an exclusive six-year
lease because all competitors had an equal opportunity to bid
for the lease and "[s]uch an opportunity for free competition
shall presumably arise again at the end of the six-year lease").
In their opposition, Plaintiffs contend that the NFL's arguments
"conflict with Plaintiffs' well-pleaded allegations that the
bidding process was not open and competitive and did not promote
competition." (Pls.' Opp'n to NFL Def.'s Mot. 40.) However,
the AC itself alleges that each time NFL entered into an
exclusive licensing agreement, it "entertained bids for the
exclusive commercial licensing rights for NFL and NFL Team
photos." (AC ¶¶ 25-27.) Indeed, because the AC plainly alleges
that there was competition to obtain the exclusive contract and
that the exclusive licenses granted by NFL were of limited
duration (AC ¶¶ 25-27), Plaintiffs cannot plausibly allege
market foreclosure and harm to competition stemming from the
challenged agreements.


   b. Antitrust Claims Against AP


      As discussed above with respect to the NFL Defendants,
Plaintiffs lack standing to recover damages for the alleged
antitrust violation because (1) Plaintiffs' asserted injury is
indirect; (2) other, better-positioned potential plaintiffs

exist; (3) Plaintiffs' claimed injuries are speculative; and (4) identifying damages and apportioning them among Plaintiffs would be speculative.  See Gatt Commc'ns, 711 F.3d at 78.

Additionally, Plaintiffs' AC does not allege that AP had any involvement in an alleged agreement between the NFL and the NFL Clubs to create NFLP and to manage all commercial licensing of NFL-related stock photographs through NFLP.  (AC ¶¶ 23-24; see also AC ¶¶ 37-39, 126-128, 130, 133).  Plaintiffs allege only two agreements involving AP in their antitrust claim: the First and Second AP Agreements, effective respectively April 1, 2009 and April 1, 2012, each of which granted AP the exclusive right to commercially license NFL and NFL Club photographs for a term of three years.  (AC ¶¶ 26-27, 54.)

Plaintiffs do not allege facts supporting a plausible inference that these exclusive license agreements are unlawful. An exclusive license, which merely confers upon the licensee the ability to exploit the licensor's exclusive intellectual property rights, does not violate the antitrust laws.  Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 135-36 (1969); D.E. Virtue v. Creamery Package Mfg. Co., 227 U.S. 8, 36-37 (1913); Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931,

74

949 (Fed. Cir. 1993), cert. denied, 114 S. Ct. 1126, abrog. on other grounds, 551 U.S. 277 (1994); U.S. v. Studiengesellschaft Kohle, m.b.H., 670 F.2d 1122, 1127 (D.C. Cir. 1981); U.S. v. Westinghouse Elec. Corp., 648 F.2d 642, 647 (9th Cir. 1981); SCM Corp. v. Xerox Corp., 463 F. Supp. 983, 1005 (D. Conn. 1978), aff'd on other grounds, 645 F.2d 1195 (2d. Cir. 1981). Moreover, the license agreements in this case are "vertical" arrangements, meaning that they occur between companies at different levels of the distribution chain. See Bus. Elecs. Corp. v. Sharp Elecs. Corp, 485 U.S. 717, 730 and n. 4 (1988). Exclusive vertical arrangements of this nature are presumptively legal under the antitrust laws. See E&L Consulting, 472 F.3d at 30 (citing Elec. Comm's Corp. v. Toshiba Am. Consumer Prods., 129 F.3d 240, 245 (2d Cir 1997)).  To overcome that presumption at the pleading stage, a plaintiff must allege facts showing exceptional circumstances, such as evidence of predatory practices or a "unique" opportunity to leverage two distinct monopolies.  E&L Consulting, 472 F.3d at 30.  A plaintiff that fails to allege such exceptional circumstances fails to state a Section 1 claim under the Sherman Act and its complaint must be dismissed under Rule 12(b)(6).  Id.; Elec. Comm's Corp., 129 F.3d at 242.


In this case, Plaintiffs' AC fails to allege

exceptional circumstances, or anything else that suggests that the First and Second AP Agreements were something other than standard exclusive licensing arrangements. As noted above, Plaintiffs' own factual allegations regarding the competitive bidding process conducted by NFL undercut claims of illegality. (AC ¶¶ 26-27, 54, 88; Deutsch Decl. Ex. A at 1 and Ex. B at 1.) Exclusive vertical agreements of reasonable duration that are subject to a competitive award process do not violate the antitrust laws. See Balaklaw, 14 F.3d at 799 ("Such a situation may actually encourage, rather than discourage, competition, because the incumbent and other, competing [suppliers] have a strong incentive continually to improve the care and prices they offer in order to secure exclusive positions."); see also Ferguson, 848 F.2d at 982 (six-year lease that is subject to competitive award is not unlawful).

Accordingly, Plaintiffs have not alleged facts that would support a finding of exceptional circumstances, and have not overcome the presumption that the NFL and AP's exclusive license agreements are legal. Plaintiffs' antitrust claim against AP must, on this basis, therefore be dismissed.

Furthermore, as discussed above with respect to the NFL Defendants, Plaintiffs have not alleged facts plausibly

suggesting that they suffered anticompetitive injury from the existence or performance of the exclusive license agreements, a substantive element of every private antitrust claim.  See Atl. Richfield, 495 U.S. at 334 (citing Brunswick, 429 U.S. at 489); Daniel v. Am. Bd. of Emergency Med., 428 F.3d 408, 441 (2d Cir. 2005); USAirways Group, Inc. v. British Airways PLC, 989 F. Supp. 482, 488 (S.D.N.Y. 1997).  The allegedly anticompetitive injury that Plaintiffs claim to have suffered is that Defendants "precluded Plaintiffs from seeking or obtaining fair market value for commercial uses of their NFL photographs."  (AC ¶ 143.)  However, the AC appears to allege that this injury does not arise from the fact that AP had an exclusive license with NFLP, but from the NFL Defendants' alleged exercise of market power conferred by an ostensible agreement between the NFL, the NFL Clubs, and NFLP to monopolize the market for commercial use of NFL-related photos.[17]  (See AC ¶ 133.)  However, the fact that

---

[17] Specifically, Plaintiffs allege:

- "[T]he NFL Defendants leveraged their illegal monopoly to obtained [sic] unfettered access to Plaintiffs' works and force Plaintiffs' agents to purportedly grant 'complimentary' or 'non-royalty bearing" licenses."  (AC ¶ 75.)

- "AP granted this retroactive 'license' to the NFL under threats of coercive pressure by the NFL, including the threat of moving its exclusive license back to Getty Images, which had submitted a bid to reacquire the NFL's business."  (AC ¶ 88.)

- "The NFL exploited its illegal control and monopoly of the commercial licensing rights to NFL content to force Getty Images and now AP to grant the NFL unfettered access to Plaintiffs' image libraries and to rob Plaintiffs of their rightful compensation for such uses."  (AC ¶

NFLP gave an exclusive license to AP is irrelevant to Plaintiffs' alleged anticompetitive injury. Assuming, <u>arguendo</u>, that the NFL Defendants exercise monopoly power over the commercial use of NFL-related photographs, Plaintiffs would suffer the injury they allege regardless of whether the NFL Defendants (1) used an exclusive licensee such as AP or Getty Images, (2) used several non-exclusive licensees under terms similar to those of the AP agreements, or even (3) chose one NFL defendant to negotiate directly with the Plaintiffs and licensed their NFL-related photographs directly to commercial end-users. As such, there is a critical disjunction, as mentioned above, between the market injury asserted and the injury suffered. <u>See In re LIBOR-Based Fin. Instr. Antitrust Litig.</u>, 935 F. Supp. 2d 666, 690 (S.D.N.Y. 2013); <u>S.W.B. New England, Inc. v. R.A.B. Food Grp., LLC</u>, 06 Civ. 15357, 2008 WL 540091 (S.D.N.Y. Feb. 27,

---

95).

- "The NFL has been able to convince Plaintiffs' licensing agents to purportedly allow this rampant and blatant exploitation of Plaintiffs' works only because of its illegal monopoly over the commercial licensing rights to NFL content." (AC ¶ 96.)

- "The NFL Defendants' illegal conduct directly and proximately created the circumstances that forced Plaintiffs into a 'take-it-or-leave-it' scenario when negotiating license terms with the NFL's chosen exclusive licensing partner (first Getty Images until 2009 and then AP thereafter)." (AC ¶ 144.)

- "If it were not for the NFL's illegal efforts to control the commercial licensing market for NFL-related stock photos, Plaintiff's licensing agents would not have been forced to purportedly grant the NFL 'complimentary' usage of Plaintiffs' photos." (AC ¶ 148.)

2008); <u>Granite Partners</u>, 58 F. Supp. 2d at 242.

Because NFL's exclusive license to AP is not alleged to be the cause of Plaintiffs' alleged anticompetitive injury, the AC fails to allege an "antitrust injury" with respect to AP.

Neither is Plaintiffs' assertion that "[t]he NFL Teams and NFL Entities conspired to and did illegally restrain trade in concert with Getty Images and AP" (AC ¶ 129; <u>see also</u> AC ¶ 141) persuasive.  There are no facts alleged to support this assertion of concerted action, and the conclusion itself does not state an antitrust claim against AP.  <u>Twombly</u>, 550 U.S. at 570; <u>Iqbal</u>, 556 U.S. at 678; <u>Port Dock</u>, 507 F.3d at 121; <u>In re Elevator Antitrust Litig.</u>, 502 F.3d at 50.  In particular, Plaintiffs do not allege that AP was involved in the agreement between the NFL Defendants that is the alleged source of the anticompetitive harm.

Indeed, even if the NFL Defendants' alleged conduct violated the Sherman Act, the alleged violation would not allow Plaintiffs to sue in antitrust.  As noted above, Plaintiffs are not participants in the relevant market and cannot recover for antitrust injury.  <u>See, e.g.</u>, <u>Reading Int'l, Inc. v. Oaktree Capital Mgmt.</u>, 317 F. Supp. 2d 301, 335 (S.D.N.Y. 2003) (noting

"suppliers to direct participants in relevant market 'typically cannot seek recovery under the antitrust laws because their injuries are too secondary and indirect . . . .'") (citing Associated Gen. Contractors, 459 U.S. at 311).  Likewise, the antitrust claim against AP is not saved because Plaintiffs now allege that the First and Second AP Agreements "purport to grant an exclusive license to all NFL-related photos . . . even if the photos feature only individual players, individual team colors, individual team logos, or other team specific intellectual property that is individually owned by the respective NFL Team." (AC ¶ 136.)  The allegedly anticompetitive bundling of those licenses does not stem from the fact that AP's license is exclusive, but rather, again, from the alleged agreement among the NFL Defendants to manage all of those rights together through a single entity, NFLP.  As already stated, the NFL Defendants could achieve the same alleged anticompetitive effect without using a licensing intermediary at all.

Because Plaintiffs' alleged anticompetitive injury does not derive from AP's exclusive license, and the AC does not allege that AP was involved in any other anticompetitive agreement, Plaintiffs have failed to allege an antitrust injury with respect to AP.  Additionally, for the reasons stated above, Plaintiffs also fail to allege a plausible relevant product

80

market.

The antitrust claim against AP must be dismissed for failure to state a claim.


**III.  The Motions To Dismiss Plaintiffs' Copyright Infringement Claims (Count II) Against AP And NFL Defendants Are Granted**[18]


a. Copyright Infringement Claims Against AP


In general, Plaintiffs allege that AP "exceeded the scope" of the limited rights granted to it under the AP Contributor Agreements by granting NFL an invalid sublicense, thereby infringing on Plaintiffs' copyrights.  (AC ¶ 192.)  They further allege that AP also infringed Plaintiffs' copyrights by offering copies of Plaintiffs' photos for sale through its "NFL Photo Store" that it operates jointly with Replay.  (AC ¶ 195.)


In general, a copyright owner who grants an exclusive or nonexclusive license to use a work waives any right to assert

---

[18] Because Getty's motion to compel arbitration is granted, the claims regarding the NFL Defendants' uses of Plaintiffs' Getty photos will be stayed pending arbitration.  See, e.g, Hikers Indus., Inc. v. William Stuart Indus. (Far East) Ltd., 640 F. Supp. 175, 178 (S.D.N.Y. 1986) ("A stay as to claims against a nonarbitrating defendant is properly granted where the arbitration of the plaintiff's claims against a defendant party to the arbitration would at least partially determine the issues which form the basis of the claim against that non-arbitrating defendant.").

an infringement claim against the licensee, or anyone whom the
licensee is entitled to sublicense, for acts within the scope of
the license or sublicense.  Graham v. James, 144 F.3d 229, 236
(2d Cir. 1998); U.S. Naval Inst. v. Charter Commc'ns, Inc., 936
F.2d 692, 695 (2d Cir. 1991); Harris v. Simon & Schuster, Inc.,
646 F. Supp. 2d 622, 630 (S.D.N.Y. 2009) (a "valid license,
either exclusive or non-exclusive, immunizes the licensee from a
charge of copyright infringement, provided that the licensee
uses the copyright as agreed with the licensor") (citation and
internal quotation marks omitted).  A defendant may raise a
complete defense to a copyright infringement claim by presenting
the court with the license or sublicense on a motion to dismiss,
and "[d]ismissal of a claim for copyright infringement is proper
where a contract underlying the suit clearly and unambiguously
demonstrates the existence of the defendant's license to exploit
the plaintiff's copyrights and where plaintiff has not shown any
limitation on that license."  Ariel (UK) Ltd. v. Reuters Grp.
PLC, No. 05 Civ. 9646, 2006 WL 3161467, at *5 (S.D.N.Y. Oct. 31,
2006); see also Jasper v. Sony Music Entm't, Inc., 378 F. Supp.
2d 334, 338 (S.D.N.Y. 2005) (noting that document essential to a
complaint's allegations may be considered on a motion to
dismiss).

          The license that each Plaintiff granted to AP in his

AP Contributor Agreement is as broad as the Plaintiff's own copyright in his photos. For each photo at issue in the lawsuit, AP is given a "perpetual, irrevocable transferable worldwide right and license to reproduce, edit, translate the caption of, prepare derivative works of, publicly perform, publicly display, load into computer memory, cache, store and otherwise use" the photos <u>and</u> the right to "transfer or sublicense these rights to other entities." (AP Contributor Agreements, § 4.2.) Thus, under the plain language of the AP Contributor Agreements, neither AP's license in the photos nor the sublicenses AP may grant appear to be limited as Plaintiffs allege.

Nothing in the license requires AP to issue only royalty-bearing sublicenses. AP acted within its licensed rights by granting the NFL Entities a sublicense giving them

███████████████████████████████████████████

███████████████████████████████████

█████████████████ The NFL Entities' permissible uses include all those set forth in the Second AP Agreement's definition of "Scope of Use" (the "NFL Scope of Use").[19] (Second AP Agreement,

---

[19] ████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████

§ 4(a).)

The Second AP Agreement further states that ██████ ████████████████████████████████████ ██████████████████████████████████ ████████████████████████ Id. ██████. The license provisions of the AP Contributor Agreements show that when AP granted this sublicense, each Plaintiff had already given AP the rights to issue such a sublicense, as of the effective date of the Plaintiff's AP Contributor Agreement.

Plaintiffs contend that reading the AP Contributor Agreements to include a right to issue non-royalty-bearing sublicenses constitutes an "overly broad reading" and that there is no language that "expressly permit[s]" the issuance of retroactive or non-royalty-bearing sublicenses. (See Pls.' Opp'n to AP Mot. 26-27.) However, Plaintiffs fail to cite to authority holding that each right in a license must be specifically called out to exist.[20]

███████████████████████████████████████████ ██████████████████████████████████

---

[20] Plaintiffs cite to S.O.S., Inc. v. Payday, Inc., 886 F.2d 1081, 1088 (9th Cir. 1989) to support their argument. However, S.O.S. merely states the standard rule that copyright licenses are presumed to "prohibit any use not authorized." Id. at 1087.

Copyright licenses are construed according to neutral principles of contract interpretation.  See Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co., 145 F.3d 481, 487 (2d Cir. 1998); Wu v. Pearson Educ. Inc., No. 10 Civ. 6537, 2013 WL 145666 at *4 (S.D.N.Y. Jan. 11, 2013); Leutwyler v. Royal Hashemite Court of Jordan, 184 F. Supp. 2d 303, 306 (S.D.N.Y. 2001).  In cases where only the scope of the license is at issue, it is the copyright owner's burden to prove that defendant's usage was unauthorized.  MAI Photo News Agency, Inc. v. Am. Broad. Co., Inc., 97 Civ. 8908, 2001 WL 180020, at *4 (S.D.N.Y. Feb. 22, 2001).  The licensor who argues that there should be an exception or deviation from the meaning reasonably conveyed by the language of a license loses, because he or she "should bear the burden of negotiating for language that would express the limitation or deviation."  Boosey & Hawkes Music Publishers, 145 F.3d at 487.

As made plain by the language of the AP Contributor Agreements, the grant of rights made by Plaintiffs to AP, and AP's right to sublicense these rights to others is broad and unlimited.  Section 4.2 of the AP Contributor Agreements state that AP is granted a "perpetual, irrevocable, transferable, worldwide, right and license to reproduce, edit, translate the caption of, prepare derivative works of, publicly perform,

publicly display, load into computer memory, cache, store and
otherwise use the [NFL-related photos at issue] and <u>to transfer
and sublicense these rights to other entities</u>." (Emphasis
added.) Non-royalty-bearing licenses are not excluded from this
grant. If Plaintiffs wanted to exclude non-royalty-bearing
sublicenses, such a term should have been negotiated and
included explicitly, <u>Boosey & Hawkes</u>, 145 F.2d at 497, and
cannot be read in by the Court. <u>See, e.g.</u>, <u>Gentieu v. Tony
Stone Images/Chicago, Inc.</u>, 225 F. Supp. 2d 838 (N.D. Ill. 2003)
(finding giving price discounts for images did not exceed the
scope of a broad license).

    In their opposition, Plaintiffs assert, among other
things,[21] that the language of the AP Contributor Agreements
supports their argument that non-royalty-bearing sublicenses
constitute a breach of contract. Specifically, Plaintiffs
contend that apart from two instances in which AP is not

---

[21] Plaintiffs make several assertions which will be briefly addressed. First,
Plaintiffs contend that AP did not contest the plausibility of their
copyright claims. This, however, is clearly contradicted by AP's moving
memorandum. (<u>See</u> AP Mot. 13-19.) Second, Plaintiffs make a passing
assertion that the AP Contributor Agreements may be invalid due to "fraud."
(Pls.' Opp'n to AP Mot. 18.) However, the AC does not allege fraud, so this
contention will be disregarded. Last, Plaintiffs make mention of the
doctrine of <u>contra proferentum</u> (Pls.' Opp'n to AP Mot. 22 n. 8), but that
doctrine only applies where a contract is ambiguous which, as discussed
below, the contracts do not appear to be, and only where there are no other
interpretative tools to determine the parties' intent. <u>See</u> <u>Chesapeake Energy
Corp. v. Bank Of New York Mellon Trust Co., N.A.</u>, 773 F.3d 110, 117 n. 3 (2d
Cir. 2014); <u>Int'l Multifoods Corp. v. Commercial Union Ins. Co.</u>, 309 F.3d 76,
88 n. 7 (2d Cir. 2002). Here, the AP Contributor Agreements' meaning may be
clearly gleaned from their text.

required to remit royalties (downloading of browse-quality
preview or thumbnail images and where AP uses event photos for
its publicity or advertising materials), every other kind of
sublicense that AP issues must be royalty-bearing. (Pls.' Opp'n
to AP Mot. 22-23.)  However, Section 5 of the AP Contributor
Agreements expressly specifies AP's duty to pay royalties to
"qualifying Event Photo Sales."  This, in turn, is defined to
mean "only the a la carte sales of licenses for Event Photos
through AP's online database service, currently known as 'AP
Images.'  A la carte sales shall mean the sale of licenses for
individual photos for which a per-image price is established."
(AP Contributor Agreements § 5.1 (emphasis added).)  The AP
Contributor Agreements also recognize that AP may offer the
Event Photos for a la carte sale at a "bulk rate" which may
include the photographs of photographers other than the
contributor.  In such a case, to determine royalties, AP is to
apportion the cash received on an equal pro-rata basis across
all photos included in the a la carte bulk rate. (Id.)  In
other words, the AP Contributor Agreements enumerate only that
Plaintiffs are entitled to receive royalties when AP receives
revenue from Event Photo Sales, and their royalties represent a
share of this revenue.

     The two instances Plaintiffs raise – thumbnails and AP

87

use of event photos – are contained within this Event Photo
Sales royalty provision.  Those instances appear to constitute
exceptions to AP's obligation to share revenue that it earns
from Event Photo Sales.  Thus, AP does not have to share revenue
it earns from selling access to thumbnails of Plaintiffs' Event
Photos, or earned from AP's own use of the Event Photos in
advertising or promotion.  Section 5 states, in sum, that AP
must share revenue it earns from sublicensing with Plaintiffs,
except in certain situations.  The broad rights granted in
Section 4 of the AP Contributor Agreements do not limit AP's
ability to issue non-royalty-bearing sublicenses, and such a
restriction may not be read in from Section 5, which deals only
with AP's obligation to share revenues that it actually earns
from sublicenses.[22]


     Plaintiffs separately contend that AP was not entitled
to grant sublicenses that covered periods before the issue date.
Under § 4(a) of the Second AP Agreement, ██████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

--------------------------------------------------

[22] Plaintiffs further contend that if AP were correct that it was permitted to
'sublicense' its rights, "then it must follow that the NFL would be burdened
with all of the responsibilities and limitations of the license grant."
(Pls.' Opp'n to AP Mot. 24.)  However, this assertion is without support.

███████████████████████.[23]  Because the sublicense covers uses by the NFL Entities prior to the effective date of the Second AP Agreement, Plaintiffs term it "retroactive," and claim that it is improper because they did not authorize retroactive sublicenses.  (AC ¶¶ 182-83).

        Contrary to Plaintiffs' assertions, however, such a license is permissible.  As a matter of copyright law, copyright owners and exclusive licensees are free to grant such licenses "after the fact" as they see fit.  See Wu, 2013 WL 145666, at *4 ("[T]here is no legal prohibition to obtaining a retroactive license if it is authorized by the rights holder."); Silberstein v. Fox Entm't Grp., Inc., 424 F. Supp. 2d 616, 629 (S.D.N.Y. 2004) ("The retroactivity of the licensing agreement between DAS and Fox has no necessary effect on its power to immunize Fox against claims of infringement of the [] copyright."), aff'd sub nom. Silberstein v. John Does 1-10, 242 F. App'x 720 (2d Cir. 2007).

---

23



(§ the effective date of his AP Contributor Agreement, when AP acquired the right to license his photos.  AP's sublicense to the NFL Entities thus covers their uses of each Plaintiff's photos for the period occurring on or after the effective date of that Plaintiff's AP Contributor Agreement.

Plaintiffs contend that the Second Circuit has held that "retroactive" licenses are unenforceable where one co-owner of a copyright unilaterally grants a license after the filing of an infringement complaint to "extinguish[ ] the accrued infringement claims of a non-consenting co-owner," Davis v. Blige, 505 F.3d 90, 103 (2d Cir. 2007) and that that precedent applies and thus precludes retroactive licensing in the instant case.  However, the holding in Davis was a narrow one that does not apply to the facts here: "[a] 'retroactive' assignment or license that extinguishes the accrued infringement claims of a non-consenting co-owner by traveling back in time to 'undo' an unlawful infringement" may be held invalid.  Davis, 505 F.3d at 103.

AP does not appear to have been a co-owner purporting to grant a license to which the other co-owner did not consent. Indeed, Plaintiffs make clear that AP is not a co-owner of Plaintiffs' copyrights.  (AC ¶¶ 65, 131, 185.)  Far from being a co-owner "extinguishing" Plaintiffs' rights behind their backs after Plaintiffs filed their infringement suit – which was the scenario in Davis – AP was expressly granted by Plaintiffs complete authority to sublicense their photographs as AP saw fit, and AP exercised those rights without "extinguishing" any legal action commenced by Plaintiffs.

90

Each AP Contributor Agreement licensed to AP all the
rights comprised in copyright for each photo as of the effective
date, and lasting "perpetual[ly]."  AP had a co-extensive right
to grant sublicenses.  The AP Contributor Agreements do not
limit AP's rights to issue a sublicense that covers any period
while the AP Contributor Agreements are in effect.  AP was
therefore authorized and empowered to grant broad sublicenses
for the use of Plaintiffs' copyrighted works and did so by
issuing a sublicense to the NFL authorizing their uses of a
Plaintiff's photos occurring after AP became a licensee of the
Plaintiff, but before the issue date of the sublicense.[24]

Plaintiffs further contend that AP lacked authority to
grant such a license with respect to "Archival Event Photos"
because it purportedly holds only a non-exclusive license for

---

[24] Furthermore, there are basic differences between Davis and the facts of
this case.  In Davis, there was no written agreement between the copyright
co-owners.  One of the co-owners assigned his interest (including,
purportedly, all causes of action for infringement of the copyright) to a
person who had been sued for infringement by the other co-owner.  The
assignee then claimed that he was immune from the second co-owner's
infringement suit.  Davis held that the assignment cannot be given
retroactive effect to defeat the suing co-owner's vested infringement claim,
because one co-owner has no power to grant an exclusive license or release
another co-owner's accrued claims.  Id., 505 F.3d at 103-04.  Here, however,
each Plaintiff is the sole owner of the copyright in his photos and AP's
sublicense does not affect the rights of any copyright co-owner.  Each
Plaintiff granted AP all rights comprised within copyright for the full term
of his written AP Contributor Agreement, and gave AP the right to license
others to make any use of the photos that AP could make.  Although the
license from Plaintiff Lowrance to AP is technically non-exclusive (see
Lowrance AP Contributor Agreement § 4.2), this fact does not limit AP's right
to issue retroactive licenses in Lowrance's photos to the full extent of AP's
licensed rights.

those photographs, an allegation not found in the AC.  However,
even if the rights granted to AP were non-exclusive as
Plaintiffs allege, Davis is still inapplicable.  The court in Wu
v. Pearson Education upheld as a matter of law the validity of a
retroactive copyright license even though the licenses at issue
apparently were non-exclusive and granted on a "rights managed"
basis, just as Plaintiffs allege is the case with their AP
Contributor Agreements.  See Wu, No. 10 Civ. 6537, ECF No. 51
(Plaintiff's 56.1 Counter-Statement of Facts), at ¶¶ 7-8; ECF
No. 54 (Summary Judgment Reply Br.), at 2.


        In fact, the instant case bears a close resemblance to
Wu.  In Wu, the court distinguished and limited Davis to its
specific facts by granting judgment as a matter of law to the
defendant sublicensee based on a retroactive license granted by
the plaintiff photographer's licensee.  Id. At *4-5.  As here,
the plaintiff photographer in Wu had entered into licensing
agreements with photography agencies that gave the agencies
broad discretion to sublicense the photographs.  The court
determined that by granting the agencies discretion to confer
upon the defendant "whatever licenses" were needed, the
plaintiff "indisputably gave the Photo Agencies the discretion
to enter into retroactive licenses." Id. at *5.  As such, no
copyright infringement claim could lie.  Similarly here, each

Plaintiff is an experienced sports photographer who individually negotiated his contract with AP and knowingly granted AP broad license and sublicense rights.  Plaintiffs may not now attack AP for exercising those rights.  <u>See generally</u> <u>Wu</u>, 2013 WL 145666, at *4.

Plaintiffs' additional contention that the "retroactive" license (or the Second AP Agreement in general) was invalid because it was "illegal under the Sherman Act" is without basis.  (AC ¶¶ 168, 181.)  However, as discussed above, Plaintiffs' antitrust claims are insufficient.  Because Plaintiffs do not adequately plead that the Second AP Agreement violates the Sherman Act, this contention must also fail.

Plaintiffs also allege that AP was required to "track or monitor" the NFL's uses of photos, to limit the uses that the NFL could make of photos, and to pay Plaintiffs royalties for uses of their photos by the NFL or by Replay.  They further contend that AP breached the AP Contributor Agreements by failing to perform these obligations.  (AC ¶¶ 168-174, 220-26.)  As shown above, the language of the AP Contributor Agreements imposes no such obligations on AP.  However, even if the AP Contributor Agreements had contained such terms, and AP had breached those terms, AP would not be liable for copyright

infringement, but only for breach of contract.  See Graham, 144
F.3d at 236-37.


        Second Circuit law is clear that where a licensee's
use of a copyrighted work is authorized by a license, any claim
for unpaid royalties for that use cannot form the basis of an
infringement claim.  Rather, a failure to pay royalties under a
valid license agreement could only give rise to a breach of
contract claim against the party with which the copyright owner
has contracted to receive royalties.  See, e.g., Graham, 144
F.3d at 236-37 (finding that "the payment of royalties" is a
"covenant" giving rise to a breach of contract claim but not a
claim of copyright infringement); 3 Melville B. Nimmer & David
Nimmer, Nimmer on Copyright § 10.15(A)(5) (2013) ("Failure to
pay royalties does not render past conduct an infringement of
the copyright."); cf. U.S. Naval Inst., 936 F.2d at 695 ("[A]n
exclusive licensee of any of the rights comprised in the
copyright, though it is capable of breaching the contractual
obligations imposed on it by the license, cannot be liable for
infringing the copyright rights conveyed to it."); Russian
Entm't Wholesale Inc. v. Close-Up Int'l, Inc., 767 F. Supp. 2d
392, 408 (E.D.N.Y. 2011) ("A licensee's breach of a covenant in
a copyright license does not rescind the authorization to use
the copyright work, but rather provides the licensor with a

cause of action for a breach of contract."), aff'd, 482 F. App'x
602 (2d Cir. 2012).


Plaintiffs contend that their AP Contributor
Agreements differ from those in Graham because AP's obligations
to pay royalties was a "condition" made "[i]n exchange for the
license," and therefore breach of that condition could give rise
to an infringement claim.  (See Pls.' Opp'n to NFL Def.'s Mot.
32-33.)  However, at least one court in this Circuit has held
that language virtually identical to "in exchange for" is a
covenant, not a condition.  Powlus v. Chelsey Direct, LLC, No.
09 Civ. 10461, 2011 WL 135822, at *5 (S.D.N.Y. Jan. 10, 2011)
("No court applying New York law has every construed the
commonly used phrase '[i]n consideration for' as indicating a
condition precedent.").  Indeed, under New York law,
"[c]onditions are not favored" and "in the absence of
unambiguous language, a condition will not be read into [a
contract]."  Id., at *4; see also Graham, 144 F.3d at 237 ("New
York respects a presumption that terms of a contract are
covenants rather than conditions.")  Plaintiffs offer no support
for their assertion that the "in exchange for" language denotes
a condition, rather than a covenant.


Plaintiffs finally argue that, "at worst," the AP

Contributor Agreements are "ambiguous as to whether AP was permitted to grant 'non-royalty-bearing'" licenses to third parties, and that this creates a triable issue of fact that bars dismissal. (Pl. Opp'n to AP Mot. 31.)  They assert generally that "a price term is an essential element of any binding agreement" and appear to argue that the absence of or silence regarding whether non-royalty-bearing licenses were permitted under the license constitutes an ambiguity in the contract necessitating the examination of extrinsic evidence. (Id.) This argument, however, is unavailing.

"The determination of whether a contract term is ambiguous is a threshold question of law for the court." Walk-In Med. Ctrs., Inc. Breuer Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987).  "An agreement is ambiguous only if it is 'capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement.'" GSI Commerce Solutions, Inc. v. BabyCenter, L.L.C., 618 F.3d 204, 209 (2d Cir. 2010) (citations omitted); see also British Int'l Ins. Co. v. Seguros La Republica, S.A., 342 F.3d 78, 82 (2d Cir. 2003).  Silence, or omission of a term, however, does not generally create ambiguity.  See Millgard Corp. v. E.E.Cruz/Nab/Fronier-Kemper, No. 99 CIV. 2952 (LBS), 2003 WL 22741664, at *3 (S.D.N.Y. Nov.

18, 2003) ("[U]nder New York law, the omission of terms in a contract does not create ambiguity."); Kirschten v. Research Institutes of Am., Inc., No. 94 CIV. 7947 (DC), 1997 WL 739587, at *9 (S.D.N.Y. Sept. 24, 1997) (citing Metropolitan Life Ins. Co. v. RJR Nabisco, Inc., 716 F. Supp. 1504, 1515 (S.D.N.Y. 1989) ("While it may be true that no explicit provision either permits or prohibits an LBO, such contractual silence itself cannot create ambiguity to avoid the dictates of the parol evidence rule . . . ."); Kaplan v. Cott Beverage Corp., 27 Misc.2d 655, 656–57, 212 N.Y.S.2d 103, 105 (Sup. Ct. 1961) ("The written contract makes no mention of any adjustment in purchase price because of any variation in inventory and it is silent on the subject of any adjustments as to rent, taxes, etc. on closing of title.  The plaintiff sought to overcome this apparent difficulty by asserting that the written contract is ambiguous and that the real intent of the parties may be shown by their conduct . . . .  The written agreement is clear in its terms and purports to express the entire arrangement of the parties . . . .  Therefore it may not be varied nor [sic] explained.  All that can be said is that the plaintiff is the victim of his own circumstances.")

As noted above, on the face of the AP Contributor Agreements, the grant of rights made by Plaintiffs to AP is

extremely broad, and nothing in the AP Contributor Agreements restricts AP from granting non-royalty-bearing sublicenses or retroactive sublicenses.  See Reiss v. Fin. Performance Corp., 97 N.Y.2d 195, 199, 764 N.E.2d 958, 961 (2001) ("An omission or mistake in a contract does not constitute an ambiguity [and] * * * the question of whether an ambiguity exists must be ascertained from the face of an agreement without regard to extrinsic evidence") (citations omitted).  The instant case does not qualify as an exception to the general rule that omission does not create ambiguity.  See, e.g., Chen-Oster v. Goldman, Sachs & Co., No. 10 CIV. 6950 LBSJCF, 2011 WL 803101, at *3 (S.D.N.Y. Mar. 1, 2011) (citing authority for the proposition that the missing term "must be one without which the contract is inherently ambiguous as to some issue material to defining the relationship between the parties" and "without which a contract could not be found.")  (citations omitted).

Because the facts of the AC do not sufficiently allege direct copyright infringement by AP, Count II of the AC against AP is dismissed.

b. Claims Against NFL Defendants

Plaintiffs' copyright infringement claims are premised on a general allegation that the NFL has engaged in "unauthorized uses of Plaintiffs' copyrighted photographs." (AC ¶ 29.) Plaintiffs identify the following categories of alleged infringing uses of their images by the NFL:

1. Placement on NFL.com, including in "articles, as part of photo 'essays,' and also to create stand-alone photo 'galleries'" (id. ¶¶ 75, 99, 104, 107, 109, 111);

2. Publication on international websites such as nfljapan.com, nflmexico.com, and nfl.com/international (id. ¶¶ 75, 100, 107, 194);

3. Incorporation in printed publications such as NFL Magazine, Super Bowl programs, reports, newsletters, and game programs (id. ¶¶ 75, 101, 118);

4. Use in television programming on the NFL Network (id. ¶¶ 75, 102, 117);

5. Display of a "multi-story" image "draped" over
   facades of the Dallas Omni Hotel in Dallas and
   Cowboys Stadium to promote Super Bowl XLV (id. ¶
   103); and

6. Use of unspecified internet "links that allow and
   encourage visitors to buy copies of the photos
   through www.nflshop.com" (id. ¶ 113).

In addition to these alleged infringements, Plaintiffs also make
reference to alleged "remov[al]" of "copyright management
information" from photographs.  (Id. ¶ 112.)

        The purported basis of Plaintiffs' copyright claims,
however, is not that the NFL lacked authority from Getty or AP
to make the foregoing uses of Plaintiffs' photographs.  (See id.
¶ 72.)  Nor do Plaintiffs allege that Getty or AP lacked the
authority and ability to grant a license to the NFL that would
encompass all of the allegedly infringing uses identified in the
AC.  Rather, as set forth in detail below, Plaintiffs take issue
only with the fact that they did not receive monetary
compensation in the form of royalties for the NFL's uses - i.e.,
"the appropriate commercial licensing rates required for such

uses" (AC ¶ 110) - to which Plaintiffs believe they are entitled pursuant to their licensing agreements with Getty and AP.

Although Plaintiffs bring copyright infringement claims against "all defendants," Plaintiffs fail to make allegations of specific instances of copyright infringement by any of the 32 NFL Clubs.[25]  (See, e.g., id. ¶¶ 75, 94, 98-100, 164, 166, 176, 194.)  None of the exhibits to the AC include any alleged uses of Plaintiffs' photographs by an individual NFL Club.  (Id. Exs. 8-14.)  Rather, substantive allegations in (and exhibits to) the AC relating to the infringement claims are made against the "NFL" or "NFL Defendants," which, in the AC, are defined to exclude the 32 individual NFL Clubs.  (AC ¶ 16.)  To the extent that the NFL Clubs are nominally included in the "catch all" infringement claim against "all defendants," this

---

[25] The sole exception is a stray reference to "individual NFL Teams" distributing unspecified "game programs" that included Plaintiffs' works. (AC ¶ 101.)  Even as to this purported use, however, it is "the NFL" that is alleged to have "copied and published" Plaintiffs' works.  In their opposition, Plaintiffs, without disputing that the AC lacks specific allegations of infringement by any of the 32 NFL clubs, assert that they are permitted to plead infringement "upon information and belief."  (Pls.' Opp'n to NFL Def.'s Mot. 22.)  This, type of pleading, however, is precisely the sort that cannot survive a motion to dismiss.  See Palmer Kane LLC v. Scholastic Corp., No. 12 Civ. 3890, 2013 WL 709276, at *3 (S.D.N.Y. Feb. 27, 2013) (holding that a complaint must "contain some factual allegations to narrow the infringing acts beyond broad conclusory statements of infringement"); Broughel v. Battery Conservancy, No. 07-cv-7755, 2009 WL 928280, at *4 (S.D.N.Y. Mar. 30, 2009) (noting that "it is axiomatic that plaintiff's claims cannot rest on inchoate and conclusory accusations of unauthorized copying").  Additionally, Plaintiffs' reliance on Federal Rule of Civil Procedure 11(b) is misplaced - the rule does not relieve a party of the obligation to meet basic pleading standards established by Rule 8(a)(2) and current Circuit 12(b)(6) case law.

lack of specificity in the allegations fails to satisfy basic pleading standards, and therefore the infringement claim must be dismissed as to the NFL Clubs. See, e.g., Broughel, 2009 WL 928280, at *4 ("[P]laintiff must identify, with specificity, the original works that are the subject of her copyright claim and which acts committed by defendants constitute infringement of her rights."); Marvullo v. Gruner & Jahr, 105 F. Supp. 2d 225, 230 (S.D.N.Y. 2000) ("Rule 8(a)(2) has been construed to require a plaintiff to plead with specificity the acts by which a defendant has committed copyright infringement.").[26]

As noted above, it is well established that use of a copyrighted work within the scope of a valid license is non-infringing as a matter of law, Graham, 144 F.3d at 236, and a "valid license, either exclusive or non-exclusive, immunizes the licensee from a charge of copyright infringement, provided that the licensee uses the copyright as agreed with the licensor." Harris, 646 F. Supp. 2d at 630 (citation and internal quotation marks omitted). The same holds true for a sublicensee's use that has been authorized by a licensee. See Ariel, 2006 WL

---

[26] Even assuming arguendo that Plaintiffs had sufficiently alleged infringing acts by any of the NFL Clubs, any copyright claim would nevertheless fail for the same reasons that the copyright claim against the NFL fails (as discussed below), including that the alleged uses of Plaintiffs' photographs are fully authorized and that allegations that Plaintiffs have been deprived of royalties can only give rise to breach of contract claims against Getty and AP. In this regard, the Getty and AP Agreements expressly permit the NFL Clubs to make the ██ me marketing uses of ████ intiffs' photographs a ████ NFL. (Getty Agreement ██; First AP Agreement ██, Second AP Agreement ██.)

3161467, at *9-10 (finding that "defendants' status as licensees or sub-licensees" precluded plaintiff from bringing copyright infringement claims as a matter of law), aff'd, 277 F. App'x 43 (2d Cir. 2008); Major League Baseball Promotion Corp. v. Colour-Tex, Inc., 729 F. Supp. 1035, 1041 (D.N.J. 1990) ("Under copyright law, a person is innocent of infringement if he possesses a sublicense issued by a licensee upon the due authority of the copyright owner." (citing Pathe Exch. v. Int'l Alliance, 3 F. Supp. 63, 65 (S.D.N.Y. 1932))).

The various NFL uses challenged by Plaintiffs fall within three categories: the first category consists of the NFL's publication and display of the photographs for marketing purposes-specifically on (i) NFL.com, (ii) international websites, (iii) NFL-controlled print publications, (iv) the NFL Network, and (v) a "multi-story" image on buildings (AC ¶¶ 75, 99-104, 107, 109, 111); the second category is the NFL website "includ[ing] links that allow and encourage visitors to buy copies" of the Plaintiffs' photographs "through www.nflshop.com" (id. ¶ 113); the third category is removal of "copyright management information" from photographs in purported violation of the Digital Millennium Copyright Act. (Id. ¶ 112.) Plaintiffs do not allege that the NFL itself is selling Plaintiffs' photographs.

With respect to the first category, all of the alleged uses from April 1, 2009 forward are included within the rights AP granted to the NFL and NFL Clubs.  The Second AP Agreement authorizes the NFL and NFL Clubs to make royalty-free use of contributor photographs for a variety of editorial, charitable, and marketing purposes.  (Second AP Agreement ███████.)  That broad grant of rights, in and of itself, is sufficient to cover the challenged uses on the NFL's websites, publications, programming, and other marketing efforts.  Furthermore: the Second AP Agreement permits use for ████████████████████ ████████████████ and identifies specific permissible uses of Plaintiffs' photographs that encompass the uses now being challenged.  For example, the NFL and NFL Clubs are expressly permitted to make royalty-free use of Plaintiffs' NFL images in ██████████████████████████████████ ████████████████████████████████ ███████████████████████ Moreover, the Second AP Agreement (like the First AP Agreement) imposes no territorial limitations that render use of the images on foreign NFL websites outside the scope of the license.  (Id. ██████ ███.)

With respect to the second category – the NFL's alleged "allowing" and "encouraging" of visitors to the NFL

104

website to buy copies of photos on www.nflshop.com - the copyright infringement claim must also fail.  First, Plaintiffs' allegation is a fleeting reference to www.nflshop.com, and Plaintiffs do not provide any examples (in the AC or in any of the exhibits attached thereto) of a photograph that has been sold or offered for sale on that website.  This sole conclusory allegation is neither sufficient to make out a plausible infringement claim based on alleged "encouragement" or "allowing" sales on that website, nor does it provide sufficient specificity of the alleged infringing use to survive a motion to dismiss.  See, e.g., Broughel, 2009 WL 928280, at *4; Marvullo, 105 F. Supp. 2d at 230.  Second, the mere allegation that the NFL "include[d] links" to another website and "encouraged" purchase of Plaintiffs' photographs cannot give rise to a claim of copyright infringement.  See, e.g., Pearson Educ., Inc. v. Ishayev, No. 11 Civ. 5052, 2013 WL 3948505, at *8-10 (S.D.N.Y. Aug. 1, 2013) (holding that merely providing links to websites where copyrighted works are sold does not, as a matter of law, constitute copyright infringement).

       With respect to the third category, the solitary reference to removal of "copyright management information" (AC ¶ 112) is vague and conclusory.  To the extent the alleged removal of information is part of Plaintiffs' cause of action for

copyright infringement, Plaintiffs do not allege when, where, or how such removal of information occurred.  (<u>See generally</u> <u>id.</u> ¶¶ 160-200.)  Accordingly, any claim based on such activity is dismissed.

Plaintiffs' contention that the Second AP Agreement constitutes a "retroactive" license (AC ¶ 87) with respect to alleged royalty-free uses of contributor photographs prior to the effective date of that agreement (April 1, 2012) does not alter the conclusion that the NFL's alleged uses were authorized and the infringement claims against the NFL and NFL Clubs should be dismissed.  As discussed further above with respect to AP, the grant of a retroactive license can be permissible, and in fact is permissible when there is a broad grant of rights, as here.

Additionally, Plaintiffs do not allege that their contributor agreements foreclosed Getty and AP from licensing the use of their photographs to the NFL for editorial, charitable, or marketing purposes across a wide variety of media.  Rather, Plaintiffs' complaint is that that they were not paid by Getty and AP - and that Getty and AP did not seek to collect from the NFL (or NFL Clubs) - "the appropriate

commercial licensing rates required for such uses." (<u>Id.</u> ¶ 110.)  For example, Plaintiffs claim that:

- Getty and AP "allowed the NFL to make free or 'complimentary' use," "failed to charge the NFL appropriate market value" (<u>id.</u> ¶ 72), and permitted the NFL to use Plaintiffs' photos "without paying for any usage rights and without reporting usages to Plaintiffs on their royalty statements" (<u>id.</u> ¶ 82);

- "[T]he NFL has never paid any fees or compensation to Plaintiffs . . . and none of [the challenged] uses has ever been reported by Getty Images or AP to Plaintiffs on any royalty report or otherwise" (<u>id.</u> ¶ 106);

- Plaintiffs' photographs were not included in Getty's or AP's existing "royalty-free collections or offerings" (<u>id.</u> ¶ 173) and should have been part of "Rights-Managed licensing" that "would require a higher license fee than a license granting more narrow usage rights" (<u>id.</u> ¶ 70);

- "The notion that AP was authorized to grant its customers complimentary or 'non-royalty bearing' licenses" without any "compensation to Plaintiffs is anathema to the

fundamental purpose and objective" of the Plaintiffs'

agreements (id. ¶ 80); and

- "Plaintiffs have never received any compensation in
  exchange for the NFL Defendants' prolific and ongoing use
  of thousands of Plaintiffs' photos." (Id. ¶ 76.)


However, even assuming arguendo that Plaintiffs are

entitled to such royalties under their agreements with AP, such

an allegation cannot form the basis for a copyright infringement

claim.  As discussed above, a failure to pay royalties under a

valid license agreement can only give rise to a breach of

contract claim, not a claim of copyright infringement and

Plaintiffs have failed to adequately establish that the failure

of royalties constituted a violation of a "condition."  See,

e.g., Graham, 144 F.3d at 236-37.


c. Copyright Infringement Claims Against Replay


As with NFL, AP had a right to grant broad sublicense

to Replay to use Plaintiffs' photographs, and did, in fact,

grant such a sublicense as part of the Replay Agreement.  (See

Zibas Decl. Ex. A; AC ¶ 114.); see also Bourne v. Walt Disney

Co., 68 F.3d 621, 631 (2d Cir. 1995) (under copyright law, "the

existence of a license is viewed as an affirmative defense" to
infringement claims); Pathe Exch., 3 F. Supp. at 63 ("It may
well be that an exhibitor would be innocent if he held a
sublicense issued by a license upon due authority from the
copyright owner").  Replay may not be held liable for direct
copyright infringement when it possesses a sublicense issued by
a license upon the due authority of the copyright owner.  See
Colour-Tex, 729 F. Supp. at 1041.  As such, there has been no
primary infringement by Replay.[27]

III.     **The Motion To Dismiss Plaintiffs' Vicarious Copyright
         (Count III) and Contributory Infringement Claims (Count IV)
         Against AP Is Granted**

          Counts III and IV of the AC do not state plausible
claims for vicarious and contributory copyright infringement
against AP, based on the NFL and Replay's asserted use of
photos.  AP's license from Plaintiffs permitted the uses of the
photos by NFL and Replay alleged in the AC, and AP was entitled
to sublicense those rights to the NFL and Replay.  The alleged
uses are not copyright infringement.  See Colour-Tex, 729 F.

---

[27] As with the Getty Agreement and First and Second AP Agreements, Plaintiffs'
argument that the Court should not consider the Replay Agreement is
unavailing.  The Replay Agreement was attached as an exhibit to AP's original
motion to dismiss the Complaint, which was incorporated by reference by
Replay.  (See Dkt. Nos. 26-28, 36-38.)  Additionally, Plaintiffs' reliance on
extraneous material to support contentions not found in the AC will be
disregarded.  See, e.g., Adams v. Crystal City Mariott Hotel, 02 Civ. 10258
(PKL), 2004 U.S. Dist. LEXIS 5819 (S.D.N.Y. Apr. 5, 2004).

Supp. at 1041.  As discussed above, because Plaintiffs have not adequately alleged primary infringement by either the NFL or Replay, AP cannot be liable for either vicarious or contributory copyright infringement.  See Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd., 545 U.S. 913, 930 (2005); Faulkner v. Nat'l Geographic Enters. Inc., 409 F.3d 26, 40 (2d Cir. 2005); see also Russian Entm't Wholesale, 482 F. App'x. at 606.

As such, Counts II through IV of the AC for direct or secondary copyright infringement against AP are dismissed.

## IV.  The Motion To Dismiss Plaintiffs' Breach Of Contract (Count V) Against AP Is Granted

A breach of contract claim must be dismissed where the unambiguous terms of the contract do not support a plaintiff's claim.  Soroof Trading Dev. Co. Ltd. v. GE Fuel Cell Sys. LLC, 842 F. Supp. 2d 502, 509-10 (S.D.N.Y. 2012).  The provisions of the parties' agreements establish the rights of the parties and prevail over conclusory allegations in the complaint.  805 Third Ave. Co. v. M.W. Realty Assoc., 58 N.Y.2d 447, 451, 461 N.Y.S.2d 778, 780 (1983).  The Court cannot "supply a specific obligation the parties themselves did not spell out."  Tonking v. Port Auth. Of New York and New Jersey, 3 N.Y.3d 486, 490, 787

N.Y.S.2d 708, 710 (2004).  Moreover, New York law and the
Twombly-Iqbal standards of federal pleading require a complaint
to identify, in non-conclusory fashion, the specific terms of
the contract that a defendant has breached.  Otherwise, the
complaint must be dismissed.  Swan Media Grp., Inc. v. Staub,
841 F. Supp. 2d 804, 807-08 (S.D.N.Y. 2012); Orange Cnty.
Choppers, Inc. v. Olaes Enter., Inc., 497 F. Supp. 2d 541, 554
(S.D.N.Y. 2007); Highlands Ins. Co. v. PRG Brokerage, Inc., No.
01 Civ. 2272, 2004 WL 35439, at *8 (S.D.N.Y. Jan. 6, 2004).


        These principles require dismissal of Plaintiffs'
breach of contract claim against AP.  Plaintiffs' nowhere allege
specific contractual provisions that were allegedly breached by
AP.  Plaintiffs allege the following obligations on AP's part:
(1) Plaintiffs' photos are subject to "rights managed" licensing
(AC ¶ 69); (2) the agreements restricted AP's ability to
retroactively or otherwise sublicense the photos to the NFL on a
royalty-free basis (AC ¶ 223); (3) AP was required to notify
Plaintiffs that it was granting the NFL Entities a royalty-free
license to use the photos (AC ¶ 67); and (4) AP was required to
report non-royalty bearing licenses of their photos (AC ¶¶ 68,
225).  Plaintiffs have not shown any contractual language
supporting these assertions.

In fact, Plaintiffs' conclusions are contradicted by
the actual terms of the AP Contributor Agreements.  While
Plaintiffs retained all copyrights in their photos (AP
Contribution Agreements § 4.1), this fact did not limit
Plaintiffs' broad license to AP, which permitted AP to grant a
sublicense to the NFL.[28]  While Plaintiffs may have a right to
sue for infringement for unauthorized uses of their photos, each
Plaintiff authorized AP to issue sublicenses for uses of the
Plaintiff's photos occurring after the effective date of the
Plaintiff's AP Contributor Agreement.  See id.  AP did not
breach the AP Contributor Agreements by exercising its right to
grant those sublicenses.  The AP Contributor Agreements contain
no language requiring AP to "charge license fees" to the NFL and
remit a percentage to the Plaintiffs, or requiring AP to "track
or monitor" the activities of the NFL under their non-royalty-
bearing sublicense.  Plaintiffs' contrary conclusory statements
are therefore disregarded.  (Cf. AC ¶¶ 223-24).[29]

---

[28] Ownership of copyright in the photos does not give Plaintiffs the exclusive
right to pursue claims for infringement.  For all Plaintiffs except Lowrance,
AP is an exclusive licensee, and AP has the right to sue for infringement of
its exclusive license rights.  17 U.S.C. §501(b); Eden Toys, Inc. v. Floralee
Undergarment Co., 697 F.2d 27, 32 (2d Cir. 1982), superseded on other grounds
by Fed. R. Civ. P. 52(a).

[29] Plaintiffs' allegations regarding the content of the First and Second AP
Agreements (AC ¶¶ 175-76) or a request by AP to amend the AP Contributor
Agreements (AC ¶¶ 116, 196-97) are similarly unavailing.  It is the AP
Contributor Agreements, not alleged unconsummated amendments to those
contracts, that govern AP's right to license and sublicense Plaintiffs'
photos.  As detailed above, the broad license granted in the AP Contributor
Agreements is the operative provision with respect to Plaintiffs' copyright
infringement and breach of contract claims.  Plaintiffs' inclusion of

Finally, in their opposition to AP's motion to dismiss, Plaintiffs contend that the AP Contributor Agreements were obtained through "duress" or are "unconscionable." (See Pls.' Opp'n to AP Mot. 16-19.)  However, while Plaintiffs cite to two paragraphs of the AC which would seem to support such claims (see AC ¶¶ 144-45), these contentions are not explicitly present or set forth as claims in the AC and at best more directly relate to Plaintiffs' first count for violations of the Sherman Act.  To be sure, the facts as alleged by Plaintiffs tend to show that the precedents relating to broad licensing, combined with the power and capacity of the Defendants, and, by contrast, apparent relative lack of market power of Plaintiffs, lead to a difficult result, approaching unfairness, in this case.  This reality alone, however, does not transform Plaintiffs' duress and unconscionability arguments into viable claims at this juncture.  See Fox v. Idea Sphere, Inc., 12 Civ. 1342, 2013 WL 1191743, at *28 (Mar. 21, 2014) (dismissing claims of unconscionability raised "for the first time" in plaintiff's

---

allegations regarding "rights managed licensing" which constitute extrinsic evidence is not considered in light of the unambiguous terms of the AP Contributor Agreements and the agreements' merger clause, which states that each AP Contributor Agreement "incorporates the entire understanding of the Parties and supersedes any and all prior agreements, oral or written, relating to Photographer's relationship with AP and is intended as a complete and exclusive statement of the terms of the arrangement between the parties." (AP Contributor Agreements § 10); see also Abha Int'l, LLC v. Clover Int'l Corp., 11 Civ. 6841, 2012 WL 569187, at *3 (S.D.N.Y. Feb. 16, 2012) ("A 'general merger clause' . . . 'precludes extrinsic proof to add to or to or vary' the terms of the agreement.").

opposition to defendant's motion to dismiss and where "the [complaint] contains no allegations of unconscionability.")

In sum, Plaintiffs have failed to plausibly plead a claim for breach of contract against AP.  Their conclusory allegations as to the terms of the contracts allegedly breached by AP are contradicted by the plain language of their own AP Contributor Agreements.  As such, Count V is dismissed.

## V.  The Motion To Dismiss Plaintiffs' Breach of Fiduciary Duties (Count VI) Against AP Is Granted

Count VII of the AC, which alleges that AP breached a fiduciary duty to Plaintiffs, is premised on the legal conclusion that AP "held itself out" as Plaintiffs' "agent" and therefore owes them a special fiduciary duty.  (AC ¶¶ 235-45.) However, the assertion of agency is conclusively contradicted by the Plaintiffs' own agreements.  Each Plaintiff's AP Contributor Agreement expressly states that:

> Photographer shall be acting as an independent contractor and shall not represent himself or herself as an employee of AP, but only as an independent contractor. . . . Neither the making of this Agreement nor the performance of its provisions shall be construed to constitute either Party an agent, partner, joint venture, employee or legal representative of the other

Party.

(AP Contributor Agreements § 1 or § 1.3.)  In disputes between a purported principal and purported agent, where the interests of third parties or government agencies are not in issue, the parties are bound by a contractual agreement that their relationship is not one of agency.  Such a disclaimer bars a claim for breach of fiduciary duty.  See, e.g., In re Rezulin Prods. Liab. Litig., 392 F. Supp. 2d 597, 607 n. 67 (S.D.N.Y. 2005) (parties' own characterization of their relationship as not an agency may be disregarded only where it is attacked by a "stranger to the relationship."); New Millennium Consulting, Inc. v. United Healthcare Servs., Inc., 695 F.3d 854, 858 (8th Cir. 2012) ("this Court affirmed the district court's determination that ABC Radio was not an agent . . . as a matter of law because the parties expressly disclaimed a principal-agent relationship in their contract"); Children's Broad. Corp. v. Walt Disney Co., 245 F.3d 1008, 1021-22 (8th Cir. 2001); Norsul Oil & Mining Co. v. Texaco, Inc., 703 F. Supp. 1520, 1545-46 (S.D. Fla. 1988).  Where a contract contains a disclaimer that the defendants are not acting as a fiduciary or financial investment advisor for two financial institutions, such a disclaimer "preclude[s] a finding of a fiduciary or other special relationship, absent special circumstances."  BNP

<u>Paribas Mortg. Corp. v. Bank of America, N.A.</u>, 866 F. Supp. 2d 257, 269-70 (S.D.N.Y. 2012); <u>see also</u> <u>Cooper v. Parsky</u>, 140 F.3d 433, 439, 442 (2d Cir. 1998); <u>Seippel v. Jenkens & Gilchrist, P.C.</u>, 341 F. Supp. 2d 363, 381-82 (S.D.N.Y. 2004); <u>Calvin Klein Trademark Trust v. Wachner</u>, 129 F. Supp. 2d 248, 250 (S.D.N.Y. 2001).

There are no "special circumstances" here, and Plaintiffs' conclusory assertions that AP "held itself out as Plaintiffs' agent" and "artfully craft[ed] the language of their contributor agreements" does not change that fact. (AC ¶¶ 235, 238.) The AP Contributor Agreements appear to embody ordinary commercial transactions. <u>See, e.g.</u>, <u>Rodgers v. Roulette Records, Inc.</u>, 677 F. Supp. 731, 738-39 (S.D.N.Y. 1988) (record company did not owe fiduciary duty to recording artist although it collected royalties for him); <u>Van Valkenburgh, Nooger & Neville v. Hayden Publ'g Co.</u>, 33 A.D.2d 766, 766, 306 N.Y.S.2d 599, 600 (1st Dep't 1969), <u>aff'd</u>, 30 N.Y.2d 34, 330 N.Y.S.2d 329 (1972) (book publisher did not have a fiduciary relationship to author).

Finally, the breach of fiduciary duty claim must be dismissed because it is duplicative of Plaintiffs' claim for breach of contract. Both claims are based on the same

allegations and alleged duties owed to Plaintiffs: that AP, under its contracts with Plaintiffs, was required to track and monitor the NFL uses of Plaintiffs' photos and to charge the NFL licensing fees (compare AC ¶¶ 223 and 241) was not permitted to grant retroactive licenses (compare AC ¶¶ 222 and 242), and failed to provide allegedly required information to Plaintiffs (compare AC ¶¶ 225 and 244-45).[30]  A cause of action for breach of fiduciary duty that is merely duplicative of a breach of contract claim cannot stand.  Granirer v. The Bakery, Inc., 54 A.D.3d 269, 863 N.Y.S.2d 396, 399 (1st Dep't 2008); William Kaufman Org. v. Graham & James, 269 A.D.2d 171, 703 N.Y.S.2d 439, 442 (1st Dep't 2000).  Accordingly, Count VI is dismissed.

Plaintiffs have also contended that the "terms" of the AP Contributor Agreements "demonstrate that the entire purpose for Plaintiffs to enter these agreements was to earn royalties

---

[30] Plaintiffs allege in their breach of contract count that the AP Contributor Agreements specifically provided that Plaintiffs retained the "exclusive right to pursue claims for infringements." (AC ¶ 221.)  Plaintiffs then allege in their breach of fiduciary duty count that in AP's prior motion to dismiss, AP claimed that "it is entitled to pursue and settle infringement claims on plaintiffs' behalf" and that, as such, AP "must either claim such authority as co-owners of the underlying copyrights or as agents for the copyright owners." (AC ¶¶ 234, 236.)  All Plaintiffs but Lowrance have issued exclusive licenses to AP encompassing all of their rights in copyright.  This exclusive license gives AP the right to sue infringers as a matter of law – not for infringement of Plaintiffs' rights, but for infringement of AP's own rights.  Were AP to sue for infringement, it would neither be acting as a co-owner of copyright nor as an agent of Plaintiffs.  Thus, AP's right to sue for infringement does not bear on whether AP is an agent of Plaintiffs.  Plaintiffs are bound by their own contractual agreements that unambiguously state that AP does not act as their agent, i.e., fiduciary.

from AP licensing their photos" and the "covenant of good faith and fair dealing thus precludes AP's self-serving reading of the contracts." (Pls.' Opp'n to AP Mot. 26.)  However, the AC does not plead a breach of an implied covenant of good faith and fair dealing.  At any rate, while it is true that contracts include an implied covenant of good faith and fair dealing under New York law, a claim for breach of the implied covenant will be dismissed as redundant "where the conduct allegedly violating the implied covenant is also the predicate for breach of covenant of an express provision of the underlying contract." Usov v. Lazar, 13 Civ. 818, 2013 WL 3199652, at *6 (S.D.N.Y. June 25, 2013)(quotation marks and citation omitted); see also Matsumura v. Benihana Nat'l Corp., 465 F. App'x 23, 29 (2d Cir. 2012); Harris v. Provident Life & Accident Ins. Co., 310 F.3d 73, 81 (2d Cir. 2002) ("New York law . . . does not recognize a separate cause of action for breach of the implied covenant of good faith and fair dealing when a breach of contract claim, based upon the same facts, is also pled.").  Because Plaintiffs have already sued for breach of contract, a breach of implied duty of fair dealing and good faith claim based on the same contract has not been adequately pled.

**VI.  The Motions To Dismiss Plaintiffs' Unjust Enrichment Claim (Count VII) Against NFL Defendants, AP, And Replay Are Granted**

"In the alternative to their copyright claims" (AC ¶ 248), Plaintiffs have asserted a claim for unjust enrichment based on NLF Defendants, AP, and Replay's alleged uses of their photographs.  This claim, too, must fail because enforceable contracts govern the use of Plaintiffs' photographs and because the claim is preempted by the Copyright Act.

**a. Enforceable Contracts Govern The Use Of Plaintiffs' Photographs**

It is well-settled that "the existence of a valid and enforceable contract precludes an unjust enrichment claim relating to the subject matter of the contract." Morgan Stanley & Co. v. Peak Ridge Master SPC Ltd., 930 F. Supp. 2d 532, 545 (S.D.N.Y. 2013); see also Keifer v. Harlequin Enters. Ltd., No. 12-CV-5558, 2013 WL 1324093, at *3 (S.D.N.Y. Apr. 2, 2013), rev'd in part on other grounds, ("Plaintiffs can recover on an unjust enrichment theory only in the absence of an enforceable agreement."); IDT Corp. v. Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132, 142, 907 N.E.2d 268 (2009) ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust

enrichment for events arising out of that subject matter is ordinarily precluded."). Here, the use of Plaintiffs' photographs – which forms the basis for Plaintiffs' theory that NFL Defendants were unjustly enriched – is subject matter clearly governed by the AP Contributor Agreements and by the license agreements between AP and NFLP (or, in the case of the Second AP Agreement, NFL Enterprises). Accordingly, any claim for unjust enrichment is precluded as a matter of law with respect to NFL Defendants.

They are similarly precluded as against AP. There is no dispute that every Plaintiff has entered into an AP Contributor Agreement, and that each AP Contributor Agreement deals with the subject matter which is the basis for the unjust enrichment claim, namely the extent to which Plaintiffs will be compensated for use of their photographs. As shown above, the AP Contributor Agreements do not prohibit AP from sublicensing Plaintiffs' photographs to NFLP for certain uses that will not result in the payment of royalties to the Plaintiffs. As such, Plaintiffs may not circumvent their contracts through the expedient of an unjust enrichment claim.

b. Copyright Act Preempts Unjust Enrichment Claims

120

Even if Plaintiffs' state-law claim for "unjust enrichment" were not precluded by the existence of written agreements, it still could not be maintained because it is preempted by Section 301(a) of the Copyright Act.

Under § 301(a):

> all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

A state-law claim is preempted by § 301(a) when:

> (1) the particular work to which the claim is being applied falls within the type of works protected by the Copyright Act under 17 U.S.C. §§ 102 and 103, and (2) the claim seeks to vindicate legal or equitable rights that are equivalent to one of the bundle[s] of exclusive rights already protected by copyright law under 17 U.S.C. § 106. The first prong of this test is called the "subject matter requirement," and the second prong is called the "general scope requirement."

Briarpatch Ltd. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004) (internal citations omitted). A preempted claim fails to state a cause of action and is subject to immediate

121

dismissal under Rule 12(b)(6).  <u>Briarpatch Ltd.</u>, 373 F.3d at
308-09.

       For a claim arising under state law to be preempted,
two tests must be met.  The first, called the "subject matter
requirement," <u>Nat'l Basketball Ass'n v. Motorola, Inc.</u>, 105 F.3d
841, 848 (2d Cir. 1997), requires that the work in which the
right is asserted must be fixed in tangible form and come within
the subject matter of copyright as specified in §§ 102 or 103 of
the Copyright Act.  <u>Id</u>.  The second prong of the test for
copyright preemption is that the right asserted by a plaintiff's
state-law claim must be equivalent to rights specified and
protected in § 106 of the Act.  This is often called the
"general scope" requirement.  <u>Id</u>.  The general scope requirement
is satisfied when "the state-created right may be abridged by an
act that would, by itself, infringe one of the exclusive rights
provided by federal copyright law."  <u>Briarpatch</u>, 373 F.3d at
305.

       For a state-law claim not to be considered
'equivalent' to a copyright claim, the state claim must require
an additional element that is qualitatively different from the
elements of copyright infringement.  The courts "take a
restrictive view of what extra elements transform an otherwise

equivalent claim into one that is qualitatively different from a copyright infringement claim." Briarpatch, 373 F.3d at 305; NBA, 105 F.3d at 851 ("[T]he 'extra element' test should not be applied so as to allow state claims to survive preemption easily."). For example, an "action will not be saved from preemption by elements such as awareness or intent, which alter 'the action's scope but not its nature.'" Computer Assocs. Int'l, Inc. v. Altai, Inc., 982 F.2d 693, 717 (2d Cir. 1992) (citation omitted).

Plaintiffs' Count VII alleges that Defendants were "unjustly enriched by the uncompensated use of Plaintiffs' photos." (AC ¶ 249.) However, both preemption elements are satisfied in this case regarding NFL Defendants. As to the first element, Plaintiffs allege, and it is therefore presumed for purposes of this motion, that their photographs are protected by the Copyright Act. As to the second element, the substantive allegations underlying Plaintiffs' unjust enrichment claim are identical to those underlying their infringement claims: that the NFL improperly copied, displayed, and distributed Plaintiffs' photographs without paying royalties. (See, e.g., AC ¶¶ 176, 250-251.) While "enrichment" is an element of unjust enrichment but not copyright infringement, the allegation that the NFL has been "unjustly enriched . . . at the

123

expense of Plaintiffs" (AC ¶ 254) as a result of the alleged infringements is insufficient to avoid preemption.  <u>Briarpatch Ltd.</u>, 373 F.3d at 3066 ("While enrichment is not required for copyright infringement, we do not believe that it goes far enough to make the unjust enrichment claim qualitatively different from a copyright infringement claim."); <u>Gusler v. Fischer</u>, 580 F. Supp. 2d 309, 316-17 (S.D.N.Y. 2008) ("[A]lthough enrichment is not an element of a copyright infringement claim, it does not constitute an 'extra element' for the purposes of preemption analysis" (citation omitted)); <u>see also</u> <u>Atrium Grp. De Ediciones Y Publicaciones, S.L. v. Harry N. Abrams, Inc.</u>, 565 F. Supp. 2d 505, 509 (S.D.N.Y. 2008) (noting that plaintiffs' allegation that they failed to receive royalties "does not transform their copyright infringement claim into an unjust enrichment claim," and "[i]f the law were otherwise," it would "undermine § 301 preemption"); <u>accord</u> <u>Thompson v. V.E.W. Ltd, Coty, Inc.</u>, No. 06 Civ. 15336, 2007 WL 1746739, at *3-4 (S.D.N.Y. June 15, 2007) (holding that a claim for unjust enrichment based upon the unauthorized use of images was preempted).  A claim for unjust enrichment arising from unauthorized use (i.e., reproduction, display, and distribution) of such works is within the general scope of copyright, because it seeks to vindicate legal and equitable rights that do not

qualitatively differ from the rights protected under copyright

law.  Briarpatch Ltd., 373 F.3d at 306-307.


     Moreover, no allegation is made suggesting that AP was

unjustly enriched: Plaintiffs' claim only addresses the "NFL

Defendants' uses of their photos" without paying royalties.

(Id. ¶¶ 250, 252.)  But even if this claim were read to assert

that AP was somehow unjustly enriched, it would also fail on

preemption grounds.[31]

---

[31] The fact that Plaintiffs allege unjust enrichment "in the alternative" to
their copyright infringement claims does not save Count VII from dismissal.
"The relevant question is whether Plaintiffs could bring their claims under
the copyright law at all, not whether they will, nor even whether they will
ultimately prevail on their copyright claim."  Moser Pilon Nelson Architects,
LLC v. HNTB Corp., 05 Civ. 422, 2006 WL 2331013, at *11 (D. Conn. Aug. 8,
2006) (emphasis in original) (granting summary judgment on unjust enrichment
claim "plead in the alternative" to claim of copyright infringement on
preemption grounds); see also Atrium Grp., 565 F. Supp. 2d at 510
(alternatively plead unjust enrichment claim based on same theory as
copyright claim preempted and dismissed, as "Rule 8(d)(2) of the Federal
Rules of Civil Procedure does not purport to override § 301 preemption.");
Eliya, Inc. v. Kohls Dep't Stores, 06 Civ. 195, 2006 WL 2645196, at *13
(S.D.N.Y. Sept. 13, 2006) ("[P]leading a claim in the alternative does not
resuscitate an otherwise unviable claim.  Regardless of whether Eliya's
statutory copyright claim has merit, its common law copyright claim asserts
rights in 'the general scope of copyright' and therefore, win or lose, those
rights are 'governed exclusively by' the Copyright Act. 17 U.S.C. § 301(a).
Accordingly, Eliya's common law copyright claim will be dismissed."); Katz
Dochrermann & Epstein, Inc. v. Home Box Office, 97 Civ. 7763, 1999 WL 179603,
at *5 (S.D.N.Y. Mar. 31, 1999) ("The [unjust enrichment] claim is dismissed .
. . as an alternative ground for recovery on KDE's copyright infringement and
unfair competition claims.").  In any event, none of the case law cited by
Plaintiffs discusses "alternative" pleading or supports their contentions.
Levine v. Landy, 832 F. Supp. 2d 176 (N.D.N.Y. 2011), presented a situation
not at issue here, where the plaintiff alleged infringement with respect to
some works and unjust enrichment with respect to others (for which the uses
were conceded by plaintiff to have been authorized), and the court addressed
only the issue of Copyright Act preemption, not alternative pleading.
Levine, 832 F. Supp. 2d at 187-88.  The court was never presented with the
issue of whether an unjust enrichment claim is precluded by the existence of
valid and enforceable contracts.  In Astroworks, Inc. v. Astroexhibit, Inc.,
257 F. Supp. 2d 609 (S.D.N.Y. 2003), Copyright Act preemption was not
implicated; the court simply determined that because the existence of a

Lastly, the Plaintiffs' unjust enrichment claim against Replay is similarly preempted.  Plaintiffs seek to protect their alleged interests in their photos under the theory that Replay was unjustly enriched by offering Plaintiffs' photos for sale without compensating plaintiffs, and without appropriate attribution.  (AC ¶¶ 250-54.)  As with the other defendants, these rights are those which are protected by the Copyright Act and are therefore preempted.

---

contract could not be determined absent discovery, an unjust enrichment claim could survive the motion to dismiss stage.  <u>Astroworks</u>, 257 F. Supp. 2d at 620-21.

Additionally, Plaintiffs assertion that "even if AP is correct that it was technically authorized to grant a complimentary, royalty-free, and retroactive license to the NFL, it was still unjustly enriched because it had an obligation in equity to obtain compensation for Plaintiffs or share with them the benefits of its bargain with the NFL" is unsupported by case law – Plaintiffs cite no authority that establishes that they can maintain a separate unjust enrichment claim even if all of the uses of their photos were authorized.  (<u>See</u> Pls.' Opp'n to AP Mot. 41.)

Conclusion

      For the reasons set forth above, Getty's motion to compel arbitration is granted and Defendants' motions to dismiss are granted.  The AC is dismissed without prejudice with leave to replead within 20 days of this opinion.

      It is so ordered.

New York, NY
March 24, 2015

ROBERT W. SWEET
U.S.D.J.

127