## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL SPINELLI; SCOTT BOEHM; PAUL JASIENSKI; GEORGE NEWMAN LOWRANCE; DAVID STLUKA; DAVID DRAPKIN; and THOMAS E. WITTE, | No. 13-cv-07398 (RWS) |
| | Hon. Robert W. Sweet |
| *Plaintiffs*, | |
| | **SECOND AMENDED COMPLAINT AND DEMAND FOR A JURY TRIAL** |
| v. | |
| NATIONAL FOOTBALL LEAGUE; NFL PROPERTIES, LLC; NFL VENTURES, L.P.; NFL PRODUCTIONS, LLC; NFL ENTERPRISES, LLC; REPLAY PHOTOS, LLC; GETTY IMAGES (US), INC.; ASSOCIATED PRESS; ARIZONA CARDINALS HOLDINGS, INC., ATLANTA FALCONS FOOTBALL CLUB LLC, BALTIMORE RAVENS LIMITED PARTNERSHIP, BUFFALO BILLS, INC., PANTHERS FOOTBALL LLC, CHICAGO BEARS FOOTBALL CLUB, INC., CINCINNATI BENGALS, INC., CLEVELAND BROWNS LLC, DALLAS COWBOYS FOOTBALL CLUB, LTD., DENVER BRONCOS FOOTBALL CLUB, DETROIT LIONS, INC., GREEN BAY PACKERS, INC., HOUSTON NFL HOLDINGS LP, INDIANAPOLIS COLTS, INC., JACKSONVILLE JAGUARS LTD., KANSAS CITY CHIEFS FOOTBALL CLUB, INC., MIAMI DOLPHINS, LTD., MINNESOTA VIKINGS FOOTBALL CLUB LLC, NEW ENGLAND PATRIOTS, LP, NEW ORLEANS LOUISIANA SAINTS, LLC, NEW YORK FOOTBALL GIANTS, INC., NEW YORK JETS FOOTBALL CLUB, INC., OAKLAND RAIDERS LP, PHILADELPHIA EAGLES FOOTBALL CLUB, INC., PITTSBURGH STEELERS SPORTS, INC., SAN DIEGO CHARGERS FOOTBALL CO., SAN FRANCISCO FORTY NINERS LTD., FOOTBALL NORTHWEST LLC, THE RAMS FOOTBALL CO. LLC, BUCCANEERS LIMITED PARTNERSHIP, TENNESSEE FOOTBALL, INC., and WASHINGTON FOOTBALL INC., | |
| *Defendants.* | |

Plaintiffs Paul Spinelli, Scott Boehm, Paul Jasienski, George Newman Lowrance, David Stluka, Thomas Witte, and David Drapkin ("Plaintiffs"), by and through counsel, for their Second Amended Complaint against Defendants National Football League; NFL Properties, LLC; NFL Ventures, L.P.; NFL Productions, LLC; NFL Enterprises; Replay Photos, LLC; Getty Images (US), Inc.; Associated Press; and the 32 NFL teams or member clubs (collectively "Defendants"), state as follows.  Except as to allegations related specifically to the actions of the Plaintiffs, the allegations herein are based upon information and belief.

## THE PARTIES

1.      Plaintiffs are professional photographers who make their living taking and licensing sports-related photographs, including but not limited to content related to the National Football League ("NFL") and its players, practices, games, functions, and other events.

2.      Plaintiff Paul Spinelli ("Spinelli") is a resident of the State of California.  Plaintiff Spinelli is the sole owner of and does business through SpinPhotos, Inc. whose principal place of business is Long Beach, California.  Plaintiff Spinelli formerly was a Director of the NFL's now-dissolved Photographic Services division ("NFL Photos").

3.      Plaintiff Scott Boehm ("Boehm") is a resident of the State of Illinois.  Plaintiff Boehm is the sole owner of and does business through Boehm Creative, Inc. whose principal business address is in Lake Villa, Illinois.

4.      Plaintiff Paul Jasienski ("Jasienski") is a resident of the State of Nevada.

5.      Plaintiff George Newman Lowrance ("Lowrance"), who is known professionally as G. Newman Lowrance, is a resident of the State of Kanas.

6.      Plaintiff David Stluka ("Stluka") is a resident of the State of Wisconsin.  Plaintiff Stluka is the sole owner of and does business through David Stluka Photography, LLC whose principal business address is in Oregon, Wisconsin.

7.      Plaintiff David Drapkin ("Drapkin") is a resident of the State of New Jersey.

8.      Plaintiff Thomas E. Witte ("Witte") a resident of the State of Ohio.  Plaintiff Witte is the sole owner of and does business through GO Photography whose principal business address is in Cincinnati, Ohio.

9.      The NFL is a tax-exempt association formed under 18 U.S.C. § 501(c)(6) with its business headquarters located at 280 Park Avenue, New York, New York.

10.      The NFL operates several business units, subdivisions, and/or related corporate entities through which it carried out the misconduct described herein and each of which also participated in the misconduct described herein.

11.      The NFL's business units or entities involved in the misconduct alleged herein include, but are not limited to, Defendants NFL Properties, LLC ("NFL Properties"), NFL Ventures, L.P. ("NFL Ventures"), NFL Enterprises LLC ("NFLE"), and NFL Productions LLC (also known as NFL Films) ("NFL Productions").

12.      The NFL also does business as or exclusively controls other various business entities, including the NFL Network and NFL International LLC.

13.      Defendant NFL Ventures is a limited partnership organized under the laws of Delaware that advertises, promotes and markets the NFL, its brand and products, and its member teams.      Defendant NFL Venture's wholly-owned subsidiaries include Defendants NFL Productions and NFLE.

14.     Defendant NFL Productions produces NFL-related programming for the NFL and its member teams.  NFL Films also provides services, including licensing of NFL-related content to customers operating in the entertainment and media industries.

15.     Defendant NFLE sells, advertises, and promotes the NFL and its interests, including by operating the NFL's primary website located at www.nfl.com ("NFL.com").

16.     Each of these business divisions or entities operates under the exclusive control of the National Football League.

17.     Defendants NFL, NFLE, NFL Properties, NFL Productions, and NFL Ventures are referred to herein collectively as "the NFL Entities" and/or simply "the NFL."

18.     The remaining Defendants are the 32 NFL teams or member clubs: Arizona Cardinals Holdings, Inc.; Atlanta Falcons Football Club LLC; Baltimore Ravens Limited Partnership; Buffalo Bills, Inc.; Panthers Football LLC; Chicago Bears Football Club, Inc.; Cincinnati Bengals, Inc.; Cleveland Browns LLC; Dallas Cowboys Football Club, Ltd.; Denver Broncos Football Club; Detroit Lions, Inc.; Green Bay Packers, Inc.; Houston NFL Holdings LP; Indianapolis Colts, Inc.; Jacksonville Jaguars Ltd.; Kansas City Chiefs Football Club, Inc.; Miami Dolphins, Ltd.; Minnesota Vikings Football Club LLC; New England Patriots, LP; New Orleans Louisiana Saints, LLC; New York Football Giants, Inc.; New York Jets Football Club, Inc.; Oakland Raiders LP; Philadelphia Eagles Football Club, Inc.; Pittsburgh Steelers Sports, Inc.; San Diego Chargers Football Co.; San Francisco Forty Niners Ltd.; Football Northwest LLC; and The Rams Football Co. LLC; Buccaneers Limited Partnership; Tennessee Football, Inc.; and Washington Football Inc.  These Defendants are referred to herein as the "NFL Teams" or "NFL Member Clubs."

19.     Each of the NFL Teams operates as a separately-owned and independent business entity which operates a for-profit professional football franchise in its respective city.  Each of the NFL Teams owns and markets its own name, colors, logos, trademarks, and other intellectual property.  The NFL Teams compete with each other for customers of their respective apparel, clothing, souvenirs, memorabilia, and other commercial products and goods.

20.     Although each NFL Team is an independent business entity, they conspired and acted in concert to form the NFL and its various subsidiaries, including NFL Properties and NFLE, for the express purpose of influencing and fixing the market for commercial licensing of NFL-related stock photographs.

21.     Together with the other NFL Entities, the NFL Teams are included in any and all references to the "NFL" and "NFL Defendants."

22.     Defendant Getty Images (US), Inc. ("Getty Images"), a New York corporation, is the world's largest aggregator and licensor of stock photography, including sports-related photo collections.

23.     Defendant Associated Press ("AP"), a New York Corporation, describes itself as a not-for-profit news "cooperative" that is owned by and made up of over 1,400 newspapers and media organizations.  AP's headquarters are located in New York, New York.  In addition to other services and products, AP also acts a licensing agent for stock photography collections.

24.     Defendant Replay Photos, LLC ("Replay Photos") is a North Carolina Limited Liability Company.  Replay Photos is an online retailer that specializes in selling sports-related photographs.  Replay Photos' primary place of business is located in Durham, North Carolina.  Replay Photos' owns and operates the website located at www.replayphotos.com.

25.     Replay Photos and AP cooperatively own, control, and operate the "NFL Photo Store," which is a website that sells posters, prints, and canvases of NFL-themed images.

## NATURE OF THE ACTION

26.     For many years, Plaintiffs obtained media credentials to photograph events for the NFL and its individual Member Clubs from various editorial and commercial entities.

27.     Plaintiffs collectively have photographed thousands of NFL regular season games, NFL playoff games, NFL team practices, and other NFL functions.  Over their careers, each Plaintiff has amassed a large collection or library of NFL-related photographs.  Together, Plaintiffs own copyrights to hundreds of thousands of NFL-related photographs.

28.     Plaintiffs primarily photographed NFL events and games under so-called speculation agreements (or "on spec"), meaning that instead of being paid flat fees (also called "day rates") for their work they retained ownership of the copyrights in the photos that they took during an event and then earned income by licensing their photos.

29.     This action involves only those photos that Plaintiffs created "on spec" and thus pertains only to those photos in which Plaintiffs retained and currently own copyrights; this action does not involve any photos that Plaintiffs occasionally may have created under day-rate or work-for-hire agreements.  All allegations herein related to Plaintiffs' photographs refer only to those photographs to which Plaintiffs own copyrights.

30.     Plaintiffs' photo libraries include tens of thousands of photos featuring only specific players, individual NFL Team logos, NFL Team stadiums, NFL Team cheerleaders, or other content that does not include any marks, logos, or other intellectual property owned by the NFL Entities.

31.     Plaintiffs' photo libraries include thousands of photos taken at NFL Team practices, functions, and events that were not organized by the NFL and feature no logos, marks, or other intellectual property owned by the NFL Entities.

32.     Although Plaintiffs' now have been forced by the Defendants' illegal conduct to license the photos that they shot "on spec" through third-party licensors, they never transferred their copyrights in these photos to their licensors.

33.     Plaintiffs formerly licensed their NFL-related photographs directly to end users as well as through NFL Photos and then Getty Images.  Plaintiffs currently license their NFL-related photographs through AP.

34.     Plaintiffs' contributor agreements with Getty Images and AP expressly provided that Plaintiffs retained sole and exclusive ownership of all copyrights in these photos.

35.     This is an action for violations of the Sherman Act and Copyright Act and other related claims brought by Plaintiffs against Defendants for violations of the antitrust laws and unauthorized uses of Plaintiffs' copyrighted photographs.

36.     This action concerns the NFL's blatant conspiracy to create a monopoly to illegally restrain trade and otherwise control the market for commercial licensing of NFL-related stock photographs, including any such photos that include only the marks, logos, and other intellectual property of the NFL Teams and do not include any marks, logos, or other intellectual property owned separately by the NFL itself or its related entities.

37.     This action also concerns the NFL Defendants' rampant, willful, and continued unauthorized uses of Plaintiffs' photographs.

38.    This action also involves Getty Images' and AP's illegal and unethical misconduct which permitted, encouraged, and contributed to the NFL Defendants' infringements.

## VENUE AND JURISDICTION

39.    Jurisdiction for Plaintiffs' claims lies with this Court pursuant to the Sherman Act, 15 U.S.C. §§ 1, *et seq.*; the Copyright Act of 1976, 17 U.S.C. §§ 101, *et seq.*; 28 U.S.C. § 1331 (conferring original jurisdiction "of all civil actions arising under the Constitution, laws, or treaties of the United States"); and 28 U.S.C. § 1338(a) (conferring original jurisdiction over claims arising under any act of Congress relating to copyrights).

40.    This Court has jurisdiction over Plaintiffs' state and common law claims under 28 U.S.C. § 1967 because those claims are so related to Plaintiffs' federal claims that they form part of the same case or controversy.

41.    Venue is proper in this Court under 28 U.S.C. § 1391(b) since the alleged misconduct by Defendants giving rise to the claims asserted herein occurred in this District and 28 U.S.C. § 1400(b) since Defendants infringed Plaintiffs' copyrights in this District.  All Defendants also reside in or conduct substantial business in this District, including business directly related to the claims at issue in this action.

## FACTUAL ALLEGATIONS

42.    Beginning in approximately 1965, the NFL formed and operated a division called NFL Properties, Inc. that included NFL Photographic Services or NFL Photos which effectively operated as an in-house photo library and licensing agency.

43.    Through NFL Photos, the NFL actively solicited and issued licenses for photography by freelance photographers in order to expand the NFL's brand, including through

the licensing of photos to media outlets and commercial entities, as well as by publishing its own magazines, newsletters, books, public relations and promotional materials.

44.     NFL Photos operated much like the more well-known NFL Films, except with an emphasis on still photography rather than film and video footage.  One crucial difference, however, is that the NFL typically does not own copyrights in the still photos that it uses because the vast majority of photos are created by freelance photographers.

45.     Beginning in approximately 2003, the NFL transitioned away from its in-house photo library to licensing arrangements with established stock photography agencies, including Getty Images.

46.     Beginning in approximately 2007, Getty Images obtained exclusive control over all commercial licensing rights to any NFL-themed photos, even if the particular photos did not include any intellectual property owned by the NFL, and retained exclusive licensing rights until 2009.

47.     The licensing agreement between the NFL and Getty Images did not include a license to use contributor photos, whether on a complimentary basis or otherwise.  Instead, the NFL was required to obtain subsequent licenses from Getty Images to use contributor content. And where the NFL wished to obtain permission to use an image on a complimentary basis, it was required to request separate and express permission from Getty Images or Plaintiffs for any such license or usage rights.

48.     At various times during this period, each Plaintiff entered into a "contributor agreement" with Getty Images pursuant to which Getty Images acted as Plaintiffs' agents and facilitated the licensing of their works, including but not limited to Plaintiffs' NFL collections.

49.     Beginning in 2008, the NFL accepted bids for the exclusive right to grant commercial licenses for NFL-related photographic content.

50.     The NFL selected AP's bid, and the NFL and AP subsequently entered into an exclusive licensing agreement effective as of April 1, 2009 (the "2009 NFL-AP Agreement").

51.     As a direct consequence of the NFL's decision to transition its exclusive license to AP, Plaintiffs lost the ability to sell higher-value commercial licenses, as opposed to editorial licenses, through Getty Images.  Thus, if Plaintiffs wished to continue offering commercial licenses for their NFL content, they were forced to transition their NFL collections to AP.

52.     Eventually, all Plaintiffs ended their relationships with Getty Images and entered into contributor agreements with AP to allow them to commercially license their NFL content. As a result, Getty Images terminated its relationships with Plaintiffs causing Plaintiffs to lose significant revenue due to the loss of licensing opportunities for their non-NFL content.

53.     Like its prior license agreement with Getty Images, the 2009 NFL-AP Agreement did not include a license, permission, or any authority for the NFL to use AP's contributors' photos.   Thus, if the NFL wished to use any contributor photos, it was required to obtain a separate license.

54.     Although the 2009 NFL-AP Agreement did not include permission for the NFL to use contributor photos, AP made no effort to limit the NFL's copying and use of contributor photos.  Instead, despite knowing that the NFL lacked a license to use contributor content, AP permitted the NFL to copy and use contributor photos without a license and without charging the NFL any license fee.

55.    AP also failed to track which contributor photos were being copied and used by the NFL (and its various entities and Member Clubs) and it never reported to its contributors that it was allowing the NFL unfettered, complimentary access to their collections.

56.    In January of 2012, Plaintiffs contacted the NFL to demand information regarding its use of their photos and to demand that it cease and desist using their copyrighted works without permission and without paying licensing fees.

57.    Sometime thereafter in 2012, the NFL and AP entered into a new agreement (the "2012 NFL-AP Agreement") renewing the AP's exclusive licensing authority.  The agreement is effective as of April 1, 2012.

58.    Plaintiffs are not parties to and were not involved in the negotiations pertaining to either of the NFL-AP Agreements and did not have access to copies of either agreement prior to filing this lawsuit.  Plaintiffs still do not have access to any of the communications between the NFL and AP regarding these agreements.  Plaintiffs thus do not know when either agreement was actually executed, and Plaintiffs cannot determine or verify whether the documents filed by AP and the NFL under seal in this lawsuit are complete or accurate.

59.    In the 2012 NFL-AP Agreement, AP purported to grant the NFL (and its various related business entities and Member Clubs) a license that permitted complimentary and royalty-free use of AP's contributors' photos for various editorial and marketing purposes.   AP also granted the NFL a "license" that purported to retroactively cover the NFL's blatant unlicensed use of AP's contributors' photos back to April 1, 2009.[1]

---

[1] Plaintiffs dispute the validity of the purported license granted by AP to the NFL in the 2012 NFL-AP Agreement.  References herein to this agreement as including a license to the NFL do not reflect or indicate a concession by Plaintiffs that this license is valid.

***Plaintiffs' Contributor Agreements with Getty Images***

60.     In order to continue licensing their NFL photo collections on a commercial basis, each Plaintiff entered into a contributor agreement with Getty Images pursuant to which Getty Images licensed their works, including but not limited to Plaintiffs' NFL photo collections. These agreements are referred to herein as the "Getty Contributor Agreements."[2]

61.     When Getty Images obtained an exclusive license from the NFL, Plaintiffs were forced to either accept the take-it-or-leave-it contracts being offered by Getty Images or lose the ability to receive compensation from any commercial licensing opportunities for their libraries of NFL-related photos.

62.     Given Getty Images' market dominance and its exclusive control over the commercial licensing of NFL content, if Plaintiffs had not accepted Getty Images' contracts then they would have been shut out of the market and unable to continue making a living licensing their photos.

63.     Prior to entering into contracts with Getty Images, Plaintiffs were able to license and were in fact licensing their works directly to customers, including on a commercial basis. Plaintiffs also were licensing their works directly to the NFL Defendants, including previously through licenses to NFL Photos.

64.     As such, Plaintiffs were direct market competitors with other licensors of NFL-related stock photographs.

65.     Representatives from Getty Images exploited the market dominance created by Getty Images' exclusive licensing arrangement with the NFL during contract negotiations with

---

[2] The Getty Contributor Agreements were standardized form contracts that contained similar, if not identical terms and thus are referred to collectively herein.

Plaintiffs, including by proposing unequal and substantively improper contract terms in its contributor agreements and offering Plaintiffs such terms on a take-it-or-leave-it basis.

66.    Under the Getty Contributor Agreements, Plaintiffs agreed to license their photos through Getty Images and, in exchange, Getty Images agreed to market and license the photos either directly or through its various "Getty Offices and/or Licensees."  Although Getty Images was permitted to determine the "terms and conditions" of licenses granted to its Offices or Licensees, including to not charge a royalty, it was required to charge license fees and pay royalties to Plaintiffs for any licenses granted to "Clients."  The Getty Contributor Agreements thus allowed Getty Images to "sublicense" Plaintiffs' works to its own affiliates or agents without charging a license fee, but only so these entities could then license Plaintiffs' works "to Clients" who were required to pay licensing fees.

67.    The Getty Contributor Agreements also permitted Plaintiffs to specify additional usage restrictions at the time of submission, including identifying their images as either "Rights Managed" or "Royalty Free" photos.  Getty Images expressly agreed to honor all restrictions that Plaintiffs placed on the licensing of their photos, including that images identified as Rights Managed must be licensed and marketed on a rights-managed basis only.

68.    The Getty Contributor Agreements also required Getty Images to pay higher royalty rates for images licensed on a rights-managed basis than photos licensed through Getty Images' royalty-free collections and products.

69.    Plaintiffs identified all of the photos at issue in this suit as Rights Managed at the time that they were submitted to Getty Images, and all images were accepted and marketed by Getty Images as such.

70.     The Getty Contributor Agreements also required that Getty Images make periodic reports of all transactions pertaining to their photos and to pay the necessary royalties due to Plaintiffs for all license sales during that period.

71.     The Getty Contributor Agreements expressly provide that Plaintiffs retained all copyrights in the images that they provided to and licensed through Getty Images.

### The 2007 Getty License

72.     In 2007, Getty Images attempted to entice the NFL to extend its exclusive licensing agreement with Getty Images by offering to allow the NFL very limited, complimentary use of Getty Images' third-party contributor photos.  The Getty Contributor Agreements, however, expressly precluded Getty Images from granting any such complimentary licenses to the NFL for Plaintiffs' photos because such authority was limited to "Getty Offices or Licensees" and the NFL was clearly a "Client."  The Getty Contributor Agreements also expressly prohibited Getty Images from granting any "royalty-free use" of Plaintiffs' photos.

73.     Given these restrictions, Getty Images approached Plaintiffs in 2007 to request that they agree to a new, separate license agreement that would allow Getty Images to include their photo collections in a license to the NFL.  Getty Images explained that this license would be granted to the NFL on a trial basis only and would not be extended automatically without additional agreement from Plaintiffs.   Getty Images further explained that the license would last only three months and would be limited to Plaintiffs' photos for the 2007-2008 season only and would permit the NFL to use Plaintiffs' photos on NFL.com only and only for editorial uses.

74.     Plaintiffs agreed to this new trial license because it was very limited in scope and expired after three months and involved only their photos from the 2007-2008 season.

14

75.    In an effort to enhance its own bid to retain the NFL license, Getty Images approached Plaintiffs in 2008 to request that they extend this now-expired trial license for an additional five years and expand its terms.

76.    Plaintiffs did not agree to terms with Getty Images on this issue, and Getty Images did not grant the NFL any additional license or rights to Plaintiffs' photos after this very limited trial license expired.

### The NFL Selects AP as Its Exclusive Licensor in 2009

77.    As a direct consequence of the NFL's decision to grant an exclusive license to AP, Plaintiffs lost the ability to sell higher-value commercial licenses (as opposed to editorial licenses) through Getty Images.  Thus, if Plaintiffs wished to continue offering commercial licenses for their NFL content, they were forced to transition their NFL collections to AP.

78.    The NFL's decision to grant AP an exclusive license presented serious difficulties for Plaintiffs because they also own the copyrights to and license other sports-related stock photo collections, including stock photographs of Major League Baseball ("MLB") and National Collegiate Athletic Association ("NCAA") games and events, and Getty Images had exclusive licensing deals and/or significant licensing partnerships with these entities, including MLB.

79.    In a blatant attempt to exploit this dilemma, Getty Images threatened to remove Plaintiffs' other sports content from its distribution networks and/or terminate its relationship with Plaintiffs entirely if they did not agree to continue licensing their NFL content through Getty Images even though its commercial licensing deal with the NFL had expired.

80.    Getty Images also made clear that it would not "welcome back" any contributors who moved their NFL content to AP should Getty Images ever regain the right to commercially license NFL content in the future.

81.    Getty Images communicated these threats to Plaintiffs, and numerous other contributors, in an e-mail on June 10, 2009 from Travis Lindquist, the Managing Editor for Getty Images' Sport collection.  In subsequent e-mails from Mr. Lindquist in August of 2009, Getty Images claimed that these punitive measures were necessary to allow Getty Images to focus its efforts on those photographers who contribute their entire portfolio to Getty Images.  This stated explanation was concocted to hide Getty Images' true punitive intentions, as evidenced by the fact that Getty Images did and still does permit other contributing photographers to obtain credentials and contribute sports photos to Getty Images while still contributing other content to other licensors.

82.    Because Plaintiffs had significant non-NFL content at Getty Images, Getty Images' position forced Plaintiffs to make an impossible choice between losing commercial licensing opportunities for their NFL content by not going to AP or giving up commercial licensing opportunities for their non-NFL content by leaving Getty Images.

83.    Plaintiffs Jasienski, Stluka, Spinelli, Witte, and Drapkin risked Getty Images' wrath and moved their NFL content to AP in August of 2009.

84.    Plaintiffs Lowrance and Boehm chose not to risk the loss of other licensing opportunities and thus kept their NFL content at Getty Images.  As result, Plaintiffs Lowrance and Boehm lost significant and valuable commercial licensing opportunities for their vast NFL collections by leaving those images at Getty Images.

85.    Although Getty Images ultimately sub-licensed Lowrance's and Boehm's collections through AP, the number of sales was significantly diminished and Plaintiffs were paid significantly lower royalties because both Getty Images and AP withheld their respective percentage of the license fees and thus Plaintiffs Lowrance and Boehm were effectively "double

16

charged" for each license.  In addition, AP punitively charged undisclosed "sales commissions" in order to facilitate the licensing of these non-AP collections.

86.     In 2011 and 2012 respectively, Plaintiffs Lowrance and Boehm also ended their relationships with Getty Images and entered into agreements to license their NFL collections through AP.

87.     When each Plaintiff ultimately moved their NFL collections to AP, Getty Images advised them that it would no longer accept any other sports content from Plaintiffs or provide them any credentials for any future sporting events.

88.      All Plaintiffs have lost significant revenue due to the loss of licensing opportunities for their non-NFL content that resulted from the termination of their relationships with Getty Images.

### *Plaintiffs' Contract Negotiations with AP*

89.     The circumstances and relative bargaining power of the parties shows that Plaintiffs entered into contracts with AP under duress and coercion and were forced to accept contract terms that were drafted entirely by AP and were inequitable, unconscionable, and contrary to law.

90.     AP also intentionally misled Plaintiffs in order to fraudulently induce them into signing AP's proposed contracts.

91.     As occurred previously when the NFL agreed to an exclusive licensing arrangement with Getty Images, when the NFL shifted its exclusive license to AP in 2009 Plaintiffs were faced with the dilemma of either being forced to move their NFL photo collections to the AP or risk losing the ability to earn compensation from valuable commercial licensing opportunities.

92.     AP and its representatives, including primarily Greg Payan, the Deputy Director of AP Images Content, exploited AP's market dominance created by this exclusive license arrangement with the NFL during contract negotiations with Plaintiffs in the summer of 2009.

93.     Among other things, AP included unequal and improper contract terms in its contributor agreements, including, but not limited to, language purporting to grant AP a "perpetual" and "irrevocable" license even though the contracts are terminable and the license was non-exclusive for all historical photos and became non-exclusive when AP's agreement with the NFL expired.

94.     AP and Mr. Payan also refused repeated requests by Plaintiffs and their representative during these contract negotiations, Ed Greenburg, to discuss Plaintiffs' contract concerns with AP's legal team (or other persons drafting the contracts) directly.

95.     Mr. Payan also intentionally misled Plaintiffs during contract negotiations that took place between June and August of 2009, including by misrepresenting both AP's dealings with the NFL and whether AP had allowed or intended to allow the NFL complimentary use of contributor photos.

96.     For example, during a conference call between Mr. Payan, Mr. Greenburg, and Plaintiff Spinelli on or about July 14, 2009, Mr. Payan stated that AP had not granted the NFL a license to use contributor photos and represented that AP did not intend to permit the NFL complimentary use of contributor photos, including Plaintiffs' collections.   Mr. Payan specifically explained that the AP's agreement with the NFL did not include a complimentary license to use contributor photos and thus the NFL was required, like any other customer, to purchase separate licenses in order to obtain rights to use contributor photos.

97.     Plaintiffs had raised concerns regarding the NFL's potential use of contributor photos on several occasions prior to this conference call and even had proposed contract language granting a narrow license to the NFL on certain conditions and in exchange for specified consideration, including guarantees regarding access to credentials and the acceptance of their collections by future NFL licensing partners.  Plaintiffs proposed language regarding the NFL's use of their photos on a limited basis as an exception to the requirement under Section 5.1 (of the proposed contracts) that AP must pay a minimum royalty of $25 per license.

98.     Prior to this call in July of 2009, AP and Mr. Payan were aware of Plaintiffs' concerns regarding the NFL's potential use of their photos and were aware that Plaintiffs understood the minimum royalty requirement of the agreements proposed by AP to preclude any complimentary use of their photos by the NFL.

99.     During the call on July 14, 2009, Mr. Payan failed to disclose that AP did not agree that the minimum royalty requirement precluded AP from granting non-royalty bearing licenses to the NFL.  In fact, Mr. Payan expressly stated that AP did not want or require any such revisions to the contracts because it had not granted and did not intend to grant the NFL complimentary use of contributor photo collections.  According to Mr. Payan, AP did not want or require any exception to this this minimum royalty requirement because it intended to charge the NFL for any use of contributor photographs in order to offset the complimentary use of AP's wholly-owned photos that AP already had agreed to.

100.    Mr. Payan's representations were knowingly false at the time they were made.

101.    Mr. Payan understood at the time that his fraudulent representations would be a crucial inducement to Plaintiffs to sign their contracts with AP, and he intended his false statements to deceive and mislead Plaintiffs.

102.     Mr. Payan's fraudulent representations were a crucial inducement to Plaintiffs to sign their contracts with AP.

103.     AP and Mr. Payan knowingly misled Plaintiffs' in order to falsely assuage Plaintiffs' stated concerns and to intentionally deceive Plaintiffs into signing the one-sided contracts drafted and proposed by AP.

104.     AP and Mr. Payan expressly rejected Plaintiffs' offer to include any language in the contributor agreements to allow the NFL any complimentary use of Plaintiffs' photos.  If AP rejected this offer because it believed that the existing license language was broad enough to permit AP to grant the NFL complimentary uses of Plaintiffs' photos, AP and Mr. Payan failed to disclose that view during contract negotiations and failed to correct Plaintiffs' stated understanding of the language drafted by AP.

105.     Ultimately, AP refused to consider any of Plaintiffs' concerns or proposals raised during this July 2009 call.  In an e-mail from Mr. Payan to Mr. Greenburg dated August 10, 2009, AP made clear that the (horribly one-sided) contract terms being offered to Plaintiffs were final and were take-it-or-leave-it.

106.     In an e-mail response to Mr. Payan also on August 10, 2009, Mr. Greenburg expressed frustration with AP's bad faith during these one-sided negotiations, including both AP's refusal to permit him to discuss contract issues directly with AP's legal department and its refusal to accept any substantive input from Plaintiffs.

107.     Plaintiffs were under extreme duress to accept the AP's unfair contract terms because the NFL already had granted the AP an exclusive license and the NFL's 2009 season was starting in only a few weeks.  AP was aware of this duress and intentionally sought to compound and exploit it, including when Mr. Payan made clear during the July 14, 2009

conference call that anyone that did not sign a contract promptly would be precluded from obtaining NFL credentials for the entire upcoming season.  Thus, if Plaintiffs did not bow to AP and accept the take-it-or-leave-it contracts being offered then they would lose any chance to license their existing collections commercially and would not be able to obtain credentials to the entire slate of 2009 NFL events.

108.    Given that Plaintiffs had devoted many years of their careers, not to mention substantial effort and money, to creating and curating their NFL photo collections and this work was the primary basis of Plaintiffs' livelihoods, Plaintiffs were left with no alternative except to bow to AP's pressure and accept the contract terms being offered.

109.    Plaintiffs also were forced to bow to AP's coercive tactics because they lacked any reasonable alternative since Getty Images already had made clear its position regarding future licensing of Plaintiffs' works.

110.    When Plaintiffs chose to sign with AP, they were forced out of Getty Images and thus lost the ability to obtain credentials for any sporting events, including NCAA, MLB, and NBA games, or commercially license their existing collections of non-NFL photos.  Losing these licensing opportunities for their non-NFL works caused serious harm to Plaintiffs.   Whereas Plaintiffs previously were able to shoot sporting events throughout the year and thereby maintain a consistent income, Plaintiffs now have severely limited opportunities to shoot sporting events on a commercial basis.

111.    The actions of the NFL, AP, and Getty Images, together with their vastly superior bargaining power, put Plaintiffs' livelihoods in jeopardy and operated to create substantial duress and coercive pressure on Plaintiffs to accept the AP's inequitable and unconscionable contract terms.   Plaintiffs were forced to decide between accepting AP's contract terms or losing the

ability to license their NFL collections commercially and to choose whether to continue licensing their NFL collections at the cost of being forced out of Getty Images and thus not being able to license their other sports collections.

112.    In May and June of 2012, Doug Benc o AP also represented to Plaintiff Boehm that the contract being offered by AP was only temporary (or an interim placeholder) and that AP intended in the very near future to negotiate a new contract with all NFL contributors but that Boehm needed to sign the agreement as offered in order to allow AP to begin the process of ingesting his vast NFL collection prior to the start of the 2012 season.

113.    Neither Mr. Payan nor Mr. Benc disclosed to Boehm the terms of AP's recent license agreement with the NFL and did not correct Boehm's understanding, as explained more fully below, that AP had not yet granted a license to the NFL.

114.    Based on AP's false representations and failure to disclose crucial information in AP's sole possession, Plaintiff Boehm understood and believed at the time that he entered into his agreement with AP that the contract was intended to cover, at best, only the 2012 NFL season and that a new contract would be negotiated with all NFL contributors in the very near term and that AP had not granted a license to the NFL and would not do so without his additional consent to a new contract.

*Plaintiffs' Contributor Agreements with AP*

115.    True and correct (redacted) copies of Plaintiffs' contributor agreements with AP are attached hereto as Exhibits 22-28.  Although these agreements include slight variations, they include similar terms with respect to most of the major sections and thus are collectively discussed and referred to herein as the "AP Contributor Agreements."

116.    Section 4.1 of the AP Contributor Agreements expressly provides that Plaintiffs retained "all right, title and interest" to the images that they provide to AP, "including all copyrights and any other rights in law or equity."

117.    Section 4.2 defines the license granted to AP.[3]   For all Plaintiffs, the license in Section 4.2 of their contributor agreements is prospective only.   No language in Section 4.2, or anywhere else in the AP Contributor Agreements, grants AP the authority to settle, release, or otherwise compromise claims involving any unauthorized use of Plaintiffs' photos, including through retroactive licensing.

118.    The license granted to AP by Plaintiff Lowrance is entirely non-exclusive.   For the other Plaintiffs, Section 4.2 provides that the rights granted to AP were non-exclusive with respect to any photos that Plaintiffs created prior to joining AP (which necessarily included all photos previously licensed through Getty Images) as well as any new NFL photos for which Plaintiffs did not obtain credentials through AP.   To the extent that any aspect of the license granted to AP was exclusive, such rights were exclusive with respect to other agencies only as Plaintiffs retained the right to market and license their photos directly to customers.

119.    Although the license granted to AP purports to be perpetual and irrevocable, Section 7 permits either AP or Plaintiffs to terminate the agreement with or without cause.

120.    Typically in Section 5.1, the AP Contributor Agreements provide that the license granted to AP is "in exchange for" AP agreeing to pay royalties to Plaintiffs for licenses it grants to third parties.   The only stated exceptions to AP's obligations to pay royalties or other compensation to Plaintiffs are specifically limited to where AP allows "the downloading of 'preview' or 'thumbnail' or other promotional or browse-quality images" and for use of

---

[3] Plaintiffs challenge the validity of the AP Contributor Agreements, and thus any references to these agreements or the licenses granted therein do not reflect or indicate a concession by Plaintiffs that the agreements or licenses are in fact valid.

Plaintiffs' photos in "AP's own publicity or advertising materials."  The AP Contributor Agreements recognize no other circumstances in which AP is not required to pay compensation to Plaintiffs for the use of their photos.

121.    Based on this explicit language and Mr. Payan's representations regarding both AP's understanding of this term and AP's intention to charge the NFL for licenses to use contributor photos, Plaintiffs reasonably understood their contributor agreements with AP to preclude AP from allowing free or complimentary (or "non-royalty bearing") uses of their photos except under the very narrow circumstances expressly stated in the AP Contributor Agreements.

122.    Section 5.1 of the Jasienski, Spinelli, Stluka and Witte contributor agreements also require AP to pay "the greater of" either a royalty based on the Net Revenue collected by AP or "twenty-five dollars ($25.00) per Final Photo."

123.    Although the agreements state that this royalty is due on "qualifying Event Photo Sales" only, the AP Contributor Agreements do not permit AP to sublicense or transfer rights to third parties by any other means and Section 10 of the AP Contributor Agreements makes clear that "[t]he rights and obligations of Parties under the Agreement may not be assigned or transferred without the express prior written consent of the other Party[.]"

124.    The AP Contributor Agreements also provide, typically under Section 5.2, that the royalties to be paid by AP are determined by the nature of the "use" rights granted to the customer, with different royalty rates applying depending on whether the permitted use was "editorial" or "commercial" in nature.  Because the royalties to be paid by AP are determined by the nature of the "use" granted in the underlying license, any license granted by AP must reflect the permitted "use" in order to determine what royalty rate applies.

125.    The AP Contributor Agreements also require that AP make periodic reports of all transactions pertaining to their photos.  Section 5.1 of the agreements between AP and Plaintiffs Stluka, Spinelli, Witte, and Jasienski require AP to make payment of all due royalties within 45 days of the end of each calendar month and to provide a statement of all licenses prior to that 45-day deadline.

### *Plaintiffs' Course of Dealing with AP*

126.    The consistent course of dealings between Plaintiffs and AP, as well as the agreements themselves, demonstrate a clear understanding that AP was to license Plaintiffs' photos as "Rights Managed" and not "Royalty Free."

127.    All AP Contributor Agreements provide that AP is to calculate the royalties due based on the nature of the "use" or rights it grants to its customers.  There is no other method for determining the applicable royalty rate in the agreements.

128.    This requirement is antithetical to and precludes royalty-free licensing because the nature of the intended use is not relevant or tracked in royalty-free licensing and the license fee is instead calculated based on the size or resolution quality of the image file.

129.    In rights-managed licensing, on the other hand, the license reflects the permitted uses of the work and the license fees are calculated based on the scope of the rights granted.  Thus, a license that granted a customer broader usage rights (such as allowing commercial use of the licensed photos) would require a higher license fee than a license granting more narrow usage rights (such as allowing only limited editorial uses).

130.    As the name suggests, rights-managed licensing also requires that the licensor track and manage the usage rights being granted to end users.  This is crucial for several reasons, including that fees are directly linked to the usage rights being granted and also because the

ability to subsequently grant high-value "exclusive" licenses depends on the licensor's ability to assure a prospective client that no other comparable rights have been granted to other customers, especially the prospective client's competitors.

131.    This distinction is well understood by AP, as it maintains distinct archives for rights-managed and royalty-free images, and markets them separately on its website.

132.    Like their photos submitted to Getty Images, Plaintiffs identified their photos to AP as Rights Managed at the time of submission and, to this day, AP licenses Plaintiffs' photos only under its rights-managed collections and, when a customer selects a photo for licensing, AP's website identifies all of Plaintiffs' photographs as a "rights managed" photos.

133.    Other than the retroactive license granted to the NFL in 2012, AP has not granted any other royalty-free licenses to any customers related to any of Plaintiffs' works.

134.    This extensive course of conduct demonstrates that AP understood that the contributor agreements required AP to market and license Plaintiffs' works on a rights-managed basis and precluded any royalty-free licensing.

135.    Despite the fundamental obligations to license Plaintiffs' works according to the principles inherent in the rights-managed licensing model, including to track usage rights and also charge appropriate market value for each license, Getty Images and AP granted the NFL nearly unfettered access to Plaintiffs' photo collections and, either expressly or by inaction, allowed the NFL to make free use of Plaintiffs' copyrighted photos.

136.    In doing so, Getty Images and AP not only failed to charge the NFL appropriate market value for licenses to use thousands of Plaintiffs' photos, they both also failed to monitor, track, or responsibly manage the NFL's use of Plaintiffs' photos.  The failure of Getty Images

and AP to track and monitor the NFL's use of Plaintiffs' photos severely undermines the future value of their copyrighted works.

137.     As a result of this misconduct by AP and Getty Images, the NFL was able to widely copy, display, publish, and distribute literally thousands of Plaintiffs' copyrighted works without ever paying any compensation to Plaintiffs and without ever reporting the uses it has made of Plaintiffs' works.

### The 2009 and 2012 NFL-AP Agreements

138.     The 2009 NFL-AP Agreement did not include a license allowing the NFL to use contributor content.  The 2009 agreement between the NFL and AP thus did not grant the NFL (or any of its related entities, Member Clubs, or partners) any rights, permission, or authority to use Plaintiffs' photos, whether on a royalty-free or complimentary basis or otherwise.

139.     Despite the lack of any license to use Plaintiffs' photos, the NFL did use (and AP did allow the NFL to use) Plaintiffs' photos extensively and did so with AP's full knowledge.

140.     Beginning in August of 2009 when most Plaintiffs uploaded their photo collections to AP, the NFL immediately began to use Plaintiffs' photos without paying for any usage rights.

141.     The NFL was able to obtain high-resolution copies of Plaintiffs' photos from AP only because the AP had full knowledge of the NFL's conduct and fully acquiesced and facilitated that NFL's blatant unlicensed use of contributor photos.

142.     In January of 2012, Plaintiffs contacted the NFL to demand information regarding its use of their photos and to demand that it cease and desist using their copyrighted works without permission and without paying the requisite licensing fees.  After the NFL ignored

Plaintiffs' inquiry, Plaintiffs contacted the NFL again in February of 2012, this time through counsel, to make the same demands.

143.    In response to Plaintiffs' letters and inquiries, the NFL falsely represented that its 2009 contract with AP included an express license that allowed complimentary use of any NFL-related photos licensed by AP, including all contributor photos.

144.    Because such a license would violate the express terms and fundamental purpose of Plaintiffs' agreements with AP, Plaintiffs contacted AP in or about June of 2012 to inquire about the NFL's seemingly preposterous claim.   As expected, AP (specifically, Mr. Payan) denied the NFL's claim and assured Plaintiffs that the 2009 agreement between AP and NFL not include such a license.

145.    During a conference call on June 25, 2012, Mr. Payan further explained that the NFL was insisting on a license to use AP's contributor content on a complimentary basis and was making this request due to Plaintiffs' inquiries.   According to Mr. Payan, the fact that AP believed that it did not have the authority to grant such a license to the NFL was a major issue that continued to hold up the new NFL-AP agreement.

146.    Based on this representation, Plaintiffs understood that AP had not yet granted the NFL a license to use contributor photos at this time.   Plaintiffs thus agreed to continue negotiations (through counsel) with AP (through Mr. Payan) regarding Plaintiffs' various concerns.

147.    During contract negotiations that occurred between June and September of 2012, AP requested that Plaintiffs agree to contract amendments that would permit AP to grant the NFL limited but complimentary uses of Plaintiffs' photo collections.   AP specifically requested Plaintiffs' input in defining the scope of permissible use of photos by the NFL that Plaintiffs

would be willing to accept.  Among other things, AP requested that Plaintiffs agree to allow the NFL complimentary editorial and promotional use of their photos by NFL entities and third parties.

148.    In a letter dated July 12, 2012, Plaintiffs advised AP that they would consider AP's proposal but would not agree to complimentary commercial uses by the NFL or any third-party uses.  In this letter, Plaintiffs made clear that they were willing to discuss the matter only if AP and the NFL made specific concessions on other issues.   Plaintiffs also specifically stated:

> To be clear, though, our agreeing to discuss this issue is just that, an agreement only to discuss the matter. Our discussing this issue does not create any implied license in favor of the NFL or the AP, and it does not mean that we condone the practice of unlicensed use of content by the NFL. Until recently, my clients did not know that this unlicensed use was occurring, and they certainly did not sanction it. If the AP chooses to continue to allow the NFL access to content, it does so at its own peril. My clients own all copyrights in the images provided to the AP, and their contracts with the AP do not permit complimentary uses of content by any third parties, including the NFL. Thus, all unlicensed uses to date are unauthorized and constitute unlawful copyright infringements.

149.    Despite the fact that this letter made clear Plaintiffs' understanding that AP had not yet granted the NFL a license to use contributor photos, AP's representatives did not disclose that AP and the NFL apparently already had entered into a license agreement by that time. Despite having superior knowledge regarding this matter, AP's representatives did not disclose this information to Plaintiffs for several months during ongoing contract negotiations.  Instead, AP intentionally represented and/or failed to correct Plaintiffs' stated understanding that they would be allowed input into the negotiation of the NFL's new license.

150.    That AP engaged in such negotiations with Plaintiffs at all, not to mention the nature of AP's pre-suit communications, made clear that AP understood that any grant of a complimentary license to the NFL would require it to negotiate amendments to Plaintiffs' contributor agreements.  And during these contractual negotiations, Plaintiffs made clear that

they would allow the NFL use of their photos only according to very narrow, specific, and limited usage rights pertaining to Plaintiffs' works in exchange for specific consideration.

151.   AP's pre-suit correspondence confirms that AP shared Plaintiffs' understanding that the Plaintiffs' contributor agreements did not include any right or authority to grant the NFL, either prospectively or retroactively, a royalty-free and complimentary license to use Plaintiffs' photos.

152.   For example, in an e-mail dated September 10, 2012 from Lloyd Pawlak, AP's Director of Sales, AP confirmed that all of the NFL's uses of Plaintiffs' photos from April 2009 until April 2012 were unlicensed and AP was requesting that Plaintiffs agree to contract amendments that would permit AP such authority.

153.   According to Mr. Pawlak, the AP's contract offer was, once again, a "take-it-or-leave-it" proposition and if Plaintiffs did not accept the proposed contract amendments then AP would not permit them to continue to shoot NFL events, despite AP's contractual obligations to provide Plaintiffs with at least one NFL credential per week during the NFL season.

154.   Specifically, Mr. Pawlak stated:

"Although we did not grant the NFL the right to use contributor content in our first contract from 4/1/2009 through 3/31/2012, we have included this usage in the new NFL deal.  These rights were built into the NFL's RFP and were a non-negotiable mandatory element in the contract.  The realities of the situation are pretty straight forward.  The NFL needs a full grant of rights for all content shot at their games and aren't [sic] interested in working with agencies or photographers who will not grant these rights. Your clients will need to review this language and decide if these terms are acceptable to them.  If not, the AP will have no choice but to utilize other contributors to fulfill our coverage needs for the 2012 season."

155.   In an e-mail the following day, Mr. Pawlak characterized the AP's proposed contract amendments as "opt in or opt out," again reflecting that AP understood that it did not presently have the right to include Plaintiffs' photos in the NFL licensing deal.

156.    Indeed, if AP believed it already had such authority, then it would not have acknowledged that Plaintiffs will need to "decide if these terms are acceptable to them" and choose whether they would "opt in or opt out" of the NFL's demand.

157.    This is the first time that AP disclosed that it already had granted a retroactive license to the NFL allowing complimentary and royalty-free use of Plaintiffs' photos.  Prior to September 10, 2012, Plaintiffs were unaware that AP already had agreed to grant the NFL such a license, primarily because AP had represented that no license had yet been granted and that Plaintiffs' views and concerns were being considered in the licensing process.

158.    Prior to September 10, 2012, AP made no effort to correct Plaintiffs' stated understanding that the AP and NFL were still negotiating a license agreement.

159.    AP's representatives intentionally misled Plaintiffs into believing that no such license had been granted yet in order to dupe Plaintiffs into negotiating contract amendments in bad faith and to intentionally delay Plaintiffs' bringing suit against the NFL.

160.    AP's pre-suit correspondence acknowledged and confirmed that AP granted this retroactive "license" to the NFL under threats and coercive pressure by the NFL, including the threat of moving its exclusive license back to Getty Images, which also had submitted a bid to reacquire the NFL's business.

161.    The NFL's threats and coercive pressure were successful only because of its illegal monopoly over the commercial licensing rights, including for photographs to which the NFL itself does not own any copyrights and in which its trademarks are not displayed.

162.    The NFL exploited its singular control and illegal monopoly of the commercial licensing rights to force AP to grant the NFL unfettered access to Plaintiffs' image libraries and

to rob Plaintiffs of their rightful compensation for the uses the NFL has made, and continues to make, of their copyrighted works.

163.    The clear purpose of the retroactive "license" granted by AP in the 2012 NFL-AP Agreement was to release and extinguish the copyright infringement claims that Plaintiffs recently had brought to the NFL's attention and to attempt to insulate the NFL Defendants from liability for the copyright infringements identified herein and that are the subject of this action.

164.    The AP Contributor Agreements do not authorize AP to pursue infringements or settle claims on their behalf, and Plaintiffs never authorized AP to grant any release to any infringers and certainly not to do so without notifying Plaintiffs in advance and without Plaintiffs receiving any compensation.

165.    The license purportedly granted by AP in the 2012 NFL-AP Agreement violates the terms of the AP Contributor Agreements and infringes on Plaintiffs' copyrights, including their exclusive statutory rights to sue for infringements of their copyrights.

166.    The purported retroactive/royalty-free/complimentary "license" included in the 2012 NFL-AP Agreement is invalid and void.

### The NFL's Widespread Use of Plaintiffs' Photos

167.    The use of photographic works is one of the key ways that the NFL markets and promotes itself.  Despite being well aware that it does not own the copyrights to Plaintiffs' works and its own 38-years of experience operating NFL Photos as a stock photo agency that managed the licensing of photos owned by its contributing photographers, the NFL systemically used thousands of Plaintiffs' photos between 2009 and 2012 for promotional, marketing, and commercial purposes without a license.

168.    The NFL Defendants, including all NFL Teams, have used tens of thousands of Plaintiffs' photographic works to promote the NFL's brand, sell NFL-related products, and enhance the NFL's image in order to generate revenue.  Despite Plaintiffs' issuing repeated cease and desist demands, the NFL Defendants' unlicensed use of Plaintiffs' copyrighted photos is broad and ongoing.

169.    The NFL has earned substantial revenue through publishing (including on NFL.com, on the NFL Network, in NFL Magazine, in NFL promotional materials, on NFL Team websites, and in numerous other NFL-controlled publications) and also licensing or selling (including through the NFL Photo Store and Replay Photos) copies of photographs owned exclusively by Plaintiffs for which the NFL never obtained a valid license or paid appropriate licensing fees.

170.    The NFL has used and continues to use hundreds of Plaintiffs' photos on the NFL's main website, NFL.com.

171.    The NFL also has illegally exported copies of Plaintiffs' works in order to copy and publish them on its international websites, including www.nfljapan.com; www.nflmexico.com; and www.nfl.com/international.

172.    The NFL also has copied and published Plaintiffs' works in printed publications, including NFL Magazine, the NFL's Super Bowl Programs, the NFL's Reports and Newsletters, and even in NFL regular season and playoff game programs. The NFL has used and continues to use Plaintiffs' photos on the NFL Network without ever paying for such use and without the uses being reported to Plaintiffs.

173.    In a particularly egregious example, the NFL used a photograph of Aaron Rodgers to promote Super Bowl XLV in Dallas by draping the image over a multi-story portion

of the façades of the Omni Hotel and Cowboys Stadium.  Despite the fact that Plaintiff Stluka owns sole and exclusive copyrights in this photo, Plaintiff Stluka was never paid any license fees for these uses of his photo.  (See Exhibit 12 at Lines 25 & 26)

174.    Attached hereto as Exhibits 1 to 7 are true and correct copies of screen captures from NFL.com showing the NFL's widespread use of each of the Plaintiffs' works.

175.    Although a very few number of the images included in Exhibit 1 through 7 were shot by Plaintiffs under "day rate" agreements for the NFL years ago, the vast majority of the astounding number of images currently being used by the NFL on its website were created by Plaintiffs "on spec" and they own sole and exclusive copyrights in these images.

176.    The NFL has never paid any fees or compensation to Plaintiffs for these uses and none of these uses has ever been reported by Getty Images or AP to Plaintiffs on any royalty report or otherwise.

177.    Attached hereto as Exhibits 8 to 14 are spreadsheets identifying hundreds of unauthorized and infringing uses of photos to which Plaintiffs own all copyrights.  As these spreadsheets demonstrate, the NFL Defendants have used and are continuing to use photos to which Plaintiffs own all copyrights on NFL.com, NFLJapan.com, the NFL Network, and in NFL Magazine.

178.    The NFL used and is using Plaintiffs' photos in various ways on each of these platforms, including in conjunction with articles, as part of photo essays, and also to create stand-alone photo galleries"  Attached hereto as Exhibit 15 is a true and correct copy of an example of the main photo gallery page on NFL.com.  Plaintiffs' photos are included in dozens of the galleries. Attached hereto as Exhibit 16 are true and correct copies of screen captures from various photo galleries showing such uses of Plaintiffs' photos.

179.    Consistent with its practice of monetizing every possible interaction with its fan base, the NFL forces any visitor who views such photo galleries and essays to view advertisements and promotional materials after a pre-set number of "clicks" or photos viewed. Certain photo galleries also include links that allow and encourage visitors to buy copies of the photos through www.nflshop.com, including many of Plaintiffs' photos.   Nevertheless, despite the plain commercial character and value of these uses of Plaintiffs' photos, the NFL included Plaintiffs' photos in such uses beginning in 2007 when its license from Getty Images was limited to purely editorial uses only.  The NFL has never paid any licensing fees to use Plaintiffs' photos in this manner, and certainly not the commercial licensing rates required for such uses.

180.    As the screen captures attached as Exhibit 16 demonstrate, the photo galleries on NFL.com also permit visitors to access large resolution copies of Plaintiffs' photos without appropriate copyright management information or protection against illegal copying.  The NFL also has removed the copyright management information from Plaintiffs' photos and, as shown, claims to own copyrights in Plaintiffs' photos, both of which constitute separate and additional violations of Plaintiffs' rights.

181.    The NFL also encourages visitors to "tweet" on Twitter.com or "share" on Facebook.com copies of Plaintiffs' works, despite the fact that the NFL does not own the copyrights to these photos.

182.    Such sharing and tweeting of Plaintiffs' photos are unlicensed copying and publishing of Plaintiffs' photos that are encouraged by the NFL.  Such uses are not permitted under the 2012 NFL-AP Agreement.

183.    The NFL also is using Plaintiffs' photographs during broadcasts on its NFL Network.  Attached hereto as Exhibit 18 are true and correct copies of screenshots of the credits

from recent broadcasts on the NFL Network demonstrating that the NFL Network used copies of Plaintiffs' photos during broadcasts.  The NFL Network falsely claimed that its use of Plaintiffs' photos was "courtesy of" Plaintiffs when, in actuality, Plaintiffs never agreed to allow the NFL Network to use their photos and were unaware of any such use by the NFL until recently.

184.    The NFL also is using Plaintiffs' photographs in its publication entitled NFL Magazine.  Attached hereto as Exhibit 19 are true and correct examples of Plaintiffs' photos being used by the NFL in NFL Magazine.

185.    The NFL Teams are using Plaintiffs' photos on their respective websites and in other promotional materials and publications under their control.  Attached hereto as Exhibit 20 are true and correct screen captures demonstrating use of Plaintiffs' photos by NFL Teams.

186.    Plaintiffs' copyright infringement claims relate to all uses identified in Exhibits 8 to 20, and the information contained in these exhibits is fully incorporated herein.

187.    Because Getty Images and AP failed to monitor, track, or report which photos were copied by or provided to the NFL, Plaintiffs cannot yet determine the full scope of the NFL Defendants' use of their copyrighted works.  The infringements identified in Exhibits 8 through 20 merely highlight the scope of the NFL's uses of their photos and demonstrates that the NFL's unlicensed uses of Plaintiffs' photos is widespread and ongoing.

188.    Because information regarding the full scope of the NFL's use of Plaintiffs' photos remains in the Defendants' sole possession, it is clear that the infringements identified herein and in Exhibits 8 through 20 are not exhaustive and that the NFL used many additional photos owned by Plaintiffs without a license and without paying necessary license fees.

189.    The NFL has made substantial revenues from displaying and licensing photographic content, including but not limited to fees paid by commercial entities selling copies

of Plaintiffs' photos and also websites that use NFL-related photos in advertisements and to promote products, such as fantasy football leagues.

### *Replay Photos*

190.    AP and Replay Photos also sell copies of photographs directly to consumers through the "NFL Photo Store," which is an interactive website located at www.nflphotostore.nfl.com.  The prints, posters, canvases, and other copies of Plaintiffs' photos that are sold through the NFL Photo Store are created by Defendant Replay Photos.

191.    In an e-mail dated November 21, 2012, AP requested that Plaintiffs agree to amendments to their contributor agreements to allow such sales to Replay Photos.  Among other things, AP requested that Plaintiffs agree to a royalty rate of 5% of the net of any such sales, rather than the applicable 40% or 50% rates on the gross that is required under the AP Contributor Agreements.  A true and correct copy of this e-mail and the contract amendment requested by AP are attached hereto as Exhibit 21.

192.    All Plaintiffs rejected AP's request and did not agree to the proposed amendment to their contributor agreements.

193.    Attached hereto as Exhibit 17 are true and correct copies of screen captures showing numerous photos owned by Plaintiffs Spinelli, Boehm, Lowrance, Stluka, and Witte that AP allowed Replay Photos to copy and publish on its website and offer for sale at the NFL Photo Store.

194.    In each case, Defendants AP and/or Replay Photos incorrectly claim that AP owns copyright in the photos being offered for sale when in fact Plaintiffs own the sole and exclusive copyrights in each photo.

195.    Although Replay Photos pays AP for sales of photos, AP has never reported any license to Replay Photos or paid Plaintiffs any royalties for the licenses to Replay Photos.

196.    Replay Photos has sold prints, posters, canvases, and other copies of Plaintiffs photos, typically for hundreds of dollars, and yet neither AP nor Replay Photos has paid any licensing fees, royalties, or other compensation to Plaintiffs for these uses.

197.    These infringements by AP and Replay are particularly egregious given that AP allowed Replay Photos to copy and publish and offer for sale Plaintiffs' photos despite Plaintiffs' expressly rejecting an amendment to their agreement with AP to allow such uses.

198.    That AP requested an amendment to Plaintiffs' contributor agreements in order to offer their photos for sale through Replay Photos and the NFL Photo Store demonstrates that AP did not believe it was granted (and in fact was not granted) such authority under its contributor agreements with Plaintiffs.

## COUNT I:  VIOLATIONS OF THE SHERMAN ACT
### AGAINST NFL DEFENDANTS, GETTY IMAGES, & AP

199.    Plaintiffs repeat and re-allege each of the above allegations as if set forth fully herein.

200.    The foregoing acts by the NFL Defendants, Getty Images, and AP constitute violations of Sections 1 and 3 of the Sherman Act, 15 U.S.C. § 1.

201.    Each NFL Team is independently owned and operates as an independent business entity, and each NFL Team owns and markets its own name, colors, logos, trademarks, and other intellectual property.  Each NFL Team thus competes with the other NFL Teams for fans and customers, including consumers of team apparel, clothing, souvenirs, memorabilia, and other commercial products and goods.

202.     In violation of the Sherman Act, the NFL Defendants conspired and acted in concert for the express purpose of restraining trade in and otherwise influencing and controlling the market for the licensing of their products, including the licensing of stock photographs.

203.     The NFL Defendants conspired and carried out their illegal efforts to restrain trade in and create a monopoly over this market through agreements amongst themselves and the NFL's various subsidiaries, including agreements to create NFL Properties and NFLE to control and make decisions relating to each NFL Team's independently owned intellectual property.

204.     The NFL Defendants conspired and acted in concert for the express purpose of making joint decision and exercising a total monopoly over the lucrative market for NFL-related products, including stock photos even if the photos do not feature any marks, logos, or other intellectual property owned by the NFL.   The NFL Defendants conspired to and did illegally restrain trade in concert with Getty Images and AP.

205.     In doing so, the NFL Defendants conspired to and did illegally restrain trade and influence the market for commercial licensing of professional football-related stock photography.

206.     The agreements between and amongst the NFL Defendants, including their agreement to create NFL Properties and later NFLE to exercise exclusive control over the commercial market for photographs featuring NFL teams or players, constitute and demonstrate the exceptional circumstances and unique opportunity these Defendants took advantage of in order to leverage their monopoly and otherwise illegally influence and restrain trade in this market and did in fact illegally restrain trade in this market.

207.     By forcing all photo licensors to compete for a single license, the NFL forced Getty Images and AP to make substantial concessions in their respective contracts.   As AP

stated, the NFL forced all entities placing a bid for a license to guarantee that the NFL would be entitled to complimentary use of all photos, including third-party photos, and would not do business with any licensors who could not provide such a license.

208.   This conduct, made possible only by the NFL Teams' acting in concert through the NFL to force licensors to bid for an exclusive licensing contract, caused serious harm to the market, reduced output of stock photos, and created harm to consumers.

209.   As alleged herein, Getty Images cut ties with Plaintiffs who moved their NFL content to the AP.  This resulted in hundreds of thousands of photos previously available for licensing to be removed from the marketplace.

210.   Because AP and Getty Images were forced to agree to a complimentary use license, they in turn had to force their contributors to give up valuable licensing opportunities just for the privilege of being able to continue licensing their content at all.  The loss of these valuable licensing opportunities caused Plaintiffs to direct their business efforts in other directions which has led directly to a substantial downturn in the number of NFL-related photos being created by Plaintiffs.

211.   Despite owning copyrights in hundreds of thousands of photos of NFL games, teams, and players – and despite the NFL's massive popularity – Plaintiffs are unable to fully exercise their rights to license these valuable photos in a free and open marketplace due to the Defendants' illegal efforts to control and restrain the market for commercial licensing and sale of such photos.

212.   Plaintiffs own the copyrights in the photos subject to the NFL's license agreements with Getty Images and AP, and thus they are direct and intended beneficiaries of any such license agreements and the impacts felt by Plaintiffs and consumers are a direct result of the

Defendants' conduct and agreements, not the terms of Plaintiffs' contributor agreements with their licensing agents.

213.    Although Plaintiffs now have been forced by the NFL's illegal conduct to supply photos to licensing agents (formerly Getty Images and now AP) for commercial licensing, they continue to own all copyrights in these photos and previously licensed their works directly to consumers, including for commercial purposes.   In fact, Plaintiffs previously licensed their works to the NFL Defendants, including through NFL Photos, and did so for both editorial and commercial purposes.

214.    But for the collusion by the Defendants, Plaintiffs were and still would be competitors to Defendants AP and Getty Images in the relevant market.

215.    Moreover, because Getty Images and AP also have their own collections of NFL-related content available for sale and licensing, Plaintiffs still currently compete with Defendants AP and Getty Images as direct market participants for licensing revenue.

216.    The NFL's exclusive license agreements with AP and Getty Images are illegal restraints on trade because, among other things, the agreements purport to grant an exclusive license to all NFL-related photos (including those created by Plaintiffs) even if the photos feature only individual players, individual team colors, individual team logos, or other team-specific intellectual property that is individually owned by the respective NFL Team.

217.    The agreement to form and act in concert through NFL Properties to control the commercial market for professional football-related stock photography and to exercise joint control over intellectual property owned by individual NFL Teams is not reasonably necessary to produce professional football games as entertainment.

218.    The NFL's exclusive license agreements with AP and Getty Images are not reasonably necessary to produce professional football games as entertainment.

219.    The NFL's exclusive license agreements with AP and Getty Images are not reasonable or justifiable concerted action because, among other things, these licensing agreements purport to control the market for photos that do not involve NFL-organized games, including photos taken at team practices, team facilities, and other team events.

220.    The NFL's exclusive license agreements with Getty Images and AP also are illegal because they purport to apply to photos that feature only individual players, individual cheerleaders, individual coaches, individual team stadiums, individual team mascots, individual team colors, individual team logos, etc.

221.    These Defendants, through their various officers, directors, employees, and other agents, conspired together to restrain trade in the lucrative and growing market for professional football-related stock photography and to artificially depress, fix, lower, and otherwise illegally control and influence the prices of such stock photography.

222.    The NFL's decision to grant an exclusive license to Getty Images and then AP precluded Plaintiffs from seeking or obtaining fair market value for commercial uses of their photographs.

223.    The NFL's illegal monopoly and NFL Properties' agreement to grant an exclusive license to Getty Images and then AP also artificially undermined Plaintiffs' ability to bargain fairly with Getty Images and AP to obtain more favorable terms in their contributor contracts. The NFL Defendants' illegal conduct directly and proximately created the circumstances that forced Plaintiffs into a "take-it-or-leave-it" scenario when negotiating license terms with the NFL's chosen exclusive licensing partner (first Getty Images until 2009 and then AP thereafter).

Because other licensors could not offer commercial licenses for NFL photos, Plaintiffs were forced into an impossible dilemma of either accepting the contract terms being offered by the NFL's licensing partner or losing the ability to earn revenue from the sale of more lucrative commercial licenses.

224.    Because Getty Images and then AP had secured exclusive rights to sell commercial licenses for stock NFL photos, Plaintiffs effectively had no choice but to license their works through Getty Images until 2009 and then were forced to abandon that relationship and move their entire libraries of NFL photos to AP.

225.    The decision by NFL to grant exclusive licensing rights to a single licensor unfairly and illegally restricted the market for Plaintiffs' works and thus severely impacted and undermined the value of Plaintiffs' vast libraries of NFL photos that they had created over their careers.

226.    At the time that the NFL Defendants conspired to restrain trade in this market, Plaintiffs were able to and did license their works directly to end users and had a direct role in the market as licensors of their NFL-related content.  The NFL Defendants' misconduct forced Plaintiffs to abandon their own licensing efforts and capitulate to the heavy-handed and abusive tactics of Getty Images and AP.  Plaintiffs thus have a tremendous incentive to seek to vindicate their claims and would be the most efficient enforcers.

227.    Unlike Plaintiffs, Getty Images and AP do not own the copyrights in the vast majority of NFL-related content, particularly historical photos.  Moreover, both Getty Images and AP have exclusive licensing agreements with other sports or professional organizations (including Getty Images' well known agreement with MLB) that would preclude them due to their own self-interest from seeking to enforce antitrust laws against the NFL.

228.    The market for Plaintiffs' works includes licensors and retailers who target local and regional markets and thus have a high demand for commercial uses of player-specific or team-specific photos.

229.    The market for Plaintiffs' works also includes national photos licensors, media outlets, online vendors, clothing retailers, and any other companies that sell advertisements or products targeted at local viewers and/or customers and thus have a high demand for commercial uses of player-specific or team-specific photos.

230.    The market for Plaintiffs' works also includes companies and organizations that organize and market the multitude of increasingly popular fantasy football games and that sell products and advertisements directed at this market.  Companies that organize fantasy football leagues have created an enormous and ever-growing market for player-specific and team-specific photos, including for use in the operation of such fantasy football leagues and in advertisements and products targeted toward fantasy football participants.

231.    Plaintiffs collectively own tens of thousands of photos of specific players, team-specific mascots, team-specific logos, team-owned stadiums, and even team-specific cheerleaders.  Such photos do not feature any intellectual property owned by the NFL.  Instead, the logos, colors, marks, and other intellectual property in these photos are separately owned by the individual NFL Teams.

232.    The market for NFL-related commercial photos is not interchangeable with the market for photos of other sports or organizations.

233.    Among other things, the market for NFL content is unique because of the NFL's own popularity.  Due to its growing popularity, the NFL dominates the television and news cycle for much of the calendar.  The NFL Draft is perfect example.  What used to be a one-night event

of little moment to most of America is now a nationally-recognized event lasting several days, with hundreds of hours of news and editorial commentary being devoted to the topic for months.

234.   The NFL's overwhelming popularity also has turned fantasy football into a lucrative, multi-billion dollar enterprise in its own right, with hundreds of websites and magazines being devoted entirely to fantasy football.  Indeed, ESPN, Fox, and the NFL each have hours of programming specifically devoted to the issue of fantasy football, and television providers (such as Direct TV) even offer entire programming options devoted and marketed entirely around fantasy football.

235.   Businesses seeking to participate in the growing world of fantasy football enterprises require vast quantities of NFL-related stock photos, specifically player photos for profiles and biographies.  These businesses are consumers in the relevant market, and their need for NFL-related content is not interchangeable with photos from other sports organizations or entertainment options.  Fantasy football websites, magazines, shows, and other publications could not provide a desirable product to consumers without access to NFL-related stock photos, and only NFL-related stock photos.  Due to the Defendants' illegal conduct, these businesses have fewer options for obtaining such photos and thus their licenses are higher than they otherwise would be.

236.   Simply put, the market for NFL-related content cannot be reasonably substituted or interchanged with other professional sports content because of the significant advantage in popularity and revenue brought in by the NFL Defendants as compared to all other professional sports leagues in the United States.

237.   The output of commercial licenses for professional football-related stock photos is necessarily lower as a result of Defendants' illegal monopoly because, but for that monopoly,

Plaintiffs' could license their photos directly to each NFL Team or to businesses who are consumers in the relevant market.

238.    The NFL Defendants' conduct has substantially reduced the output of stock photography for NFL events as there are now only a limited number of credentials being made available to photographers and a limited number of photographers who are credentialed for commercial licensing, all of whom now must be AP employees or AP contributors.

239.    Because of the Defendants' influence on and control over this market, the aggregate cost to consumers has increased.  Consumers in the market include persons or entities seeking to use NFL-related content for commercial purposes.  This would include businesses licensing NFL-content for advertisements and commercial endorsements, as well as sports memorabilia dealers and other retailers selling NFL products.

240.    Given the popularity of the NFL, consumer demand for NFL-related content is at an all-time high, while the number of photographers able to license their NFL work for commercial purposes is at an all-time low.

241.    The impact on consumers is particularly acute when considered regionally. Whereas retailers in a given region (Wisconsin, for example) previously had numerous options for obtaining a commercial license related to Plaintiffs' works (including from Plaintiffs directly), they now are forced to purchase a license for any commercial use from AP and AP only.

242.    The impact that the NFL's monopoly has had on regional sports retailers has been dramatic, creating a flourishing black market in illegal copies NFL content.  For instance, in just the last 18 months, Plaintiffs Boehm and Stluka have been forced to file two separate lawsuits

against nearly 30 different Wisconsin sports memorabilia dealers and retailers related to the illegal use of their photos to create sports memorabilia, canvases, posters, and other products.

243.   That these retailers are even willing to risk the stiff damages for copyright infringement demonstrates the lengths that the relevant market consumers now are forced to go to avoid paying the licensing fees demanded by AP and the NFL.

244.   The decision by the NFL Defendants to act in concert to illegally exercise joint control over the entire market for commercial usage of NFL-related photos undermined and decreased the value of Plaintiffs' photographs and violated Plaintiffs' rights as copyright owners to engage in a fair and open market for the sale and/or licensing of their works.

245.   As a direct and proximate result of the Defendants' scheme and illegal conduct, Plaintiffs have been injured and financially damaged in amounts which are presently undetermined.

246.   The damage caused by Defendants' illegal and anticompetitive conduct substantially outweighs any alleged pro-competitive effects that may be offered by the NFL's monopoly over commercial licensing of stock photos and its decision to grant an exclusive license to a single licensor.  Reasonable and less restrictive alternatives are available.

247.   The NFL Defendants' bidding process does not promote healthy competition because it simply pits two of the largest stock photo agencies—Getty Images and AP—against one another with a complete disregard for Plaintiffs themselves as competitors and stakeholders in the market for licensed photo content.  The result of this highly limited "competition" is a situation in which the NFL Defendants are illegally and fraudulently granted unfettered access to otherwise valuable content created by Plaintiffs—who receive nothing in return—and the

licensors have little incentive to challenge the NFL due to their own interests in preserving other licensing agreements.

248.     The restraints challenged herein are not necessary to organize and/or produce professional football games.

249.     The Defendants' illegal monopoly over professional football-related content has produced, at the very least, an unconscionable and unfair market environment in which Plaintiffs and other potential competitors are forced acquiesce to one-sided contract terms under duress.

250.     Plaintiffs seek and are entitled to declaratory judgment that the NFL Teams, NFL Defendants, Getty Images, and AP have and are violating Sections 1 and 3 of the Sherman Act.

251.     Plaintiffs seek and are entitled to preliminary and permanent injunctions under 15 U.S.C. § 26 that terminate the NFL's current agreement with AP and preclude any future global exclusive licensing arrangements between the NFL and any stock photography licensor.

252.     Plaintiffs seek and are entitled to preliminary and permanent injunctions under 15 U.S.C. § 26 that terminate the agreements between the NFL Teams, including the agreement to form NFL Properties and NFLE, under which the NFL Defendants exercise unitary control over stock photography.

253.     Plaintiffs seek and are entitled to recover treble damages, as well as attorneys' fees and costs, under 15 U.S.C. § 15 relating to the violations alleged herein.

## COUNT II:  FRAUD
### AGAINST AP

254.     Plaintiffs repeat and re-allege each of the above allegations as if set forth fully herein.

255.     The foregoing acts by Defendant AP constitute fraud under New York law.

256.   AP intentionally and knowingly misrepresented material facts to Plaintiffs during contract negotiations between June and August of 2009.

257.   AP's fraudulent misrepresentations include, but are not limited to, statements and representations made by Mr. Payan to the effect that AP had not granted and would not grant the NFL complimentary use of Plaintiffs' photographs and that AP understood that it did not have such authority under the contributor agreements.  Mr. Payan made these false statements and representations to Plaintiff Spinelli and Plaintiffs' representative, Mr. Greenburg, during a conference call on or about July 14, 2009.

258.   Contrary to these representations, AP and Mr. Payan knew at the time that AP intended to permit the NFL unrestricted access to Plaintiffs' photos and that it did not intend to prohibit the NFL from copying and using Plaintiffs' photos without paying for a license.

259.   AP and Mr. Payan knew at the time that Plaintiffs were concerned about this issue and thus intended these representations to induce Plaintiffs to sign the contracts drafted by AP.

260.   AP and Mr. Payan knew at the time that Plaintiffs would rely on and would be deceived by these representations.

261.   Beginning in April 2009, AP knew that the NFL was using contributor photos without a license and yet AP intentionally and knowingly withheld that information from Plaintiffs during contract negotiations that took place between June and August of 2009.

262.   AP also was aware that it was permitting the NFL to copy and use contributor photos without a license and yet did not disclose that information to Plaintiffs during contract negotiations that took place between June and August of 2009.

263.   Given AP's superior information regarding the NFL's current and intended use of contributor photos, AP had a duty and obligation to disclose that information to Plaintiffs.

264.    Given AP's superior information regarding its own decision to allow or acquiesce to the NFL's copying and use of contributor photos without a license, AP had a duty and obligation to disclose that information to Plaintiffs.

265.    AP intentionally and knowingly misrepresented material facts to Plaintiff Boehm during contract negotiations in or about May of 2012, when AP and its agent, Mr. Benc, represented that AP understood and intended their agreements to temporary agreements only.

266.    AP intended by its various misrepresentations to fraudulently induce Plaintiffs into signing contributor agreements that included terms that were unfair and beneficial to AP.

267.    The falsity of AP's representations is evidenced by the fact that AP immediately allowed the NFL complimentary and unfettered access to Plaintiffs' photos without any license.

268.     AP's fraudulent intent is evidenced by the fact that AP intentionally concealed and did not disclose that it was permitting the NFL complimentary and unfettered access to Plaintiffs' photos beginning immediately when most Plaintiffs uploaded their photos to AP in August of 2009 without requiring that the NFL obtain a license or pay any fees.

269.    AP's fraudulent misrepresentations reasonably deceived Plaintiffs into believing that AP would not allow the NFL access to contributor photos without first requiring the NFL to pay for a license.

270.    AP's fraudulent misrepresentations reasonably deceived Plaintiffs into believing that AP understood and agreed that the terms of the contributor agreements drafted by AP precluded AP from granting the NFL rights to use Plaintiffs' photos without any compensation.

271.     AP's fraudulent misrepresentations reasonably deceived Plaintiffs into believing that AP understood and agreed that the terms of the contributor agreements drafted by AP

precluded AP from allowing the NFL access to contributor photos without requiring the NFL to first pay for a license.

272.    AP committed fraud by not disclosing that it understood that the terms of the contributor agreements permitted AP to grant complimentary or non-royalty bearing sublicenses to any third parties in AP's sole discretion.  Plaintiffs repeatedly made clear to AP that they reasonably understood that the proposed terms of their AP Contributor Agreements required AP to pay royalties to Plaintiffs for any usage rights that AP granted to third parties except under the very narrow circumstances expressly stated in that section.   Since AP was aware of this view and had drafted this language, it had an affirmative obligation to disclose that it understood this language to also implicitly permit AP, in its sole discretion, to grant complimentary or non-royalty bearing licenses to third parties.

273.    Plaintiffs suffered damages as a result of AP's fraud.

274.    AP's fraudulent conduct caused Plaintiffs to suffer unique and distinct pecuniary harm.   Among other things, AP's actions induced Plaintiffs into signing contracts that AP believed granted it rights that it knew Plaintiffs objected to and were unaware of.   AP's actions also induced Plaintiffs to terminate their agreements with Getty Images thus causing Plaintiffs to lose substantial revenue from licensing opportunities related to their non-NFL content.

275.    AP's conduct also deprived Plaintiffs of the opportunity to obtain the full compensation to which they were entitled from the NFL's use of their creative works without litigation and without risk of not being compensated and without incurring significant expenses to obtain such rightful compensation.

276.    Plaintiffs seek all damages recoverable under the law, including their costs and attorneys' fees.

## COUNT III:  REQUEST FOR DECLARATION OF RIGHTS
### AGAINST AP AND THE NFL DEFENDANTS

277.    Plaintiffs repeat and re-allege each of the above allegations as if set forth fully herein.

278.    As alleged herein, Plaintiffs entered into their contributor agreements with AP under substantial duress and due to intentional coercion.

279.    As alleged herein, Plaintiffs were fraudulently induced into entering into contributor agreements with AP.

280.    As alleged herein, Plaintiffs' contributor agreements with AP include a license that is inequitable, unconscionable, and contrary to law.  Among other things, the AP Contributor Agreements provide that AP's license is perpetual and irrevocable.   Moreover, the AP Contributor Agreements must be invalidated as inequitable and contrary to law if it is found that they permit AP, in its sole discretion, to grant complimentary use of Plaintiffs' photos and AP has no obligation to report any such uses or licenses to Plaintiffs.

281.    The AP Contributor Agreements also are contrary to law to the extent that AP contends that it is permitted under the contracts to grant retroactive licenses to cure past unlicensed uses of Plaintiffs' photos.  The right to pursue infringements of their copyrights is guaranteed to Plaintiffs by the terms of the Copyright Act.  Plaintiffs' contributor agreements expressly provide that Plaintiffs retain all rights in their photos, including all copyrights.  AP also disclaims any authority to act as Plaintiffs' agents in any copyright infringement disputes.

282.    Plaintiffs thus seek a judicial determination that Plaintiffs' contributor agreements are invalid and contrary to law to the extent that they allegedly permitted AP to have granted the NFL a retroactive license intended to cure past licensed uses of Plaintiffs' photos.

283.    An actual controversy thus has arisen and now exists between Plaintiffs and AP concerning the validity of the AP Contributor Agreements and the license granted to AP therein.

284.    Plaintiffs thus desire and request a judicial determination of the validity of the AP Contributor Agreements, including but not limited to AP's license.  In particular, Plaintiffs seek a judicial determination that the license granted to AP is invalid due to fraud, duress, coercion, equitable considerations, and because it is contrary to law.

285.    As alleged herein, AP was forced to grant the NFL a retroactive license intended to cure past licensed uses of Plaintiffs' photos in order to bid on the NFL's exclusive license.  AP agreed to this term under duress and coercion from the NFL.

286.    Plaintiffs' copyrighted works are the subject of this license and Plaintiffs' works have been used by the NFL under this license.

287.    Plaintiffs thus desire and request a judicial determination of the validity of the retroactive license granted to the NFL by AP in 2012.

288.    A judicial determination of the parties' rights and duties is necessary and appropriate at this time and under the circumstances in order to resolve this controversy between the parties and for the parties to be aware of their rights and in order to assess and determine their legal options.


## COUNT IV:  COPYRIGHT INFRINGEMENT
### AGAINST ALL DEFENDANTS

289.    Plaintiffs repeat and re-allege each of the above allegations as if set forth fully herein.

290.    The information included in the attached Exhibits is incorporated fully herein.

291.    The foregoing acts by Defendants infringed Plaintiffs' copyrights.

292.   Plaintiffs created and own sole and exclusive copyrights in and to the creative works identified in Exhibits 8-20.

293.   Plaintiffs also own copyrights to additional photos used and being used by the NFL Defendants without permission or a valid license.  Because the information regarding the full scope of Defendants' use of Plaintiffs' photos remains in Defendants' sole possession, Plaintiffs cannot currently ascertain all uses of the works to which they own copyright.

294.   Plaintiffs' copyrights in and to photographs that are the subject of this action, including all photos identified in Exhibits 8-20, have been registered with the United States Copyright Office.

295.   The NFL Defendants and Replay Photos infringed Plaintiffs' copyrights by copying, publishing, displaying, exporting, and otherwise using and exploiting photographic works to which Plaintiffs own all copyrights without a valid license.

296.   The NFL's 2007 license from Getty Images was limited to Plaintiffs' photos from the 2007-2008 season and permitted only editorial uses of those photos on NFL.com for only three months.  Despite these express usage restrictions in the license from Getty Images, the NFL Defendants copied and published Plaintiffs' photos on websites other than NFL.com, made commercial uses of Plaintiffs' photos, and continued to use Plaintiffs' photos after expiration of this license.

297.   The NFL Defendants never obtained a license from Getty Images, or any other entity, to cover the use of Plaintiffs' photos between the expiration of the 2007 trial license and April 1, 2009.  All uses of Plaintiffs' photos during this period thus were unlicensed and infringing.  During this period, the NFL Defendants continued to use all photos previously copied from Getty Images even though their limited-term license had expired.

298.     Getty Images was aware of the NFL Defendants' continued copying and use of Plaintiffs' photos during this period after the expiration of the 2007 license and yet failed to take any actions to prevent the NFL from accessing and copying photos.  Getty Images also failed to advise Plaintiffs that the NFL was downloading and copying their photos during this time.

299.     Getty Images violated its license from Plaintiffs by allowing the NFL to copy and use Plaintiffs' photos without requiring the NFL to pay for individual licenses in advance.

300.     The NFL Defendants' initial license agreements with Getty Images did not provide any usage rights to the NFL unless and until it paid for a specific license to use a specific photo in a particular manner.  Contrary to these restrictions, the NFL routinely and repeatedly used Plaintiffs' photos without securing or paying for a valid license prior to such use; and made additional unauthorized uses of Plaintiffs' photos beyond the terms of the particular usage rights granted for a particular photo.

301.     Getty Images violated the restrictions on its limited license, including by failing to abide by the restrictions and obligations of the rights-managed licensing model and by purportedly granting the NFL Defendants usage rights that exceeded the scope of Getty Images' licensing authority.

302.     The 2009 NFL-AP Agreement did not include any grant of a license or permission to the NFL to use Plaintiffs' photos.  Despite the lack of any license from AP, the NFL Defendants made numerous uses of Plaintiffs' photos beginning in from April 2009 to April 2012 without ever obtaining a license to use Plaintiffs' photos.

303.     Upon discovering that AP was allowing the NFL essentially unfettered and "complimentary" access to their photos, Plaintiffs repeatedly advised AP to cease and desist and to preclude the NFL from accessing their photos without paying the necessary licensing fees.

304.    Plaintiffs also repeatedly advised or otherwise indicated to AP that they intended to pursue copyright infringement claims against the NFL relating to such unlicensed uses. Plaintiffs also advised or otherwise indicated to AP that they did not approve of AP granting any purported "retroactive" license to the NFL.

305.    Nevertheless, the NFL used its illegal monopoly over the commercial licensing rights for NFL-related photos as leverage to force the AP to submit to the NFL's demand for a retroactive and complimentary and royalty-free license, over Plaintiffs' clear objections.

306.    The 2012 NFL-AP Agreement is illegal under the Sherman Act and thus does not and cannot provide a valid license to the NFL to use or sublicense Plaintiffs' works.

307.    Even if it were not illegal under the Sherman Act, the purported retroactive or complimentary or royalty-free "license" granted by AP to the NFL in the 2012 NFL-AP Agreement is invalid and contrary to law.

308.    AP did not have authority under the AP Contributor Agreements to grant such a license retroactively to supposedly cure the NFL's undeniably unlicensed uses of Plaintiffs' photos.  Among other things, Plaintiffs retained all copyrights in their photos and thus they are the only parties authorized to grant retroactive licenses to settle copyright claims.   As the sole owners of the copyrights in their photos, only Plaintiffs enjoy such rights under Section 501 of the Copyright Act.  Because AP had no authority to pursue or settle copyright infringement claims on Plaintiffs' behalf, it was not permitted to grant a retroactive license to the NFL in the hopes of releasing the NFL from liability for unlicensed uses of Plaintiffs' photos.

309.    The AP Contributor Agreements also preclude AP from transferring or assigning any rights, including through a sublicense, to any third parties except on the terms expressly agreed to in writing by Plaintiffs.   Since Plaintiffs never expressly agreed to grant AP the

authority to grant retroactive or royalty-free or complimentary licenses to third parties, the 2012 NFL-AP Agreement exceeded AP's authority and is invalid and void.

310.    At the time the NFL negotiated this purported "license" with AP, the NFL and AP were both aware that Plaintiffs did not authorize or consent to the NFL's complimentary use of their photos and that Plaintiffs objected to AP's granting any "non-royalty bearing" purported license to the NFL.

311.    The express purpose of the agreements between Plaintiffs and AP was to generate licensing revenue for Plaintiffs and any "complimentary" licenses would be antithetical to that fundamental purpose.

312.    In addition to the express provisions of Plaintiffs' agreements with AP, the parties also had an established course of dealing that made clear that Plaintiffs' photos were to be marketed and licensed only as rights-managed photo collections and established that Plaintiffs disapproved of AP granting any complimentary license to the NFL.  In fact, Plaintiffs' photos have been and continue to be listed for sale under the rights-managed section of the AP's website.

313.    Despite the written restrictions on AP's licensing rights and the understanding between the parties created by their course of dealing, AP still chose to cave to the NFL's pressure and granted the NFL a purported "license" that was retroactive and intended to release or extinguish Plaintiffs' copyright claims against the NFL.

314.    By doing so, AP exceeded its limited rights to grant prospective licenses to Plaintiffs' works and thereby infringed their copyrights, including Plaintiffs' exclusive right to pursue infringement claims related to the unauthorized uses of their photos.

315.    Even after Plaintiffs expressly informed the NFL that Plaintiffs considered any implied license from AP or Getty Images or any retroactive "license" to be invalid and repeatedly demanded that the NFL cease and desist using their photos without paying for an appropriate license, the NFL Defendants continued using Plaintiffs' photos and continue to use their photos to this day.

316.    The NFL Defendants also infringed Plaintiffs' copyrights by illegally exporting their photos, including by copying and publishing them on NFLJapan.com and NFLMexico.com.

317.    The NFL Defendants used photos in excess of the restrictions required under Section 4(a) of the 2012 NFL-AP Agreement by failing to obtain the "applicable clearances" to sell pre-existing contributor content.

318.    AP also infringed Plaintiffs' copyrights by offering copies of Plaintiffs' photos for sale through its "NFL Photo Store" that it operates jointly with Defendant Replay Photos.

319.    Plaintiffs expressly and unequivocally rejected the AP's request to amend their contributor agreements (*see* Exhibit 21) to allow such copying and sales by Replay Photos.

320.    The fact that AP requested that Plaintiffs agree to amend their contributor agreements to allow such uses by Replay Photos demonstrates that even AP believed it lacked authority to license and use Plaintiffs' photos in this manner.

321.    AP did not have authority under its contributor agreements to sublicense Plaintiffs' photos to Replay Photos or the NFL Defendants with none of the concomitant obligations imposed on it, most importantly to pay Plaintiffs' a royalty on sales of their Photos.

322.    Defendants' infringements and unauthorized use of Plaintiffs' copyrighted works was willful, intentional, and/or reckless.

323.     Plaintiffs seek all damages recoverable under the Copyright Act, including statutory or actual damages, lost licensing fees, and Defendants' profits attributable to the infringements.

324.     Plaintiffs also seek all attorneys' fees and any other costs incurred in litigating this matter.

## COUNT V:   VICARIOUS COPYRIGHT INFRINGEMENT
### AGAINST GETTY IMAGES & AP

325.     Plaintiffs repeat and re-allege each of the above allegations as if set forth fully herein.

326.     The foregoing acts by Getty Images and AP constitute vicarious copyright infringement.

327.     Getty Images and AP were aware or should have been aware of the NFL's extensive copying and publishing of Plaintiffs' photos.

328.     Despite their responsibility to sell licenses for Plaintiffs' photos, Getty Images and AP ignored the NFL's misconduct and turned a "blind eye" to the NFL's infringements.

329.     Getty Images and AP directly contributed to the NFL's infringements, including by permitting unfettered access to Plaintiffs' works and making the intentional decision not to monitor or track the NFL's uses and not to require that the NFL report back all uses of Plaintiffs' photos.

330.     Despite their ability to do so, Getty Images and AP also failed to stop the NFL's infringements even after Plaintiffs brought the infringements to their attention.

331.   AP vicariously infringed Plaintiffs' copyright by explicitly permitting Replay Photos to sell Plaintiffs' works despite knowing that it did not have the authority to do so and knowing that Plaintiffs' would not authorize such use.

332.   Getty Images' and AP's misconduct was willful, intentional, and/or reckless.

333.   Plaintiffs seek all damages recoverable under the Copyright Act, including statutory or actual damages, lost licensing fees, and Defendants' profits attributable to the infringements.

334.   Plaintiffs also seek all attorneys' fees and any other costs incurred in litigating this matter.

### COUNT VI:   CONTRIBUTORY COPYRIGHT INFRINGEMENT
### AGAINST GETTY IMAGES & AP

335.   Plaintiffs repeat and re-allege each of the above allegations as if set forth fully herein.

336.   The foregoing acts by Getty Images and AP constitute contributory copyright infringement.

337.   Getty Images and AP were aware or should have been aware of the NFL's copying and publishing of Plaintiffs' photos.

338.   Despite their responsibility to sell licenses for Plaintiffs' photos, Getty Images and AP permitted, allowed, caused, contributed to, and/or encouraged the NFL to continuing using Plaintiffs' photos without paying the requisite license fees or reporting such uses to Plaintiffs.

339.    Getty Images and AP directly contributed to the NFL's infringements, including by permitting unfettered access to Plaintiffs' works and intentionally not monitoring or tracking the NFL's activities.

340.    Despite their ability to do so, Getty Images and AP also failed to stop the NFL's infringements even after Plaintiffs brought the infringements to their attention.

341.    AP contributorily infringed Plaintiffs' copyright by explicitly permitting Replay Photos to sell Plaintiffs' works despite knowing that it did not have the authority to do so and knowing that Plaintiffs' would not and did not authorize such use.

342.    Getty Images' and AP's misconduct was willful, intentional, and/or reckless.

343.    Plaintiffs seek all damages recoverable under the Copyright Act, including statutory or actual damages, lost licensing fees, and Defendants' profits attributable to the infringements.

344.    Plaintiffs also seek all attorneys' fees and any other costs incurred in litigating this matter.


## COUNT VII:   BREACH OF CONTRACT
### AGAINST GETTY IMAGES & AP

345.    Plaintiffs repeat and re-allege each of the above allegations as if set forth fully herein.

346.    Getty Images and AP breached their contracts with Plaintiffs through the foregoing acts.

347.    Plaintiffs' contributor agreements with AP specifically provided that Plaintiffs' retained all copyrights in their photos, including the exclusive right to pursue claims for infringements.

348.     Section 4 of Plaintiffs' contributor agreements granted AP *prospective* rights to their photos.  As such, AP had no authority to grant the NFL a purported retroactive "license" intended to release Plaintiffs' copyright claims against the NFL.

349.     In exchange for these prospective rights, Section 5 of Plaintiffs' contributor agreements with Getty Images and AP required each agency to charge license fees to customers and then pay a percentage of that fee to Plaintiffs as a royalty.

350.     By permitting the NFL unfettered access to and complimentary use of Plaintiffs' works without any of the concomitant obligations to pay royalties or report sales to Plaintiffs, Getty Images and AP breached their obligations under their agreements with Plaintiffs.

351.     Section 2.3 of Plaintiffs' contributor agreements required that AP use "commercially reasonable efforts" to request NFL credentials on behalf of Plaintiffs.  By threatening to seek out other photographers that would be more amenable to the NFL's unfettered access, AP breached its obligation to Plaintiffs under this provision of the agreement, as well as the covenants of good faith and fair dealing.

352.     The AP Contributor Agreements also require that AP make periodic reports of all transactions pertaining to their photos.  Section 5.1 of the agreements between AP and Plaintiffs Stluka, Spinelli, Witte, and Jasienski require AP to make payment of all due royalties within 45 days of the end of each calendar month and to provide a statement of all licenses prior to that 45-day deadline.  AP breached this contractual obligation.  AP has repeatedly failed to make timely monthly reports and payments to Plaintiffs Stluka, Spinelli, Witte, and Jasienski, and has intentionally delayed these reports and payments during this litigation for punitive purposes.

353.    AP also breached this obligation by failing to report all transactions related to licenses involving Plaintiffs' photos, including by failing to report any licenses to Replay Photos and/or any sales made by Replay Photos.

354.    Even if the AP Contributor Agreements allowed AP the discretion to grant broad "sublicenses" to third parties for no consideration, which they did not, AP's decision to exercise that discretion by granting the NFL Defendants unfettered access to and use of Plaintiffs' entire photo archives without paying any royalties or compensation to Plaintiffs breached the implied covenants of good faith and fair dealing that exists under New York law and deprived Plaintiffs' of their reasonable expectations under the contracts.

355.    By sublicensing Plaintiffs' photos to NFL Defendants and Replay Photos with no royalty requirement, despite believing it lacked such authority and being put on notice of Plaintiffs' objection to such use, AP breached its obligations the AP Contributor Agreements as well as the covenants of good faith and fair dealing.

356.    From 2009 to 2012, AP undoubtedly was aware that the NFL Defendants were copying and using Plaintiffs' photos without a license and yet it failed to take any steps to stop the NFL's illegal conduct or to advise Plaintiffs of this fact.   The obligation to report such information is required by the implied covenant of good faith.

357.    Beginning in January of 2012, AP was aware that Plaintiffs were concerned about the NFL's unlicensed use of their photos and were intending to pursue copyright claims against the NFL.   In response to that information, AP chose to embark on a secret negotiation with the NFL that was intended to extinguish and deprive Plaintiffs of their rights to pursue such claims. In doing so, AP set itself at odds with plaintiffs' interests and used deceptive and false

representations to stall Plaintiffs from filing suit long enough to permit AP and the NFL to reach a final license agreement.

358.    Plaintiffs seek all damages recoverable against Getty Images and AP under their respective contracts and New York law.

## COUNT VIII:   BREACH OF FIDUCIARY DUTIES
## AGAINST GETTY IMAGES & ASSOCIATED PRESS

359.    Plaintiffs repeat and re-allege each of the above allegations as if set forth fully herein.

360.    Plaintiffs entered into contributor agreements with both Getty Images and AP for the express purpose of having these companies sell licenses related to Plaintiffs' photographs in order for Plaintiffs to earn royalty revenues.

361.    Getty Images routinely holds itself out as an agent for its contributing photographers, including by claiming to third parties that it is entitled to pursue and settle unlicensed uses, license violations, and other copyright infringements related to its contributors' photos.

362.    AP similarly held itself out as Plaintiffs' agents when it entered into the 2012 agreement with the NFL and purported to grant the NFL a retroactive license that would release the NFL from liability for prior unlicensed uses of Plaintiffs' photos.

363.    AP has repeated its claim that it is entitled to pursue and settle infringement claims on Plaintiffs' behalf in its filings in this action.

364.    By doing so, AP held itself out as Plaintiffs' agent and thus was required in such dealings to act as a fiduciary for Plaintiffs.

365.    To the extent that Getty Images and AP claim that they are entitled to bring and settle copyright claims on behalf of Plaintiffs or any other contributors, then Getty Images and AP must claim such authority as agents for the copyright owners.

366.    Getty Images and AP cannot simultaneously claim to have authority to act on behalf of copyright owners with respect to their exclusive rights under Section 501 of the Copyright Act and yet disclaim any agency obligations to deal with the copyright owners fairly and honestly and not to engage in undisclosed self-dealing.

367.    Although AP and Getty Images have gone to great lengths to artfully craft the language of their contributor agreements, the actual dealings between Getty Images and AP and Plaintiffs have all the indicia of a principal-agent relationship, or the functional equivalent thereto, and thus Getty Images and AP each owed certain fiduciary duties and responsibilities to Plaintiffs.

368.    Although Getty Images and AP included provision in the contributor agreements that they drafted disclaiming any agency relationship with Plaintiffs, these agency disclaimers are invalid, void, and enforceable due to numerous special circumstances.

369.    Special circumstances exist here because Getty Images and AP had actual possession and control over Plaintiffs' copyrighted photos.  Getty Images and AP also claim to have broad and nearly unchecked discretion to choose the terms and fees related to any licenses that they granted related to Plaintiffs' photos.  Indeed, AP contends that it is entitled, in its sole discretion, to grant retroactive and royalty-free and complimentary licenses to any third parties and does not have to report these licenses to Plaintiffs in any royalty statements or pay Plaintiffs any compensation for these licenses, even if AP itself benefits directly and tremendously as a

result of including Plaintiffs' photos in any such licenses, such as it did in the 2012 NFL-AP Agreement.

370.    Special circumstances exist here because Getty Images and AP are not required to, and did not, disclose the terms of licenses negotiated on behalf of Plaintiffs.  In fact, Getty Images and AP adamantly refused all requests to provide Plaintiffs copies of any licenses related to their photos absent a formal audit demand or legal process.  As such, Plaintiffs must rely entirely on the good faith of Getty Images and AP to negotiate these license agreements at arms-length on their behalf.   Such circumstances are inconsistent with an independent contractor relationship and require that the entity negotiating the license, particularly one armed with significant discretion to determine the terms and fees, be held to a higher standard.

371.    Special circumstances exist here because Getty Images and AP are not required to, and did not ever, disclose what benefits they received from including Plaintiffs' photos in any product offerings.  For instance, Getty Images included Plaintiffs' photos in its "Premium Access" product offerings which are bulk subscription pricing agreements with Getty Images' largest customers.  Getty Images paid Plaintiffs a reported percentage of the license fees collected from its customers, but it has refused to disclose the actual compensation terms of any of its Premium Access agreements to its contributors and it has not disclosed how it calculates the apportionment of license fees under such bulk contracts, including whether Getty Images retains any special commissions or royalties or other fees or whether it has arranged the payment apportionments to its own benefit at Plaintiffs' expense.  Similarly, AP has included Plaintiffs' photos in its 2012 NFL-AP license agreement but has not disclosed the financial compensation or other benefits that it has received under that agreement, and has redacted that information from the documents it has filed in this litigation.

372.   AP and Getty Images claim to have (or have had) broad discretion to negotiate licenses on Plaintiffs' behalf and yet refused to share the terms of these licenses with Plaintiffs or disclose what benefits or compensation they received under such agreements.  AP and Getty Images thus claim to have a high degree of dominance over Plaintiffs' copyrighted works, and certainly exercised de facto control over their copyrighted works.  These circumstances require voiding the agency disclaimer provisions.

373.   Special circumstances also exist here because Plaintiffs' transferred property to AP and Getty Images, in the form of their photo collections, which these companies held on Plaintiffs' behalf and over which they exercised discretionary and de facto control.

374.   Special circumstances also exist here because the AP Contributor Agreements purport to grant AP a perpetual and irrevocable and thus, even if Plaintiffs terminate their contracts, AP may attempt to continue to exercise significant control over Plaintiffs' copyrighted works.

375.   Special circumstances also exist here because the AP Contributor Agreements include an unspecified "sales commission" that AP has applied at the rate of 3% to all sales involving Plaintiffs' photos.  That AP contends that the AP Contributor Agreements permit it the discretion to choose the amount of this sales commission demands that AP be held to a higher standard in its dealings with Plaintiffs than would otherwise be required in an independent contractor relationship.

376.   The agency disclaimer provisions also must be rejected because both AP and Getty Images are sophisticated commercial entities with tremendous experience dealing with this precise legal issue, whereas Plaintiffs are individual photographers without sophisticated experience negotiating agency-waiver agreements.

377.   Getty Images and AP also failed to make a full disclosure of their own side dealings or the implications of this agency disclaimer during the parties' contract negotiations.

378.   In negotiating these agreements, Plaintiffs thus were forced to place their confidence in AP and Getty Images to deal with them fairly and honestly, which did not occur.

379.   Despite holding themselves out as Plaintiffs' agents and operating as such, Getty Images and AP failed to deal with Plaintiffs fairly and engaged in undisclosed self-dealing.

380.   Getty Images and AP breached their fiduciary obligations to Plaintiffs through the acts, omissions, and misconduct detailed herein.

381.   Getty Images and AP breached their fiduciary obligations by failing to track and monitor the NFL's use of their photos and failing to charge the NFL appropriate licensing fees for using Plaintiffs' photos.   AP also breached its fiduciary obligations by attempting or purporting to release or extinguish Plaintiffs' copyright claims against the NFL, particularly by doing so without any compensation for Plaintiffs.

382.   Even if AP had authority to negotiate a settlement of Plaintiffs' claims against the NFL, AP's own business dealings with the NFL created an intractable conflict of interest and thus AP should have refrained from exercising such authority or should have informed Plaintiffs of the conflict and included them in its negotiations with the NFL.

383.   Getty Images and AP also breached their fiduciary obligations by refusing Plaintiffs' repeated demand for information regarding which photos the NFL had downloaded from each agency's website and other systems.

384.   Getty Images and AP refused to provide this information to Plaintiffs in order to conceal their misconduct and protect the NFL Defendants.

385.    Plaintiffs seek all damages recoverable against Getty Images AP under New York and/or common law, including punitive damages.

**WHEREFORE,** Plaintiffs respectfully pray for judgment on their behalf and for the following relief:

1.      A judicial determination of the parties' rights as set forth herein;

2.      A preliminary and permanent injunction against the NFL Defendants and Replay Photos from copying, displaying, distributing, and/or selling Plaintiffs' works or any publications or other materials that include Plaintiffs' works, and requiring the NFL Defendants and Replay Photos to deliver to the Court for destruction or other appropriate disposition all relevant materials, including digital files of Plaintiffs' photographs and all copies of any infringing materials that included Plaintiffs' works that are in the control or possession or custody of the NFL Defendants or Replay Photos;

3.      From all NFL Defendants, Getty Images, and AP, all allowable damages under the Sherman Act, including treble damages and attorneys' fees and costs;

4.      From all Defendants, all allowable damages under the Copyright Act, including, but not limited to, statutory or actual damages, including damages incurred as a result of Plaintiffs' loss of licensing revenue and Defendants' profits attributable to the infringements of Plaintiffs' rights;

5.      All allowable damages caused by and/or resulting from Getty Images' and AP's breaches of contract and/or violations of their fiduciary obligations, including actual damages and punitive damages if available;

6.      All damages allowed under New York law and/or common law principles due to AP's fraud;

7.      Plaintiffs' full costs, including litigation expenses, expert witness fees, interest, and any other amounts authorized under law, and attorneys' fees incurred in pursuing and litigating this matter;

8.      Any other relief authorized by law, including statutory, punitive, and/or exemplary damages; and

9.      For such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMANDED**

Dated: August 17, 2015
        New York, New York.

Respectfully submitted,

NELSON & McCULLOCH LLP

By: _____

Danial A. Nelson (DN4940)
Kevin P. McCulloch (KM0530)
NELSON & McCULLOCH LLP
155 East 56th Street
New York, New York 10022
T: (212) 355-6050
F: (646) 308-1178
dan@nmiplaw.com
kevin@nmiplaw.com

*Attorneys for Plaintiffs*